1 | AARON C. GUNDZIK (Bar No. 132137)
2 | GARTENBERG GELFAND HAYTON & SELDEN LLP
3 | 801 South Figueroa Street, Suite 2170 Los Angeles, CA 90017
4 | Telephone: (213) 542-2100 Facsimile: (213) 542-2101
5 | Email: agundzik@gghslaw.com



Attorneys for Plaintiff ST. PAUL
6 | MERCURY INSURANCE COMPANY

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

   | **SOUTHERN DIVISION**
10

11 |                                              *SA* **CV13-01866** *MMM (RZx)*

12 | ST. PAUL MERCURY INSURANCE      Case No. _____
   | COMPANY,

13 |           Plaintiff,

14 |      vs.                                  **COMPLAINT FOR**
                                              **DECLARATORY JUDGMENT**
15 | MICHAEL S. HAHN, COLIN M.
   | FORKNER, MICHAEL V.
16 | CUMMINGS, RICHARD W.
   | GRINYER, STANLEY M. CRUSE,
17 | DAVID L. ADAMS, and the
   | FEDERAL DEPOSIT INSURANCE
18 | CORPORATION as receiver for
   | PACIFIC COAST NATIONAL BANK,
19
   |           Defendants.
20

21

22 |      Plaintiff St. Paul Mercury Insurance Company ("Travelers"), for its

23 | Complaint against Defendants Michael S. Hahn, Colin M. Forkner, Michael V.

24 | Cummings, Richard W. Grinyer, Stanley M. Cruse, and David L. Adams

25 | (collectively, the "D&O Defendants"), and the Federal Deposit Insurance

26 | Corporation (the "FDIC"), as receiver for Pacific Coast National Bank ("PCNB"),

27 | alleges as follows:

28

## NATURE OF THE ACTION

1.     In this action, Travelers seeks a declaratory judgment that a management liability policy (the "Policy") it issued to PCNB does not afford coverage for an underlying lawsuit brought by the FDIC, as PCNB's receiver, against the D&O Defendants alleging that, as PCNB directors and officers, they breached duties of care owed to PCNB in their oversight of loans issued by PCNB. The underlying lawsuit is captioned *Federal Deposit Insurance Corp. v. Michael S. Hahn, et al.*, No. SACV 12-01938 AG (MLGx) (C.D. Cal.) (the "PCNB Action"). Coverage under the Policy for the PCNB Action is barred for at least two reasons. First, the Policy's Unrepaid Loan Carve-Out, which precludes coverage for loss in the amount of unpaid, unrecoverable or outstanding loans, applies because amounts that the FDIC seeks to hold the D&O Defendants legally liable includes unpaid, unrecoverable or outstanding loans issued by PCNB.  Second, the Policy's Insured versus Insured Exclusion (the "IvI Exclusion"), which precludes coverage for any Claim "brought or maintained by or on behalf of" PCNB "in any capacity," applies to the PCNB Action where the FDIC, acting in its capacity as PCNB's receiver, asserts claims which belonged to PCNB prior to its closure.

## PARTIES

2.     Travelers is a Connecticut corporation with its principal place of business in Hartford, Connecticut.

3.     Upon information and belief, Defendant Michael S. Hahn previously served as Chief Operating Officer, Chief Executive Officer ("CEO"), Vice President, and a director of PCNB.

4.     Upon information and belief, Defendant Colin M. Forkner previously served as CEO and a director PCNB.

5.     Upon information and belief, Defendant Michael V. Cummings previously served as Chairman of the Directors Credit Committee and as a director of PCNB.

6.     Upon information and belief, Defendant Richard W. Grinyer previously served as a Chief Credit Officer ("CCO"), a director, and a loan officer of PCNB.

7.     Upon information and belief, Defendant Stanley M. Cruse previously served as CCO of PCNB.

8.     Upon information and belief, Defendant David L. Adams previously served as Executive Vice President, Real Estate Industries Group Manager, and CCO of PCNB.

9.     The FDIC is a corporation organized and existing under the laws of the United States of America, with its principal place of business in Washington, D.C. *See* 12 U.S.C. § 1819.  On information and belief, PCNB was an FDIC-insured bank headquartered in San Clemente, California (Orange County).  On November 13, 2009, the Office of the Comptroller of the Currency closed PCNB and appointed the FDIC as receiver for PCNB.  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC thereupon succeeded to all rights, titles, powers, and privileges of PCNB.  This action is brought against the FDIC in its capacity as receiver for PCNB.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over these claims pursuant to 12 U.S.C. § 1819(b)(2)(A) and 28 U.S.C. § 1331 because all suits to which the FDIC is a party are deemed to arise under the laws of the United States.

11.     Venue is proper in the Central District of California (and its Southern Division), pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action occurred in this District.

12.     Travelers brings this declaratory judgment action pursuant to 28 U.S.C. §§ 2201 and 2202.  An actual controversy within the meaning of 28 U.S.C. § 2201

exists between the parties regarding the existence of coverage under the Policy for the PCNB Action.

13.    Although Travelers is under no obligation to do so, Travelers also presented a proof of claim to the FDIC under its 12 U.S.C. § 1821(d) administrative claims process.  On or about August 27, 2013, Travelers presented its proof of claim requesting the FDIC's determination and agreement that the Policy does not afford coverage for the PCNB Action.  By letter dated October 1, 2013, the FDIC responded that it was disallowing Travelers' proof of claim.  This complaint is filed within 60 days of the FDIC's notice of disallowance.

## FACTUAL ALLEGATIONS

### The Policy

14.    Travelers issued SelectOne for Community Banks Policy No. EC06100102 (the aforementioned "Policy") to PCNB.  A true and correct copy of the Policy is attached hereto as Exhibit A.

15.    The Policy was effective for the claims-made Policy Period[1] from June 5, 2008 to May 5, 2009.  (Ex. A, Declarations, Policy Period).

16.    The Policy's Management Liability Insuring Agreement includes Directors and Officers Individual Coverage (the "D&O Coverage"), which provides:

> The Insurer shall pay on behalf of the Insured Persons Loss for which the Insured Persons are not indemnified by the Company and which the Insured Persons become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period . . . or, if exercised, the Additional Extended Discovery Period, for a Management Practices Act taking place before or during the Policy Period.

(Id., Management Liability Insuring Agreement ("MLIA"), D&O Coverage).

---

[1] Capitalized terms are defined in the Policy.

17.     The Policy's definition of an Insured includes Insured Persons which, in turn, includes Directors or Officers.   (*Id.*, General Terms, Conditions, and Limitations ("GTC&L"), Definitions).

18.     A Director or Officer means "any natural person who was, now is or shall be a duly elected or appointed director, officer, member of the board of managers, or management committee member of any Company . . . ." (*Id.*).

19.     Company is defined as PCNB. (*Id.*).

20.     The Policy's definition of a Claim includes "a civil proceeding against any Insured commenced by the service of a complaint or similar pleading." (*Id.*).

21.     A Management Practices Act is defined, in pertinent part, as "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any Insured Person in their capacity as such . . . ." (*Id.*).

22.     The D&O Coverage is subject to a $5 million Limit of Liability for all Loss on account of all Claims first made during the same Policy Year.   (*Id.*, Declarations, Limits of Liability; *id.*, GTC&L, Limits of Liability, Retentions and Coinsurance).

23.     The D&O Coverage also provides an additional $1 million in excess coverage for "Loss for which the Directors or Officers are not indemnified by the Company and which the Directors or Officers become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period . . . or, if exercised, the Additional Extended Discovery Period . . . ." (*Id.*, MLIA, Extensions).

24.     Defense Costs are part of, and not in addition to, the Limit of Liability under any Insuring Agreement and, therefore, reduce and may exhaust such limits. (*Id.*, GTC&L, Limits of Liability, Retentions and Coinsurance).

1        25.    The Policy provides that it is the duty of the Insureds and not the duty

2 of the Insurer to select counsel and defend any Claim covered under any applicable

3 Insuring Agreement.  (*Id.*, Declarations, Duty to Defend; *id.*, GTC&L, Defense and

4 Settlement; *id.*, MLIA, Duty to Defend Provision).

5        26.    The Policy further provides that "the Insurer shall advance, on behalf of

6 the Insureds, Defense Costs which the Insureds have incurred in connection with

7 Claims made against them, before the disposition of such Claims . . . ."  (*Id.*,

8 GTC&L, Defense and Settlement).

9        27.    The Policy's D&O Coverage extends only to Loss, as that term is

10 defined in the Policy.  (*Id.*, MLIA, D&O Coverage).

11       28.    The Policy's definition of Loss includes "Damages, judgments,

12 settlements and Defense Costs," but expressly excepts "any unrepaid, unrecoverable

13 or outstanding loan, lease or extension of credit to any Affiliated Person or

14 Borrower."  (*Id.*, GTC&L, Definitions).

15       29.    A Borrower is "any individual or entity that is not an Affiliated Person

16 and to which the Company extends, agrees to extend, or refuses to extend, a loan,

17 lease or extension of credit."  (*Id.*).

18       30.    The Policy's IvI Exclusion provides:

19 The Insurer shall not be liable for Loss [including Defense Costs] on
account of any Claim made against any Insured:

20

                              \* \* \*

21 4.    brought or maintained by or on behalf of any Insured or
Company [including PCNB] in any capacity, except:

22

23       (a)    a Claim that is a derivative action brought or maintained
on behalf of the Company by one or more persons who are

24               not Directors or Officers and who bring and maintain such
Claim without the solicitation, assistance or active

25               participation of any Director or Officer;

26       (b)    a Claim brought or maintained by a natural person who
was a Director or Officer, but who has not served as a

27               Director or Officer for at least six-years preceding the date
the Claim is first made, and who brings and maintains the

28               Claim without the solicitation, assistance or active

participation of any Director or Officer who is serving as a Director or Officer or was serving as a Director or Officer within such six-year period;

(c)   a Claim brought or maintained by or on behalf of any Insured Person for an Employment Practices Act;

(d)   a Claim brought or maintained by any Insured Person for contribution or indemnity, if the Claim results from another Claim covered under this Policy;

(e)   only with respect to any Fiduciary Liability Insuring Agreement made part of this Policy, a Claim brought or maintained by or on behalf of any Employee of the Company for any Fiduciary Act;

(f)   a Claim brought by an Insured Person solely in his or her capacity as a customer of the Company for a Trust Act or a Professional Services Act, provided that such Claim is instigated totally independent of, and totally without the solicitation, assistance, active participation, or intervention of, any other Insured; or

(g)   a Claim brought or maintained in a jurisdiction outside of the United States of America, Canada or Australia by an Insured Person of a Company incorporated or chartered in a jurisdiction outside of the United States of America, Canada or Australia.

(*Id.*, GTC&L, Exclusion 4.).

## The PCNB Action

31.   The FDIC filed its complaint (the "Complaint") in the PCNB Action on November 6, 2012.  A true and correct copy of the Complaint is attached hereto as Exhibit B.

32.   In the Complaint, the FDIC, as PCNB's receiver, seeks to recover civil damages from the D&O Defendants for their alleged breach of duties owed to PCNB prior to its closure.  The alleged errors and omissions include the D&O Defendants' purported failure to follow PCNB's policies and procedures in connection with certain loan transactions entered into by PCNB.

33.   The PCNB Action constitutes a "Claim" under the Policy.

34.    The Complaint describes eleven (11) specific loans to borrowers which allegedly resulted in over $7.5 million in losses to the bank.   The Complaint identifies the following alleged losses as a result of the loans:

| Borrower[2] | Alleged Loss |
|---|---|
| Borrower A | $   742,741.00 |
| Borrower B | $   434,875.00 |
| Borrower C | $   670,247.00 |
| Borrower D | $   559,110.00 |
| Borrower E | $ 1,203,000.00 |
| Borrower F | $ 1,444,381.00 |
| Borrower G | $   458,251.92 |
| Borrower H | $   708,230.00 |
| Borrower I | $   485,529.00 |
| Borrower J | $   468,710.00 |
| Borrower K | $   350,000.00 |
| | $ 7,525,074.92 |

(Ex. B, ¶¶ 43, 47, 51, 56, 62, 67, 73, 79, 84, 89, 94).

35.    The identified loan losses include the unpaid portion of the identified loans.

36.    The amounts that that the FDIC seeks to recover in the PCNB Action include unpaid portions of loans issued to PCNB Borrowers.

37.    On information and belief, the D&O Defendants deny any wrongdoing or liability for the PCNB Action.

## FIRST CLAIM FOR RELIEF

### Declaratory Judgment
### The Unpaid Loan Carve-Out Bars Coverage for the PCNB Action

38.    Travelers repeats and incorporates by reference the allegations in Paragraphs 1 through 37 above, as if fully set forth herein.

39.    The Policy only provides coverage for amounts that are covered Loss, as that term is defined in the Policy.

---

[2] Citing privacy concerns, the FDIC does not identify specific borrowers in the transactions described in the Complaint.

40.   Loss is defined to mean "the amount which the Insureds become legally obligated to pay on account of each Claim and for all Claims made against them during the Policy Period, . . . or, if exercised, the Additional Extended Discovery Period, for Wrongful Acts for which coverage applies, including Damages, judgments, settlements and Defense Costs."

41.   Pursuant to the Policy's Unrepaid Loan Carve-Out, covered Loss does not include "any unrepaid, unrecoverable or outstanding loan . . . or extension of credit to any . . . Borrower."

42.   Consequently, by substituting the definition of Loss into the Unrepaid Loan Carve-Out, the Unrepaid Loan Carve-Out effectively provides that: "the amount which the Insureds become legally obligated to pay on account of each Claim . . . including Damages, judgments, settlements and Defense Costs . . . does not include . . . any unrepaid, unrecoverable or outstanding loan, lease or extension of credit to any Affiliated Person or Borrower."

43.   In the PCNB Action, the FDIC seeks to recover amounts that include unrepaid, unrecoverable or outstanding loans to PCNB Borrowers.

44.   Amounts for which the FDIC seeks to hold the D&O Defendants legally liable include unrepaid, unrecoverable or outstanding loans to PCNB Borrowers.

45.   The Unrepaid Loan Carve-Out bars coverage for the FDIC's alleged damages in the PCNB Action consisting of unrepaid, unrecoverable or outstanding loans to PCNB Borrowers.

46.   Travelers therefore is entitled to a declaratory judgment that the Unrepaid Loan Carve-Out precludes coverage for the FDIC's claimed damages in the PCNB Action that consist of unrepaid, unrecoverable or outstanding loans to PCNB Borrowers.

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment
### The IvI Exclusion Bars Coverage for the PCNB Action

47.     Travelers repeats and incorporates by reference the allegations in Paragraphs 1 through 46 above, as if fully set forth herein.

48.     As described above, the Policy's IvI Exclusion bars coverage for any Claim "brought or maintained by or on behalf of any Insured or Company [including PCNB] in any capacity."

49.     The FDIC brings the PCNB Action as PCNB's receiver, alleging that the D&O Defendants breached duties owed to PCNB prior to its closure.

50.     The PCNB Action is a Claim brought or maintained by or on behalf of PCNB and none of the exceptions to the IvI Exclusion apply.

51.     Accordingly, the IvI Exclusion bars coverage under the Policy for the PCNB Action.

52.     Travelers therefore is entitled to a declaratory judgment that the Policy's IvI Exclusion precludes coverage under the Policy for the PCNB Action.

## THIRD CLAIM FOR RELIEF

### Reservation of Rights

53.     Travelers repeats and incorporates by reference the allegations in Paragraphs 1 through 52 above, as if fully set forth herein.

54.     Travelers has reserved all of its rights under the Policy and applicable law.  By seeking a declaratory judgment based on the foregoing provisions of the Policy, Travelers does not waive any potential coverage defenses pursuant to any of the Policy's other terms, conditions, and exclusions.  Developments in connection with this lawsuit may render additional defenses to coverage ripe for judicial determination.

## **PRAYER FOR RELIEF**

WHEREFORE, Travelers prays that this Court order, adjudge and decree the following relief:

A.    A judicial declaration that the Policy's Unrepaid Loan Carve-Out bars coverage for the FDIC's claimed damages consisting of unrepaid, unrecoverable or outstanding loans to PCNB Borrowers;

B.    A judicial declaration that the Policy's IvI Exclusion bars coverage for the PCNB Action;

C.    A judicial declaration that Travelers has no duty to advance defense costs or indemnify the D&O Defendants in response to the PCNB Action;

D.    A judicial declaration of the respective rights and obligations of Travelers and the D&O Defendants under the Policy with respect to the PCNB Action; and

E.    An Order awarding Travelers such additional relief as shall be found to be appropriate under the circumstances.

DATED: November 27, 2013      GARTENBERG GELFAND HAYTON & SELDEN LLP


By: _____
          Aaron C. Gundzik

          Attorneys for Plaintiff St. Paul Mercury
          Insurance Company

# EXHIBIT A

**POLICY COVER SHEET**

Job Name:  XP3310D9
File Number: O617O

Print Date and Time:  07/11/08   21:01

Business Center/
Original Business Unit:          FINANCIAL AND PROFESSIONAL SERVICES

Policy Number:                   EC06100102

Name of insured:                 PACIFIC COAST NATIONAL BANK

Agency Number:                   0429181

Department or Expense Center:    001

Underwriter:                     1306911      Underwriting Team:

Data Entry Person:               DAWSON,PAM

Date and Time:                   07/11/08   13:03   001
                                 **Special Instructions**



Policy Commencement Date: 06/05/08

THIS POLICY CONTAINS FORMS SELECTED THROUGH DOCUMENT SELECT

THE FOLLOWING SELECTED FORMS ARE NOT APPROVED ON THE FORMS STATUS TABLE

| | FORM NBR | EDITION | CO | STATE | TRANS DATE |
|---|---|---|---|---|---|
| * | CBIDF001 | 06.07 | 2 | CA | 2008-06-05* |
| * | CM083 | 01.08 | 2 | CA | 2008-06-05* |
| * | D0146 | 01.08 | 2 | CA | 2008-06-05* |
| * | MEL2401 | 04.05 | 2 | CA | 2008-06-05* |
| * | MEL4178 | 04.06 | 2 | CA | 2008-06-05* |
| * | MEL4374 | 04.06 | 2 | CA | 2008-06-05* |

*This is not a certified copy of any policy form. * Actual policy provisions may differ. *

**DELIVERY INVOICE**                                                          The **St Paul**

06/05/2008

---

**Company:**  ST. PAUL MERCURY INSURANCE COMPANY

---

| I PACIFIC COAST NATIONAL BANK | Policy Inception/Effective Date: 06/05/08 |
| N 905 CALLE AMANECER | Agency Number: 0429181 |
| S SAN CLEMENTE CA 92673 | |
| U | Transaction Type: |
| R | RENEWAL |
| E | Transaction number: |
| D | Processing date: 07/11/2008 |
| | Policy Number: EC06100102 |

A 0429181
G FINANCIAL GUARANTY INS BROKERS INC
E 709 EAST COLORADO BLVD SUITE 230
N PASADENA CA 91101
T

---

| Policy Number | Description | Amount | Surtax/ Surcharge |
|---|---|---|---|
| EC06100102 | SELECT ONE FOR FINANCIAL INSTITUTIONS EFFECTIVE 06/05/2008 TO 05/05/2009 | $28,645 | |

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

---

40724 Ed.12-90 Printed in U.S.A.          INSURED COPY                     Page 1

**The St.Paul**

*\* This is not a certified copy of any policy form. \* Actual policy provisions may differ. \**

# POLICY DISCLOSURE NOTICE -
# TERRORISM RISK INSURANCE ACT 2002

On December 26, 2007, the President of the United States signed into law amendments to the Terrorism Risk Insurance Act of 2002 (the "Act"), which, among other things, extend the Act and expand its scope.  The Act establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in the Act) caused by "acts of terrorism".  An "act of terrorism" is defined in Section 102(l) of the Act to mean any act that is certified by the Secretary of the Treasury - in concurrence with the Secretary of State and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for Insured Losses is 85% of the amount of Insured Losses in excess of each Insurer's statutorily established deductible, subject to the "Program Trigger", (as defined in the Act).  In no event, however, will the Federal Government or any Insurer be required to pay any portion of the amount of aggregate Insured Losses occurring in any one year that exceeds $100,000,000,000, provided that such Insurer has met its deductible.  If aggregate Insured Losses exceed $100,000,000,000 in any one year, your coverage may therefore be reduced.

Please note that no separate additional premium charge has been made for the terrorism coverage required by the Act.  The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium, and does not include any charge for the portion of losses covered by the Federal Government under the Act.  The charge is no more than one percent of your premium.

*This is not a certified copy of any policy form. * Actual policy provisions may differ. *

| | | |
|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 |

D0146 Ed. 1-08                                                                                                Page 1 of 1
© 2008 The Travelers Companies, Inc.            Exhibit A, Page 000015

# IMPORTANT NOTICE – INDEPENDENT AGENT AND BROKER COMPENSATION

**NO COVERAGE IS PROVIDED BY THIS NOTICE. THIS NOTICE DOES NOT AMEND ANY PROVISION OF YOUR POLICY. YOU SHOULD REVIEW YOUR ENTIRE POLICY CAREFULLY FOR COMPLETE INFORMATION ON THE COVERAGES PROVIDED AND TO DETERMINE YOUR RIGHTS AND DUTIES UNDER YOUR POLICY. PLEASE CONTACT YOUR AGENT OR BROKER IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE OR ITS CONTENTS. IF THERE IS ANY CONFLICT BETWEEN YOUR POLICY AND THIS NOTICE, THE PROVISIONS OF YOUR POLICY PREVAIL.**

For information about how Travelers compensates independent agents and brokers, please visit www.travelers.com, call our toll-free telephone number, 1-866-904-8348, or you may request a written copy from Marketing at One Tower Square, 2GSA, Hartford, CT 06183.

*\* This is not a certified copy of any policy form. \* Actual policy provisions may differ. \**

CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

It is agreed that:

1. The following section is added to the General Terms, Conditions and Limitations:

   **Cap on Losses From Certified Acts of Terrorism**

   If aggregate insured losses attributable to Certified Acts of Terrorism exceed $100 billion in a program year (January 1 through December 31) and the Insurer has met the deductible under the Terrorism Risk Insurance Act:

   (a) the Insurer will not be responsible for the payment of any portion of the amount of such losses that exceeds $100 billion; and

   (b) insured losses up to $100 billion will be subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

   The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under any Insuring Agreement or this Policy.

2. The following is added to the Definitions section of the General Terms, Conditions and Limitations:

   **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a Certified Act of Terrorism include the following:

   (a) the act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   (b) the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms remain the same.

| | | | |
|---|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 | |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 | |

**CALIFORNIA PREMIUM ENDORSEMENT**

The St.Paul

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

1. This endorsement is issued to comply with the ruling of the Commissioner of Insurance of California and the opinion of the Attorney General of that State requiring that the premium paid for all bonds or policies be endorsed thereon.

2. The ☒ Premium
   ☐ Additional Premium
   ☐ Return Premium for the period

   from 06/05/2008 to 05/05/2009 is $28,645

3. If the premium is payable in installments they are, or are amended to read as follows:

   Payable on

   Payable on

   Payable on

   All other terms of your policy remain the same.

| | |
|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 |

CM005 Ed. 4-02 Printed in U.S.A.
®St.Paul Fire and Marine Insurance Co. 2002 All Rights Reserved

Endorsement

Page 1 of 1

Exhibit A, Page 000018

SelectOne[SM]
for Community Banks


**TRAVELERS**

# POLICY DECLARATIONS

**IMPORTANT NOTE:** **THIS IS CLAIMS MADE COVERAGE.** **PLEASE READ THIS POLICY CAREFULLY.** **This policy is written on a claims made basis and covers only Claims first made during the Policy Period, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period.** **The Limit of Liability available to pay judgments or settlements shall be reduced and may be exhausted by amounts incurred as Defense Costs.** **The Retentions shall apply to Defense Costs.**

**Company and Address:**
Pacific Coast National Bank
905 Calle Amanecer

San Clemente, CA 92673

**Policy Number:** EC06100102

**Prior Policy Number:** EC00600011

Coverage is effective only for Insuring Agreements made part of this Policy and for which an Each Insuring Agreement Limit of Liability is set forth below. Insuring Agreements are subject to the Policy Year Total Limit of Liability only if the box is checked "Yes" next to such Insuring Agreement below. Additional Coverages and Additional Insureds under each such Insuring Agreement are effective only if the box is checked "Yes" next to such Coverage or Additional Insureds below. The selection of Duty of the Insureds to Defend or Duty of the Insurer to Defend under each such Insuring Agreement is set forth by the "X" in the box next to such Duty to Defend below.

## LIMITS OF LIABILITY

**EACH INSURING AGREEMENT LIMIT OF LIABILITY:**

**Management Liability Insuring Agreement:** $5,000,000 Each Policy Year

| | | |
|---|---|---|
| Directors and Officers Individual Coverage | Yes ☒ No ☐ | |
| Company Indemnification Coverage | Yes ☒ No ☐ | |
| Company Liability Coverage | Yes ☒ No ☐ | |
| Investigative Costs Coverage | Yes ☒ No ☐ | |

**Employment Practices Liability Insuring Agreement:** $1,000,000 Each Policy Year

**Fiduciary Liability Insuring Agreement:** $1,000,000 Each Policy Year
Voluntary Compliance Program Coverage Yes ☐ No ☒

**Trust Liability Insuring Agreement:** $ Each Policy Year

**Bankers Professional Liability Insuring Agreement:** $1,000,000 Each Policy Year
Lender Liability Coverage Yes ☒ No ☐ $1,000,000 Each Policy Year
Professional Services Liability Coverage Yes ☒ No ☐ $1,000,000 Each Policy Year

*Note: The Limits of Liability for Lender Liability Coverage and Professional Services Liability Coverage are part of and not in addition to the Limit of Liability for the Bankers Professional Liability Insuring Agreement.*

**POLICY YEAR TOTAL LIMIT OF LIABILITY:** $5,000,000 **Each Policy Year**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

Exhibit A, Page 000019

**INSURING AGREEMENTS SUBJECT TO POLICY YEAR TOTAL LIMIT OF LIABILITY:**

| | | |
|---|---|---|
| Management Liability Insuring Agreement: | Yes ☒ | No ☐ |
| Employment Practices Liability Insuring Agreement: | Yes ☐ | No ☒ |
| Fiduciary Liability Insuring Agreement: | Yes ☒ | No ☐ |
| Trust Liability Insuring Agreement: | Yes ☐ | No ☐ |
| Bankers Professional Liability Insuring Agreement: | Yes ☒ | No ☐ |

*Note: The Policy Year Total Limit of Liability is the maximum amount payable by the Insurer for all Loss on account of all Claims made against the Insureds during the same Policy Year under all Insuring Agreements, combined, that are subject to the Policy Year Total Limit of Liability.*

**POLICY PERIOD** From 12:01 A.M. 06/05/2008 To 12:01 A.M. 05/05/2009 Local Time at the address of the Company

**RETENTIONS**

Management Liability Insuring Agreement:

| | | |
|---|---|---|
| Company Indemnification Coverage | $75,000 | each Claim |
| Company Liability Coverage | $75,000 | each Claim |
| | | |
| Employment Practices Liability Insuring Agreement: | $25,000 | each Claim |
| Fiduciary Liability Insuring Agreement: | $5,000 | each Claim |
| Trust Liability Insuring Agreement: | $ | each Claim |

Bankers Professional Liability Insuring Agreement:

| | | |
|---|---|---|
| Lender Liability Coverage | $75,000 | each Claim |
| Professional Services Liability Coverage | $75,000 | each Claim |

**COINSURANCE PERCENT APPLICABLE TO EACH INSURING AGREEMENT**

Management Liability Insuring Agreement:

| | |
|---|---|
| Company Indemnification Coverage and Company Liability Coverage | 0.0 % |
| Employment Practices Liability Insuring Agreement: | 0.0 % |
| Fiduciary Liability Insuring Agreement: | 0.0 % |
| Trust Liability Insuring Agreement: | 0.0 % |

Bankers Professional Liability Insuring Agreement:

| | |
|---|---|
| Lender Liability Coverage | % |
| Professional Services Liability Coverage | 0.0 % |

**DUTY TO DEFEND**

| | |
|---|---|
| Management Liability Insuring Agreement: | ☒ Duty of the Insureds To Defend |
| | ☐ Duty of the Insurer To Defend |
| Employment Practices Liability Insuring Agreement: | ☒ Duty of the Insureds To Defend |
| | ☐ Duty of the Insurer To Defend |
| Fiduciary Liability Insuring Agreement: | ☒ Duty of the Insureds To Defend |
| | ☐ Duty of the Insurer To Defend |

*\* This is not a certified copy of any policy form. \* Actual policy provisions may differ. \**

**Trust Liability Insuring Agreement:**
- ☐ Duty of the Insureds To Defend
- ☐ Duty of the Insurer To Defend

**Bankers Professional Liability Insuring Agreement:**
- ☒ Duty of the Insureds To Defend
- ☐ Duty of the Insurer To Defend

## ADDITIONAL INSUREDS

**Management Liability Insuring Agreement:**

| | Yes | No |
|---|---|---|
| Employees | ☒ | ☐ |
| Leased Employees | ☒ | ☐ |

**Employment Practices Liability Insuring Agreement:**

| | Yes | No |
|---|---|---|
| Employees | ☒ | ☐ |
| Leased Employees | ☒ | ☐ |
| Independent Contractors | ☒ | ☐ |

**Fiduciary Liability Insuring Agreement:**

| | Yes | No |
|---|---|---|
| Employees | ☒ | ☐ |
| Leased Employees | ☒ | ☐ |

**Trust Liability Insuring Agreement:**

| | Yes | No |
|---|---|---|
| Leased Employees | ☐ | ☐ |

**Bankers Professional Liability Insuring Agreement:**

| | Yes | No |
|---|---|---|
| Leased Employees | ☒ | ☐ |

## ADDITIONAL EXTENDED DISCOVERY PERIOD

| | |
|---|---|
| Additional Premium | 150% |
| Additional Period | 12 Months |

## PRIOR LITIGATION DATE

**Management Liability Insuring Agreement:**

| | |
|---|---|
| Directors and Officers Individual Coverage Prior Litigation Date | 11/04/2004 |
| Company Indemnification Coverage Prior Litigation Date | 11/04/2004 |
| Company Liability Coverage Prior Litigation Date | 11/04/2004 |

**Employment Practices Liability Insuring Agreement Prior Litigation Date:**   11/04/2004

**Fiduciary Liability Insuring Agreement Prior Litigation Date:**   06/05/2008

**Trust Liability Insuring Agreement Prior Litigation Date:**

**Bankers Professional Liability Insuring Agreement:**

| | |
|---|---|
| Lender Liability Coverage Prior Litigation Date | 11/04/2004 |
| Professional Services Liability Coverage Prior Litigation Date | 06/05/2008 |

*\* This is not a certified copy of any policy form. \* Actual policy provisions may differ. \**

## ENDORSEMENTS EFFECTIVE AT INCEPTION

CB044 Ed.10-02,CB101 Ed.10-02, CB108 Rev.10-05, CB201 Rev.10-05, CM005 Ed.04-02,
MEL2401 Ed.04-05, MEL4178 Ed.04-06, MEL4374 Ed.04-06, MEL4747 Ed.11-06

*This is not a certified copy of any policy form. * Actual policy provisions may differ. *

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Secretary and
countersigned by a duly authorized representative of the Insurer.

**Countersigned:**                                    **ST. PAUL MERCURY INSURANCE COMPANY**

_____
Authorized Representative                            *President*          *Secretary*

_____     _____
Countersignature Date                Countersigned At

CB001 Ed. 10-02                      Page 4 of 4
© 2002 The Travelers Companies, Inc.  Exhibit A, Page 000022
                                     INSURED

The**StPaul**
**St. Paul Mercury Insurance Company**
A Stock Company

**St. Paul SelectOne**[SM]
**for Community Banks**

**IMPORTANT NOTE:   This is only an informational summary and does not form a part of your insurance coverage or policies.   Please refer to each of the policy declarations for coverage information.   Please read each of your policies carefully.**

**Your SelectOne** [SM] **for Community Banks includes the following:**

Yes ☒   No ☐   Management Liability Insuring Agreement

Yes ☒   No ☐   Employment Practices Liability Insuring Agreement

Yes ☒   No ☐   Fiduciary Liability Insuring Agreement

Yes ☐   No ☒   Trust Liability Insuring Agreement

Yes ☒   No ☐   Bankers Professional Liability Insuring Agreement

Yes ☐   No ☒   Kidnap And Ransom Policy

Yes ☐   No ☒   Financial Institution Bond

*\* This is not a certified copy of any policy form. \* Actual policy provisions may differ. \**

CB000 Rev. 10-03 Printed in U.S.A
© St.Paul Fire and Marine Insurance 2003 All Rights Reserved

Exhibit A, Page 00 023

INSURED

Travelers SelectOne ℠ for Community Banks

**IDENTITY FRAUD EXPENSE REIMBURSEMENT INSURING AGREEMENT**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

The following is added to the IMPORTANT NOTE on the Declarations of this Policy:

The Identity Fraud Expense Reimbursement Insuring Agreement made part of this Policy is not claims made coverage. With respect to such agreement, this Policy covers only Identity Fraud Expenses incurred by any Insured Person as a direct result of any Identity Fraud Discovered during the Policy Period.

The following is added to the **LIMITS OF LIABILITY** section of the Declarations of this Policy:

*Coverage is effective for the Identity Fraud Expense Reimbursement Insuring Agreement made part of this Policy only if an Each Insuring Agreement Limit of Insurance for the Identity Fraud Expense Reimbursement Insuring Agreement is set forth below.*

**LIMIT OF INSURANCE**

**EACH INSURING AGREEMENT LIMIT OF INSURANCE:**

**Identity Fraud Expense Reimbursement Insuring Agreement:**

$25,000        Each Insured Person for each Identity Fraud

*Note: The Each Insuring Agreement Limit of Insurance for the Identity Fraud Expense Reimbursement Insuring Agreement is the maximum amount payable by the Insurer for all Identity Fraud Expenses incurred by each Insured Person as a direct result of each Identity Fraud. The Each Insuring Agreement Limit of Insurance for the Identity Fraud Expense Reimbursement Insuring Agreement is not subject to the Policy Year Total Limit of Liability.*

The following is added to the **RETENTIONS** section of the Declarations of this Policy:

**Identity Fraud Expense Reimbursement Insuring Agreement:**

$0        Each Insured Person for each Identity Fraud

The following is added to the **ADDITIONAL INSUREDS** section of the Declarations of this Policy:

**Identity Fraud Expense Reimbursement Insuring Agreement:**
Additional Insured Persons:

| Name of Insured | Policy Number EC06100102 | Effective Date 06/05/08 |
|---|---|---|
| PACIFIC COAST NATIONAL BANK | | Processing Date 07/11/08   13:03   001 |

CBIDF001 Ed. 6-07
© 2007 The Travelers Companies, Inc.

Exhibit A, Page 000024      Insuring Agreement

Page 1 of 7

In consideration of payment of the premium and in reliance upon the statements made in the Application, which are made a part hereof and deemed attached hereto, and subject to the Declarations, the General Terms, Conditions and Limitations of this Identity Fraud Expense Reimbursement Insuring Agreement, and the limitations, conditions, provisions and other terms of this Identity Fraud Expense Reimbursement Insuring Agreement, the Insurer, the Company and the Insured Persons agree as follows:

**Identity Fraud Expense Reimbursement Coverage**

The Insurer shall reimburse any Insured Person for Identity Fraud Expenses incurred by such Insured Person as a direct result of any Identity Fraud Discovered during the Policy Period.

It is understood and agreed that only with respect to this Identity Fraud Expense Reimbursement Insuring Agreement, the following replaces the General Terms, Conditions and Limitations of this Policy:

## GENERAL TERMS, CONDITIONS AND LIMITATIONS

### Definitions

When used in this Identity Fraud Expense Reimbursement Insuring Agreement, either in the singular or the plural, the following terms have the following meanings:

**Application** means all signed applications, including attachments and materials submitted therewith, for this Policy or for any policy of which this Policy is a direct or indirect renewal or replacement. All such applications, attachments and materials are deemed attached to and incorporated into this Policy.

**Company** means any entity named in the Declarations and its Subsidiaries.

**Director or Officer** means:

(a) any natural person who is a duly elected or appointed director, officer, member of the board of managers, or management committee member of any Company incorporated or chartered in the United States of America;

(b) with respect to any Non-Profit Entity that is a Subsidiary, any natural person who is a duly elected or appointed director, officer or trustee of any such Subsidiary incorporated or chartered in the United States of America; or

(c) with respect to a Company incorporated or chartered outside the United States of America, any natural person who is in a position that is the functional equivalent of any duly elected or appointed director or officer of any Company.

**Discovered, Discovery or Discovers** means the moment when the Insured Person first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered under this Identity Fraud Expense Reimbursement Insuring Agreement has been or will be incurred, even though the exact details of loss may not then be known.

**Employee** means any natural person, other than a Leased Employee or Independent Contractor, who is an employee of the Company and who is not a Director or Officer, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal or temporary employee.

**Identity Fraud** means the act of knowingly transferring or using, without lawful authority, a means of identification of any Insured Person with the intent to commit, aid or abet any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

**Identity Fraud Expenses** means:

(a) costs for notarizing fraud affidavits or similar documents for credit agencies, financial institutions, merchants or other credit grantors that have required that such affidavits be notarized;

(b) costs for certified mail to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors;

(c) costs for long distance telephone calls to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors to report or discuss any actual Identity Fraud;

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

© 2007 The Travelers Companies, Inc.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

(d) lost wages, up to a maximum payment of one thousand dollars ($1,000) per week for a maximum period of five (5) weeks, as a result of absence from employment:

(i) to communicate with law enforcement agencies, legal counsel, credit agencies, financial institutions, merchants or other credit grantors;

(ii) to complete fraud affidavits or similar documents; or

(iii) due to wrongful incarceration arising solely from someone having committed a crime in an Insured Person's name; provided, that lost wages shall not apply in the case of wrongful incarceration absent all charges being dismissed or an acquittal;

(e) loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;

(f) reasonable attorney fees incurred, with the Insurer's prior written consent, for:

(i) defense of lawsuits brought against the Insured Person by financial institutions, merchants, other credit grantors or their collection agencies;

(ii) the removal of any criminal or civil judgments wrongly entered against an Insured Person; or

(iii) challenging the accuracy or completeness of any information in a consumer credit report; and

(g) costs for daycare and eldercare incurred solely as a direct result of any Identity Fraud Discovered during the Policy Period.

**Independent Contractor** means a natural person, other than a Director, Officer, Employee or Leased Employee, who renders service to the Company in the course of independent employment pursuant to a contract for specified services.

**Insured** means the Insured Persons.

**Insured Persons** means:

(a) Directors or Officers;

(b) Employees;

(c) any natural person who is specifically scheduled as an Additional Insured Person under the Identity Fraud Expense Reimbursement Insuring Agreement in the Additional Insureds section of the Declarations;

(d) any natural person who is the lawful spouse, or person qualifying as a domestic partner under the provisions of any applicable federal, state or local law, of any person described in subparts (a), (b) or (c) above;

(e) any natural person who is a child of any Insured Person described in subparts (a), (b), (c) or (d) above and is:

(i) under the age of eighteen (18) years of age; and

(ii) a resident of the same household of such Insured Person; and

(f) any natural person who is a parent of any Insured Person described in subparts (a), (b), (c) or (d) above and is a resident of the same household of such Insured Person.

**Leased Employee** means a natural person, other than a Director or Officer, Employee or Independent Contractor, who is leased to the Company to perform work for the Company and for whom the Company controls the means and manner of the work performed.

**Non-Profit Entity** means any non-profit corporation, community chest, fund or foundation that is exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

**Parent Company** means the Company first named in the Declarations.

**Policy** means the Declarations, General Terms, Conditions and Limitations, each Insuring Agreement, any endorsements hereto, and the Application.

**Policy Period** means the period of time set forth in the Declarations, subject to prior termination in accordance with the Termination of Coverage section.

**Subsidiary** means:

(a) any entity in which more than 50% of the outstanding voting securities representing the present right to vote for election of directors is owned,

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

directly or indirectly, in any combination, by one or more Companies;

(b) any Non-Profit Entity or political action committee in which the right to elect or otherwise appoint more than 50% of such entity's directors or trustees, or political action committee's members, is owned, or controlled, directly or indirectly, in any combination, by one or more Companies;

(c) any limited liability company in which the right to elect or otherwise appoint or designate more than 50% of such limited liability company's managers is owned or controlled, directly or indirectly, in any combination, by one or more Companies; or

(d) any joint venture in which the right to elect or otherwise appoint more than 50% of such entity's directors, trustees or other equivalent executives is owned or controlled, directly or indirectly, in any combination, by one or more Companies.

## Exclusions

This Identity Fraud Expense Reimbursement Insuring Agreement shall not apply to, and the Insurer shall have no obligation to reimburse Identity Fraud Expenses for:

1. loss due to any fraudulent, dishonest, or criminal act by the Insured Person who is seeking reimbursement of Identity Fraud Expenses under this Identity Fraud Expense Reimbursement Insuring Agreement or by any person acting in collusion with such Insured Person;

2. an Identity Fraud Discovered during such time that an individual was not an Insured Person;

3. loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped power; government intervention, expropriation or nationalization; or any act or condition related to any of the foregoing; or

4. loss resulting directly or indirectly from nuclear reaction, nuclear radiation, radioactive contamination, biological or chemical contamination or any related act or incident.

## Limit of Insurance and Retention

For the purpose of this Identity Fraud Expense Reimbursement Insuring Agreement, all acts incidental to an Identity Fraud, any series of related Identity Frauds, and all Identity Frauds arising from the same method of operation or a common scheme or plan, whether committed by one or more persons, shall be deemed to arise out of one act and shall be treated as one Identity Fraud.

## Limit of Insurance

The Insurer's maximum liability for all Identity Fraud Expenses incurred by each Insured Person for each Identity Fraud Discovered during the Policy Period shall be the Identity Fraud Expense Reimbursement Insuring Agreement Limit of Insurance set forth in the Declarations under the Each Insuring Agreement Limit of Insurance section. If an act causes a covered loss to more than one Insured Person, the Each Insuring Agreement Limit of Insurance for the Identity Fraud Expense Reimbursement Insuring Agreement shall apply to each such Insured Person separately.

## Retentions

The Insurer's liability with respect to Identity Fraud Expenses arising from each Identity Fraud for each Insured Person shall apply only to that part of Identity Fraud Expenses which are in excess of the Retention set forth in the Declarations under the Retentions section, and such Retention shall be borne by the Insured Person uninsured and at their own risk.

If an act causes a covered loss to more than one Insured Person, the Retention for the Identity Fraud Expense Reimbursement Insuring Agreement shall apply to each such Insured Person separately and there shall be no aggregate Retention.

## Period To Report Discovered Loss

This Identity Fraud Expense Reimbursement Insuring Agreement applies only to Identity Fraud that is Discovered during the Policy Period and reported to the Insurer during the Policy Period or within thirty days thereafter.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

## Insured Person's Duties In The Event Of Loss

Upon knowledge or Discovery of a loss or occurrence that may give rise to a claim under this Identity Fraud Expense Reimbursement Insuring Agreement, the Insured Person shall:

1. give the Insurer written notice thereof as soon as practicable, but in no event later than thirty days after the expiration of the Policy Period;

2. keep books, receipts, bills and other records in such manner that the Insurer can accurately determine the amount of any loss;

3. file a detailed proof of loss, duly sworn to, with the Insurer within four (4) months after the Discovery of such loss;

4. notify law enforcement authorities;

5. at the request of the Insurer, submit to examination under oath and give the Insurer a signed statement of the answers;

6. at the request of the Insurer, produce for the Insurer's examination all pertinent books, receipts, bills, and other records, at such reasonable time and places as the Insurer shall designate; and

7. cooperate with the Insurer in all matters pertaining to loss or claims with respect thereto.

Compliance with all terms and conditions of this Identity Fraud Expense Reimbursement Insuring Agreement is a condition precedent to recovery under this Identity Fraud Expense Reimbursement Insuring Agreement.

## Other Insurance

This Identity Fraud Expense Reimbursement Insuring Agreement shall apply only as excess insurance over, and shall not contribute with any other valid and collectible insurance available to the Insured Person. As excess insurance, this Identity Fraud Expense Reimbursement Insuring Agreement will not apply or contribute to the payment of loss or Identity Fraud Expenses until the amount of such other insurance or indemnity has been exhausted by payment of loss or Identity Fraud Expenses covered thereunder. If the limit of the other insurance or indemnity is

insufficient to cover the entire amount of loss or Identity Fraud Expenses, this Identity Fraud Expense Reimbursement Insuring Agreement will apply to that part of Identity Fraud Expenses not recoverable or recovered under the other insurance or indemnity. This Identity Fraud Expense Reimbursement Insuring Agreement will not be subject to the terms of any other insurance.

## Changes in Exposure

### Acquisition or Creation of Another Entity

If during the Policy Period the Company:

   (a) acquires securities in another entity or creates another entity, which as a result of such acquisition or creation becomes a Subsidiary; or

   (b) acquires any entity by merger into or consolidation with the Company;

this Identity Fraud Expense Reimbursement Insuring Agreement will provide coverage to the Insured Persons of such entity as follows:

If the fair value of all cash, securities, assumed indebtedness and other consideration paid by the Company for any such creation or acquisition is less than 25% of the total assets of all the Companies, as reflected in the Parent Company's most recent financial statements as of the inception of the Policy Period, such Insured Persons shall automatically be covered under this Identity Fraud Expense Reimbursement Insuring Agreement, but only with respect to Identity Fraud Discovered after such creation or acquisition.

With respect to all other creations or acquisitions described in subparts (a) or (b) above, such Insured Persons shall automatically be covered under this Identity Fraud Expense Reimbursement Insuring Agreement, but only for ninety (90) days or the remainder of the Policy Period, whichever is less, following the effective date of such creation or acquisition, ("Automatic Coverage Period") and only with respect to Identity Fraud Discovered after such creation or acquisition.  As a condition precedent to further coverage with respect to such Insured Persons after the Automatic Coverage Period, the Parent Company shall give written notice of such creation or acquisition to the Insurer as soon as practicable, but in no event later than forty-five (45) days following the effective date

of such creation or acquisition, and shall thereafter promptly provide to the Insurer such information as the Insurer may request. Upon receipt of such notice and other information, the Insurer shall promptly provide to the Parent Company a quotation for coverage under this Identity Fraud Expense Reimbursement Insuring Agreement for such Insured Persons for the remainder of the Policy Period. If the Parent Company fails to comply with such condition precedent, or if within thirty (30) days following receipt of such quotation the Parent Company fails to pay any additional premium or fails to agree to any additional coverage terms and conditions as set forth in such quotation, coverage otherwise afforded by this subsection for such Insured Persons shall terminate upon expiration of the Automatic Coverage Period.

## Acquisition of Parent Company

If during the Policy Period:

(a) the Parent Company merges into or consolidates with another entity and the Parent Company is not the surviving entity; or

(b) another entity or person, or a group of entities or persons acting in concert, acquires the right to elect or otherwise appoint more than 50% of the directors, or members of the board of managers of the Parent Company,

coverage under this Identity Fraud Expense Reimbursement Insuring Agreement shall terminate as of the effective date of such merger, consolidation or acquisition.

The Parent Company shall give written notice of such merger, consolidation or acquisition to the Insurer as soon as practicable together with such information as the Insurer may request.

## Cessation of Subsidiaries

If during the Policy Period an entity ceases to be a Subsidiary, coverage under this Identity Fraud Expense Reimbursement Insuring Agreement for the Insured Persons of such Subsidiary shall terminate as of the date such entity ceased to be a Subsidiary.

## Territory and Valuation

All premiums, limits, retentions, Identity Fraud Expense and other amounts under this Identity Fraud Expense Reimbursement Insuring Agreement are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of Identity Fraud Expenses under this Identity Fraud Expense Reimbursement Insuring Agreement is stated in a currency other than United States of America dollars, payment under this Identity Fraud Expense Reimbursement Insuring Agreement shall be made in United States of America dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the payment of other element of Identity Fraud Expenses is due, respectively.

Coverage under this Identity Fraud Expense Reimbursement Insuring Agreement shall extend to Identity Fraud occurring anywhere in the world.

## Termination of Coverage

This Identity Fraud Expense Reimbursement Insuring Agreement shall terminate at the earliest of the following times:

(a) the effective date of termination specified in a prior written notice by the Parent Company to the Insurer;

(b) upon expiration of the Policy Period as set forth in the Declarations;

(c) ten (10) days after receipt by the Parent Company of a written notice of termination of this Policy from the Insurer for failure to pay a premium when due, unless the premium is paid within ten (10) day period;

(d) the effective date of the Parent Company merger, consolidation or acquisition as described in the Acquisition of Parent Company subsection of the Changes in Exposure section; or

(e) at such other time as may be agreed upon by the Insurer and the Parent Company.

The Insurer may not terminate this Identity Fraud Expense Reimbursement Insuring Agreement before expiration of the Policy Period, except as provided above for non-payment of a premium. The Insurer shall refund the unearned premium computed at customary short rates if this Identity Fraud Expense Reimbursement Insuring Agreement is terminated by the Parent Company. Under any other circumstances, the refund

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

*This is not a certified copy of any policy form. * Actual policy provisions may differ. *

shall be computed pro rata. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

## Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the Insureds' rights of recovery, including the Insured Persons' rights to indemnification or advancement from the Company. The Insureds shall execute all papers required and shall do everything necessary to secure and preserve all rights of recovery, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the Insureds.

## Recoveries

All recoveries for payments made under this Identity Fraud Expense Reimbursement Insuring Agreement shall be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

1. first, to the Insured Person to reimburse such Insured Person for Identity Fraud Expenses he or she has paid which would have been paid under this Identity Fraud Expense Reimbursement Insuring Agreement but for the fact that such expenses are in excess of the applicable Limit of Insurance;

2. second, to the Insurer in satisfaction of amounts paid or to be paid to the Insured Person in settlement of any covered claim; and

3. third, to the Insured Person in satisfaction of any applicable Retention;

Provided, recoveries do not include any recovery from insurance, suretyship, reinsurance, security or indemnity taken for the Insurer's benefit.

## Action Against the Insurer

No action shall lie against the Insurer, unless:

1. there shall have been full compliance with all of the terms of this Identity Fraud Expense Reimbursement Insuring Agreement;

2. such action is brought more than ninety (90) days after the Insured Person has filed proof of loss with the Insurer; and

3. such action is brought within two (2) years from the date when the Insured Person first Discovers the loss;

If any limitation in this section is deemed inconsistent with the applicable state law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

## Alteration and Assignment

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy that is signed by an authorized representative of the Insurer.

## Interests Covered

This Identity Fraud Expense Reimbursement Insuring Agreement shall be for the sole benefit of the Insured Persons and the Company. It provides no rights or benefits to any other person, entity or organization.

## Concealment or Misrepresentation

This Identity Fraud Expense Reimbursement Insuring Agreement is void as to any Insured Person if, at any time, such Insured Person intentionally conceals or misrepresents a material fact concerning this insurance or a claim under this Identity Fraud Expense Reimbursement Insuring Agreement.

**S**elect**O**ne<sup>SM</sup>
for Community Banks

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

**IMPORTANT NOTE:   THIS IS CLAIMS MADE COVERAGE.   PLEASE READ THIS POLICY CAREFULLY.**
**This Policy is written on a claims made basis and covers only Claims first made during the Policy Period, the Automatic Discover Period or, if exercised, the Additional Extended Discovery Period. The Limit of Liability Available to pay judgments or settlements shall be reduced and may be exhausted by amounts incurred as Defense Costs.   Retentions shall apply to Defense Costs.**

| | | |
|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 |

CB007 Rev. 10-05
© 2005 The Travelers Companies, Inc.

Exhibit A, Page 000031

*This is not a certified copy of any policy form. * Actual policy provisions may differ. *

This page intentionally left blank.

**SelectOne**<sup>SM</sup>
    **for Community Banks**

**This policy is not valid without a Policy Declarations and one or more Insuring agreements. The only Insuring Agreements made a part of this policy are those set forth and selected in the Policy Declarations.**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

| Table of Contents | Page |
|---|---|
| **Extensions** | 1 |
| Estates and Legal Representatives | 1 |
| Spousal Liability | 1 |
| Automatic Discovery Period | 1 |
| Additional Extended Discovery Period | 1 |
| **Definitions** | 2 |
| **Exclusions** | 8 |
| Exclusions Applicable to All Insuring Agreements and to All Loss | 8 |
| Exclusions Applicable to All Insuring Agreements and to Loss Other than Defense Costs | 9 |
| Severability of Exclusions | 9 |
| **Limits of Liability, Retentions and Coinsurance** | 10 |
| Each Insuring Agreement Limit of Liability and Policy Year Total Limit of Liability | 10 |
| Bankers Professional Liability Coverage Insuring Agreement | 10 |
| Retentions | 11 |
| Coinsurance | 11 |
| **Indemnification** | 11 |
| **Notice** | 11 |
| **Defense and Settlement** | 12 |
| Duty of the Insureds to Defend | 12 |
| Duty of the Insurer to Defend | 13 |
| **Allocation** | 13 |
| **Other Insurance** | 14 |
| **Changes In Exposure** | 14 |
| Acquisition or Creation of Another Entity or Plan | 14 |
| Addition of a New Professional Service | 14 |
| Acquisition of Parent Company | 15 |
| Cessation of Subsidiaries or Plans | 15 |
| Termination of Plan | 16 |
| **Representations and Severability** | 16 |
| **Territory and Valuation** | 16 |
| **Termination of Coverage** | 16 |
| **Subrogation** | 17 |
| **Recoveries** | 17 |
| **Action Against the Insurer** | 17 |
| **Authorization** | 17 |
| **Alteration and Assignment** | 17 |
| **Arbitration** | 17 |

## INSURING AGREEMENTS

Insuring Agreements made part of this Policy, as set forth in the Policy Declarations, are listed below in the same order as they appear in your policy.

**Management Liability Insuring Agreement**

**Employment Practices Liability Insuring Agreement**

**Fiduciary Liability Insuring Agreement**

**Trust Liability Insuring Agreement**

**Bankers Professional Liability Insuring Agreement**

CB007 Rev. 10-05
© 2005 The Travelers Companies, Inc.

Exhibit A, Page 000033

*This is not a certified copy of any policy form. * Actual policy provisions may differ. *

This page intentionally left blank

**SelectOne**<sup>SM</sup>
**for Community Banks**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

## GENERAL TERMS, CONDITIONS AND LIMITATIONS

### Extensions

#### Estates and Legal Representatives

This Policy shall afford coverage for Claims for the Wrongful Acts of Insured Persons made against the estates, heirs, legal representatives or assigns of Insured Persons who are deceased or against the legal representatives or assigns of Insured Persons who are incompetent, insolvent or bankrupt to the extent that in the absence of such death, incompetence, insolvency or bankruptcy, such Claims would have been covered by this Policy.

#### Spousal Liability

If a Claim against an Insured Person includes a claim against the Insured Person's lawful spouse solely by reason of such spouse's:

(a) legal status as a spouse of the Insured Person; or

(b) ownership interest in property which the claimant seeks as recovery for alleged Wrongful Acts of the Insured Person,

all loss which such spouse becomes legally obligated to pay by reason of such Claim shall be treated as the Insured Person's Loss on account of the Claim made against such Insured Person.  All terms and conditions of this Policy, including the Retentions, shall apply to any such Loss.

The coverage extension afforded by this Spousal Liability subsection does not apply to the extent that the Claim alleges any error, misstatement, misleading statement, act, omission, neglect, breach of duty, or other conduct committed or attempted by the Insured Person's spouse.

#### Automatic Discovery Period

If the Insureds or the Insurer nonrenews or terminates this Policy or any Insuring Agreement made part of this Policy, except

for termination due to non-payment of premium, coverage provided under this Policy or such Insuring Agreement shall be automatically extended for the period of sixty (60) days following the effective date of such nonrenewal or termination, (herein called the "Automatic Discovery Period"), but only with respect to a Wrongful Act otherwise covered thereunder taking place before the effective date of such nonrenewal or termination. Any Claim made during the Automatic Discovery Period shall be deemed to have been made during the Policy Year immediately preceding the Automatic Discovery Period.

#### Additional Extended Discovery Period

If the Insureds or the Insurer nonrenews or terminates this Policy or any Insuring Agreement made part of this Policy, except for termination due to non-payment of premium, the Insureds shall have the right, upon payment of the additional premium described below, to an extension of the coverage granted under this Policy or such Insuring Agreement for the period set forth in the Declarations ("Additional Extended Discovery Period"), which shall not be less than twelve (12) months, following the effective date of such nonrenewal or termination, but only with respect to a Wrongful Act otherwise covered thereunder taking place before the effective date of such nonrenewal or termination.  This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the Insureds to the Insurer within sixty (60) days following the effective date of nonrenewal or termination.  Any Claim made during the Additional Extended Discovery Period shall be deemed to have been made during the Policy Year immediately preceding the Additional Extended Discovery Period.

The premium due for the Additional Extended Discovery Period shall equal that percent set forth in the Declarations of the annualized premium for this Policy or such Insuring Agreement made part of this Policy, for the last Policy Year prior to such

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

nonrenewal or termination, including the fully annualized amount of any additional premiums charged by the Insurer for or during such Policy Year. The entire premium for the Additional Extended Discovery Period shall be deemed fully earned and non-refundable upon payment.

The Insureds shall not be entitled to elect the Additional Extended Discovery Period under this subsection if an extension of coverage is elected pursuant to the Acquisition of Parent Company subsection.

## Definitions

When used in this Policy, either in the singular or plural, the following terms have the following meanings:

**Administration** means:

(a) counseling Employees, beneficiaries or Plan participants with respect to any Plan;

(b) providing interpretations with respect to any Plan;

(c) handling records in connection with any Plan; or

(d) enrolling, terminating or canceling employees under any Plan.

**Affiliated Person** means:

(a) any Director, Officer or Employee;

(b) any shareholder of the Company that directly or indirectly, or acting through or in concert with one or more individuals or entities, owns, controls or has the power to vote ten percent (10%) or more of any class of voting securities of the Company; securities owned or controlled by a member of an individual's immediate family (spouse, minor children and adult children residing with the individual) are considered to be held by the individual for purposes of this definition; or

(c) an entity in which the Company or Directors, Officers or Employees:

(i) own, either directly or indirectly, twenty-five percent (25%) or more of any class of voting securities of; or

(ii) have a controlling direct or beneficial interest in;

at the time a loan, lease or extension of credit by the Company to such entity was made or agreed to, or was refused.

**Application** means all signed applications, including attachments and materials submitted therewith, for this Policy or for any policy of which this Policy is a direct or indirect renewal or replacement. All such applications, attachments and materials are deemed attached to and incorporated into this Policy.

**Borrower** means:

(a) any individual or entity that is not an Affiliated Person and to which the Company extends, agrees to extend, or refuses to extend, a loan, lease or extension of credit; or

(b) any individual or entity that is not an Affiliated Person and that is a guarantor of any such loan, lease or extension of credit.

**Claim** means the following, including any appeal therefrom:

(a) a written demand against any Insured for monetary damages or non-monetary relief;

(b) a civil proceeding against any Insured commenced by the service of a complaint or similar pleading;

(c) a criminal proceeding against any Insured commenced by a return of an indictment or information;

(d) an arbitration proceeding against any Insured, or a formal administrative or regulatory proceeding against any Insured Person with respect to coverage under any Management Liability Insuring Agreement or Insured with respect to coverage under any other Insuring Agreement made part of this Policy, which shall be deemed commenced by such Insured's receipt of an arbitration petition, a notice of filed charges, a formal investigative order or a similar legal document, except that with respect to an audit conducted by the United States of America Office of Federal Contract Compliance Programs, such proceeding shall be deemed commenced by such Insured's receipt of a Notice of Violation or Order to Show Cause, or a written demand against such Insured for monetary damages or non-monetary relief;

(e) a written request received by any Insured to toll or waive a statute of limitations, relating to a potential Claim described in (a), (b), (c) or (d) above; or

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

(f) solely with respect to a Fiduciary Act, any fact-finding investigation of any Insured by the Department of Labor or the Pension Benefit Guaranty Corporation;

on account of a Wrongful Act.

Claim shall not include any labor, grievance, arbitration or other proceeding pursuant to a collective bargaining agreement.

**Company** means any entity named in the Declarations and its Subsidiaries.

**Damages** means:

(a) compensatory damages;

(b) punitive or exemplary damages;

(c) the multiple portion of any multiplied damage award; or

(d) under the **Employment Practices Liability Coverage** only, liquidated damage awards pursuant to the Age Discrimination in Employment Act or the Equal Pay Act, including any amendments thereto.

**Defense Costs** means that part of Loss consisting of reasonable costs, charges, fees (including attorneys' fees, experts' fees, and mediators' or arbitrators' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, trustees, members of the board of managers, officers or employees of the Insurer, Company or Plan) incurred in defending or investigating a Claim, and the premium for appeal, attachment or similar bonds.

**Director or Officer** means:

(a) any natural person who was, now is or shall be a duly elected or appointed director, officer, member of the board of managers, or management committee member of any Company incorporated or chartered in the United States of America;

(b) with respect to any Non-Profit Entity that is a Subsidiary, any natural person who was, now is or shall be a duly elected or appointed director, officer or trustee of any such Subsidiary incorporated or chartered in the United States of America;

(c) with respect to a Company incorporated or chartered outside the United States of America, any natural person who was, now is or shall be in a position that is the functional equivalent of any duly elected or

appointed director or officer of any Company; or

(d) only with respect to any Fiduciary Liability Insuring Agreement made part of this Policy, any natural person who was, now is or shall be a duly elected or appointed trustee, director or officer of any Plan.

Only with respect to any Management Liability Insuring Agreement or Employment Practices Liability Insuring Agreement made part of this Policy, Director or Officer includes any natural person described in (a), (b), (c) or (d) above who was, now is or shall be serving in an Outside Position.

**Employee** means any natural person, other than a Leased Employee or Independent Contractor, who is a past, present or future employee of the Company or, only with respect to any Fiduciary Liability Insuring Agreement made part of this Policy, of a Plan, and who is not a Director or Officer, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal or temporary employee, acting in their capacity as such.

**Employment Practices Act** means any actual or alleged:

(a) violation of any federal, state, provincial or local statutory law, common law or civil law anywhere in the world, prohibiting discrimination of any kind;

(b) harassment, including any type of sexual, workplace, religious, racial, sexual orientation, pregnancy, disability, age, or national origin-based harassment;

(c) abusive or hostile work environment, whether based on gender, religion, age, disability, race, national origin, pregnancy, marital status, sexual orientation or other legally protected status;

(d) wrongful discharge or termination, whether actual or constructive;

(e) breach of an actual or implied employment contract;

(f) failure or refusal to hire;

(g) misrepresentation;

(h) failure or refusal to provide equal treatment or opportunities;

(i) defamation, libel, slander, disparagement or invasion of privacy;

(j) failure or refusal to promote, including wrongful failure to train,

advance or grant bonuses or perquisites;

(k) wrongful demotion;

(l) negligent hiring or negligent supervision of others;

(m) failure or refusal to adopt or enforce adequate workplace or employment practices, policies or procedures;

(n) wrongful, excessive or unfair discipline;

(o) wrongful infliction of emotional distress; or

(p) retaliation, including retaliation for exercising protected rights, supporting in any way another's exercise of protected rights, participating in strikes or lockouts, threatening or actually reporting wrongful activity of an Insured, including violation of any federal, state, provincial or local "whistle blower" or similar law,

related to the actual or prospective employment of any person by the Company and committed or attempted by any of the Insureds in their capacity as such, or related to the actual or prospective employment of any person by any entity in which any Director or Officer serves in an Outside Position and committed or attempted by such Director or Officer in their capacity in such Outside Position.

Employment Practices Act does not include any conduct actually or allegedly committed or attempted by any Insured Person in their capacity as a director, officer, trustee, governor, member of the board of managers, or any equivalent position, or employee of any entity other than the Company, even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Insured Person by, the Company, except in their capacity in an Outside Position.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

**Executive Officer** means the chairperson, chief executive officer, chief financial officer and in-house general counsel of the Company, and the trustees of the Plans.

**Fiduciary Act** means any actual or alleged:

(a) breach of the responsibilities, obligations or duties imposed upon any Insured in its capacity as a fiduciary of any Plan by ERISA or by the common or statutory law of the United States of America or any

other jurisdiction anywhere in the world;

(b) other matter claimed against the Company or an Insured Person solely because of their service as a fiduciary of any Plan; or

(c) negligent act, error or omission solely in the Administration of a Plan.

**Financial Impairment** means the status of the Company resulting from (a) the appointment by any state, provincial or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the Company, or (b) the Company becoming a debtor in possession.

**Independent Contractor** means a natural person, other than a Director, Officer, Employee or Leased Employee, who renders service to the Company in the course of independent employment pursuant to a contract for specified services; provided that (i) any coverage afforded under this Policy for such natural person only applies to the extent that the Company agrees to indemnify such natural person, and (ii) any such coverage shall be specifically excess of any other indemnity and insurance otherwise available to such natural person or any entity with which such natural person is affiliated.

**Insured** means:

(a) the Insured Persons;

(b) the Company, except the Company shall not be an Insured with respect to the **Directors and Officers Individual Coverage**; and

(c) only with respect to any Fiduciary Liability Insuring Agreement made part of this Policy, the Plans.

**Insured Persons** means:

(a) Directors or Officers;

(b) only with respect to any Bankers Professional Liability Insuring Agreement and Trust Liability Insuring Agreement made part of this Policy, Employees; and

(c) only to the extent that coverage is granted as set forth in the Declarations, Employees, Leased Employees and Independent Contractors.

**Interrelated Wrongful Acts** means all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts,

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

circumstances, situations, events, transactions or causes.

**IRA/Keogh Act** means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any Insured Person on behalf of the Company, or the Company, in their capacity as a trustee of any Individual Retirement Account (I.R.A.) or Keogh Account ((H.R. 10 Plan), provided such trustee activity is allowed under the limited trust authority granted by such accounts or plans.

**Leased Employee** means a natural person, other than a Director or Officer, Employee or Independent Contractor, who is leased to the Company to perform work for the Company and for whom the Company controls the means and manner of the work performed; provided that (i) any coverage afforded under this Policy for such Leased Employee only applies to the extent that the Company agrees to indemnify such Leased Employee, and (ii) any such coverage shall be specifically excess of any other indemnity and insurance otherwise available to the Leased Employee from or provided by the entity from which such Leased Employee is leased.

**Lending Act** means, only with respect to a loan, lease or extension of credit, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any Insured Person on behalf of the Company, or the Company, in connection with or relating to:

(a) an agreement or refusal to grant or extend any such loan, lease or extension of credit;

(b) the granting or extending of any such loan, lease or extension of credit;

(c) Loan Servicing, but only for any such loan, lease or extension of credit in which the Company has an ownership interest; or

(d) the restructure, termination, transfer, repossession or foreclosure of any such loan, lease or extension of credit.

**Loan Servicing** means the servicing of a loan, lease or extension of credit (not including financing for investment banking, or leveraged or management buy-outs). Loan Servicing includes the following servicing activities: record keeping, billing and disbursements of principal or interest, receipt or payment of insurance premiums and taxes, credit reporting or statements of a customer's creditworthiness, determination

of the depreciation amount of property (but not projections of or an appraisal for residual or future value of property).

Loan Servicing shall not include the purchase, acquisition or sale of any loan, lease or extension of credit, any act of restructure, termination, transfer, repossession or foreclosure of any loan, lease or extension of credit, or any act arising out of the operation or control of any entity or property that the Insured acquired as security or collateral for any loan, lease or extension of credit.

**Loss** means the amount which the Insureds become legally obligated to pay on account of each Claim and for all Claims made against them during the Policy Period, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period, for Wrongful Acts for which coverage applies, including Damages, judgments, settlements and Defense Costs. Loss does not include:

(a) any amount for which the Insureds are absolved from payment;

(b) taxes, or fines or penalties imposed by law, provided that this exception to the definition of Loss shall not apply under any Fiduciary Liability Insuring Agreement made part of this Policy to the 5% or less, or the 20% or less, civil penalties imposed upon an Insured under Section 502(i) or (l), respectively, of ERISA;

(c) any unrepaid, unrecoverable or outstanding loan, lease or extension of credit to any Affiliated Person or Borrower;

(d) dividends or other distributions of corporate profits;

(e) any amounts that constitute inadequate consideration in connection with the Company's purchase of securities issued by any Company; or

(f) matters uninsurable under the law pursuant to which this Policy is construed; provided that Damages shall be deemed insurable under this Policy if such Damages are insurable under the law of any jurisdiction that is most favorable to the insurability of such Damages and has a substantial relationship to the Insureds, the Claim, the Insurer, or this Policy.

**Management Practices Act** means:

(a) any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

committed or attempted by any Insured Person in their capacity as such, or in an Outside Position or, with respect to the **Company Liability Coverage**, by the Company; or

(b) any matter claimed against the Insured Persons solely by reason of their serving in such capacity or in an Outside Position.

Management Practices Act does not include (i) a Fiduciary Act; or (ii) any conduct actually or allegedly committed or attempted by any Insured Person in their capacity as a director, officer, trustee, governor, member of the board of managers, or any equivalent position, or employee of any entity other than the Company, even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Insured Person by the Company, except in their capacity in an Outside Position.

With respect only to any **Company Liability Coverage**, Management Practices Act also does not include an Employment Practices Act, Trust Act, Lending Act or Professional Services Act.

**Non-Profit Entity** means any non-profit corporation, community chest, fund or foundation that is exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

**Outside Position** means the position of director, officer, manager, trustee or other equivalent executive position held by any Director or Officer of the Company in:

(a) any Non-Profit Entity not included in the definition of Company; or

(b) any other entity, if such coverage is specifically granted by endorsement to this Policy,

if service in such position is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Director or Officer by, the Company.

**Parent Company** means the Company first named in the Declarations.

**Plan** means:

(a) any employee benefit plan (as defined by ERISA) which is operated solely by the Company, or jointly by the Company and a labor organization, for the benefit of the Employees of the Company located anywhere in the world, if such plan existed before the Policy Period or is afforded coverage pursuant to the Changes In Exposure section;

(b) any other employee benefit plan not subject to Title 1 of ERISA sponsored solely by the Company for the benefit of the Employees of the Company, if such plan existed before the Policy Period or is afforded coverage pursuant to the Changes In Exposure section;

(c) any other employee benefit plan if listed as a Plan in an endorsement to this Policy; or

(d) any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for Employees;

provided that Plan shall not include any multi-employer plan or employee stock ownership plan (as defined by ERISA) unless such plan is specifically listed as a Plan in an endorsement to this Policy.

**Policy** means the Declarations, General Terms, Conditions and Limitations, each Insuring Agreement, any endorsements hereto, and the Application.

**Policy Period** means the period of time set forth in the Declarations, subject to prior termination in accordance with the Termination of Coverage section.

**Policy Year** means:

(a) the period of one year following the inception date of the Policy Period of this Policy or any anniversary thereof;

(b) if the time between the inception date of the Policy Period of this Policy or any anniversary thereof, including any Insuring Agreement made a part of this Policy as of such inception date, and the termination of this Policy, or any such Insuring Agreement, is less than one year, then such lesser period;

(c) if an Insuring Agreement is made part of this Policy after the inception date of the Policy Period of this Policy, and the time between the inception date of such Insuring Agreement and any anniversary of this Policy is less than one year, then such lesser period with respect to such Insuring Agreement; or

(d) if an Insuring Agreement is made part of this Policy after the inception date of the Policy Period of this Policy, and the time between the inception

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

Exhibit A, Page 000040
© 2005 The Travelers Companies, Inc.

date of such Insuring Agreement and the termination of this Policy, or such Insuring Agreement, is less than one year, then such lesser period with respect to such Insuring Agreement.

**Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States of America Environmental Protection Agency or a state, county, municipal or local counterpart thereof. Such substances shall include solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. Pollutants shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, lead or lead products, electric or magnetic or electromagnetic field and noise.

**Professional Services** means only those services any Insured Person on behalf of the Company, or the Company, performs or is required to perform for a customer of the Company:

(a) pursuant to an agreement between such customer and the Company for a fee, commission or other monetary compensation that inures to the benefit of the Company; provided that such fee, commission or other monetary compensation is not solely comprised of interest or investment income;

(b) pursuant to a written agreement between the Company and a third party under which the Company provides Loan Servicing for such customer on behalf of such third party; or

(c) gratis in connection with the services for a fee, commission, or other monetary compensation described in subpart (a) above;

provided, however, that Professional Services shall not include: (i) a Lending Act; (ii) a Trust Act; (iii) services performed by any entity as to which the Company shall have acquired ownership or control as security for a loan, lease or other extension of credit; (iv) medical or health care services; (v) the practice of law or the rendering of legal services; (vi) architectural or construction management services; (vii) services provided customers as an enrolled actuary as that term is used in or in connection with ERISA; (viii) the rental of a safe deposit box; or (ix) the designing, building, or maintenance of any website or the content of any website.

**Professional Services Act** means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any Insured in the rendering or failure to render Professional Services.

**Securities Claim** means any Claim which, in whole or in part, is:

(a) brought by one or more security holders of the Company, in their capacity as such; or

(b) based upon, arising out of or attributable to the purchase or sale of, or offer to purchase or sell, any equity or debt securities issued by the Company (including any such Claim brought by the Securities and Exchange Commission or any other claimant);

provided, however, that this definition shall apply only with respect to equity or debt securities issued by the Company for the purpose of raising capital for the Company and not securities issued in the course of the Company's business.

**Securities Offering** means any public offering of equity or debt securities issued by the Company, including an initial public offering; provided that Securities Offering does not include a private offering of any such securities.

**Subsidiary** means:

(a) any entity in which more than 50% of the outstanding voting securities representing the present right to vote for election of directors is owned, directly or indirectly, in any combination, by one or more Companies;

(b) any Non-Profit Entity or political action committee in which the right to elect or otherwise appoint more than 50% of such entity's directors or trustees, or political action committee's members, is owned, or controlled, directly or indirectly, in any combination, by one or more Companies;

(c) any limited liability company in which the right to elect or otherwise appoint or designate more than 50% of such limited liability company's managers is owned or controlled, directly or indirectly, in any combination, by one or more Companies; or

(d) any joint venture in which the right to elect or otherwise appoint more than 50% of such entity's directors, trustees or other equivalent executives

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

Exhibit A, Page 000041

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

is owned or controlled, directly or indirectly, in any combination, by one or more Companies.

**Trust Act** means:

(a) an IRA/Keogh Act; and

(b) any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any Insured Person on behalf of the Company, or the Company, in their capacity as:

(i) executor, administrator, or personal representative of estates, administrator of guardianships, trustee under personal or corporate trust agreements, or conservator of any person;

(ii) custodian, depository or managing agent for securities or real property, manager of personal property, attorney-in-fact, escrow agent, transfer or dividend disbursing agent, registrar, fiscal paying agent, tax withholding agent, exchange agent, redemption or subscription agent, warrant or scrip agent, trustee under bond indenture or sinking fund agent;

(iii) trustee or co-trustee, fiduciary or co-fiduciary under a pension, profit sharing, health and welfare or other similar employee benefit plan or trust, other than a Plan; or

(iv) trustee exercising any other trust or fiduciary powers permitted by law.

**Voluntary Compliance Program** means the Voluntary Compliance Resolution ("VCR") Program or the Walk-In Closing Agreement Program ("Walk-In CAP"), both as described in the Employee Plans Compliance Resolution System ("EPCRS"), IRS Rev. Proc. 98-22, as amended, or the Tax Sheltered Annuity Voluntary Correction Program ("TVC"), for a Fiduciary Act involving the actual or alleged noncompliance by any Plan with any statute, rule or regulation.

**Wrongful Act** means Employment Practices Act, IRA/Keogh Act, Fiduciary Act, Lending Act, Management Practices Act, Professional Services Act, and Trust Act, but only to the extent that coverage is granted for such acts pursuant to an Insuring Agreement made part of this Policy.

## Exclusions

### Exclusions Applicable to All Insuring Agreements and to All Loss

The Insurer shall not be liable for Loss on account of any Claim made against any Insured:

1. for any deliberately fraudulent act or omission or any willful violation of any statute or regulation if a final non-appealable judgment or adjudication adverse to such Insured establishes that such Insured committed such an act, omission or violation; provided that this exclusion shall not apply to a Claim for an Employment Practices Act;

2. based upon, arising out of, or attributable to such Insured gaining in fact any personal profit, remuneration or financial advantage to which such Insured was not legally entitled;

3. based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given under any policy of which this Policy is a direct or indirect renewal or replacement;

4. brought or maintained by or on behalf of any Insured or Company in any capacity, except:

   (a) a Claim that is a derivative action brought or maintained on behalf of the Company by one or more persons who are not Directors or Officers and who bring and maintain such Claim without the solicitation, assistance or active participation of any Director or Officer;

   (b) a Claim brought or maintained by a natural person who was a Director or Officer, but who has not served as a Director or Officer for at least six-years preceding the date the Claim is first made, and who brings and maintains the Claim without the solicitation, assistance or active participation of any Director or Officer who is serving as a Director or Officer or was serving as a Director or Officer within such six-year period;

   (c) a Claim brought or maintained by or on behalf of any Insured Person for any Employment Practices Act;

   (d) a Claim brought or maintained by any Insured Person for contribution or indemnity, if the Claim directly

results from another Claim covered under this Policy;

(e) only with respect to any Fiduciary Liability Insuring Agreement made part of this Policy, a Claim brought or maintained by or on behalf of any Employee of the Company for any Fiduciary Act;

(f) a Claim brought by an Insured Person solely in his or her capacity as a customer of the Company for a Trust Act or a Professional Services Act, provided that such Claim is instigated totally independent of, and totally without the solicitation, assistance, active participation, or intervention of, any other Insured; or

(g) a Claim brought or maintained in a jurisdiction outside of the United States of America, Canada or Australia by an Insured Person of a Company incorporated or chartered in a jurisdiction outside of the United States of America, Canada or Australia;

5. for a Wrongful Act by an Insured Person in an Outside Position if such Claim is brought or maintained by or on behalf of the entity in which the Insured Person serves, or by or on behalf of any director, officer, trustee, governor, or member of the board of managers, or equivalent position of such entity in any capacity except:

(a) a Claim that is a derivative action brought or maintained on behalf of such entity by one or more persons who are not directors, officers, trustees, governors, members of the board of managers, or holders of any equivalent position of such entity and who bring and maintain the Claim without the solicitation, assistance or active participation of such entity or any such directors, officers, trustees, governors, members of the board of managers, or holders of any such equivalent position; or

(b) a Claim brought or maintained by any director, officer, trustee, governor, member of the board of managers, or holder of any equivalent position of such entity for any Employment Practices Act; or

6. based upon, arising out of, or attributable to: (a) the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of Pollutants into, in or on real or personal property, water or the atmosphere; or (b) any direction or request that the Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or any voluntary decision to do so; including any Claim by or on behalf of the Company, its securities holders or creditors based upon, arising out of, or attributable to the matters described in this exclusion; provided that this exclusion shall not apply:

(a) under the **Directors and Officers Individual Coverage**, to any Claim that is a derivative action brought or maintained on behalf of the Company by one or more security holders in their capacity as such, who are not Directors or Officers and who bring and maintain the Claim without the solicitation, assistance or active participation of the Company or any Director or Officer; or

(b) under the **Employment Practices Liability Coverage**, to any Claim for retaliation against any claimant on account of such claimant's actual, alleged or threatened: (i) refusal to violate any federal, state, provincial or local statutory law, common law or civil law anywhere in the world, regarding the matters described in this exclusion; or (ii) disclosure regarding the matters described in this exclusion.

## Exclusions Applicable to All Insuring Agreements and to Loss Other than Defense Costs

The Insurer shall not be liable for that part of Loss that constitutes the cost of complying with any order for, grant of or agreement to provide injunctive or non-monetary relief, including the cost of:

(a) instituting or conducting any corporate policy, procedure, program or training;

(b) modifying any building, or providing any accommodation, pursuant to the Americans with Disabilities Act or the Civil Rights Act of 1964, as amended, or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state, provincial or local statutory law, common law or civil law anywhere in the world; or

(c) employment reinstatement or continued employment;

provided that this exclusion shall not apply to Defense Costs.

## Severability of Exclusions

No fact pertaining to or knowledge possessed by any Insured Person shall be

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

imputed to any other Insured Person for purposes of applying exclusions 1 and 2 set forth in the Exclusions Applicable to All Insuring Agreements and to All Loss section. Only facts pertaining to or knowledge possessed by an Executive Officer shall be imputed to the Company or Plan for purposes of applying exclusions 1 and 2 set forth in this Exclusions Applicable to All Insuring Agreements and to All Loss section.

## Limits of Liability, Retentions and Coinsurance

For the purposes of this Policy, all Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts of the Insureds shall be deemed one Claim, and such Claim shall be deemed to be first made against the Insureds on the date the earliest of such Claims is first made against them, regardless of whether such date is before or during the Policy Period.

### Each Insuring Agreement Limit of Liability and Policy Year Total Limit of Liability

The Insurer's maximum liability for Loss on account of all Claims first made during the same Policy Year, including the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period, covered under each Insuring Agreement made part of this Policy, shall be the respective amount set forth in the Declarations under the Each Insuring Agreement Limit of Liability for such Insuring Agreement.

Defense Costs shall be part of, and not in addition to, the respective Each Insuring Agreement Limit of Liability set forth in the Declarations, and Defense Costs shall reduce and may exhaust such Limit of Liability.

The Insurer's maximum aggregate liability for Loss on account of all Claims covered under the Insuring Agreements that are subject to the Policy Year Total Limit of Liability, as set forth in the Insuring Agreements Subject to Policy Year Total Limit of Liability section of the Declarations of this Policy, that are first made against the Insureds during the same Policy Year, including the Automatic Discovery Period and, if exercised, the Additional Extended Discovery Period, combined, whether covered under one or more of such Insuring Agreements made part of this Policy, shall be the Policy Year Total Limit of Liability set forth in the Declarations.   The Policy Year Total Limit of Liability shall be reduced and may be exhausted by payment of Loss under any such Insuring Agreements made part of this Policy.  Defense Costs shall be part of, and

not in addition to, the Policy Year Total Limit of Liability set forth in the Declarations, and Defense Costs shall reduce and may exhaust such Policy Year Total Limit of Liability.

For all Claims covered under any Insuring Agreement made a part of this Policy that is not subject to the Policy Year Total Limit of Liability, the Insurer's maximum liability for Loss on account of all Claims that are first made against the Insureds during the same Policy Year, including the Automatic Discovery Period and, if exercised, the Additional Extended Discovery Period, shall be the Each Insuring Agreement Limit of Liability for such Insuring Agreement set forth in the Declarations.

If Loss arising from a single Claim is covered under more than one Insuring Agreement made part of this Policy, the applicable Each Insuring Agreement Limit of Liability shall apply separately to each part of such Loss.

The Insurer's obligations for all Claims first made against the Insureds during the same Policy Year under each Insuring Agreement made part of this Policy shall cease once the applicable Each Insuring Agreement Limit of Liability or the Policy Year Total Limit of Liability has been exhausted by payment of Loss.

The Limit of Liability for the Automatic Discovery Period, and the Additional Extended Discovery Period, if exercised, shall be part of, and not in addition to, the applicable Each Insuring Agreement Limit of Liability and the Policy Year Total Limit of Liability for the Policy Year immediately preceding the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period.  The purchase of the Additional Extended Discovery Period shall not increase or reinstate the applicable Each Insuring Agreement Limit of Liability or the Policy Year Total Limit of Liability for the Policy Year immediately preceding the Additional Extended Discovery Period.

### Bankers Professional Liability Coverage Insuring Agreement

If coverage for **Lender Liability Coverage** or **Professional Services Liability Coverage** is set forth in the Declarations, the Limit of Liability for **Lender Liability Coverage** or **Professional Services Liability Coverage**, respectively, shall be part of, and not in addition to, the Each Insuring Agreement Limit of Liability for the Bankers Professional Liability Insuring Agreement. Payment of Loss under the **Lender Liability**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

Exhibit A, Page 000044

© 2005 The Travelers Companies, Inc.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

**Coverage** or the **Professional Services Liability Coverage** shall reduce and may exhaust the Each Insuring Agreement Limit of Liability for the Bankers Professional Liability Coverage Insuring Agreement.

## Retentions

Except as otherwise provided in this Limits of Liability, Retentions and Coinsurance section, the Insurer's liability with respect to Loss arising from each Claim shall apply only to that part of Loss which is excess of the applicable Retention set forth in the Declarations, and such Retention shall be borne by the Company uninsured and at its own risk.

No Retention shall apply to Loss incurred by Insured Persons on account of each Claim for which the Company:

   (a) is not permitted by law to indemnify such Insured Persons; or

   (b) is permitted or required to indemnify such Insured Persons but does not do so by reason of Financial Impairment.

The applicable Retention set forth in the Declarations shall apply to all other Loss, including Loss for which the Company is permitted or required by common or statutory law to indemnify any such Insured Persons, but fails or refuses, other than for reason of Financial Impairment, to do so.

If Loss arising from a single Claim is subject to more than one Retention, the applicable Retention shall be applied separately to each part of such Loss, but the largest applicable Retention set forth in the Declarations shall be the maximum Retention applicable to all Loss arising from such Claim. If a single Retention applies to multiple Insureds, the Retention shall be pro-rated among such Insureds.

## Coinsurance

With respect to Loss excess of the applicable Retention covered under any Insuring Agreement made part of this Policy, the Company shall bear uninsured at its own risk the applicable percent of such Loss set forth in the Declarations as the Coinsurance Percent Applicable To Each Insuring Agreement, and the Insurer's liability hereunder shall apply only to the remaining percent of such Loss.

## Indemnification

For purposes of this Policy, the Company agrees, to the fullest extent permitted by law, to indemnify the Insured Persons for all Loss. The Company will also take all steps necessary or allowable to provide such indemnification.

## Notice

The Insureds shall, as a condition precedent to their rights under this Policy, give to the Insurer written notice of any Claim made against the Insureds as soon as practicable, but in no event later than: (a) sixty (60) days after expiration of the Policy Year in which the Claim was first made; or (b) the expiration of the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period.

If during the Policy Period, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period, the Insureds become aware of circumstances which could give rise to a Claim for a Wrongful Act taking place before or during the Policy Period and give written notice of such circumstances and the other information referenced below to the Insurer during the Policy Period, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period, then any Claims subsequently arising from such circumstances shall be considered to have been made during the Policy Year, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period in which such notice of such circumstances and such other information was first given to the Insurer.

The Insureds shall, as a condition precedent to exercising their rights under this Policy: (a) include within any notice of Claim or circumstance a description of the Claim or circumstances, the nature of the alleged Wrongful Act, the nature of the alleged or potential damage, the names of actual or potential claimants and Insureds involved, and the manner in which the Insureds first became aware of the Claim or circumstances; and (b) give to the Insurer such other information and cooperation as the Insurer may reasonably request.

All notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail or fax properly addressed to the appropriate party. Notice to the Insureds may be given to the Parent Company at the address set forth in the Declarations. Notice to the Insurer of

any Claim or circumstance shall be given to The St. Paul Travelers Companies, Inc., 385 Washington Street, St. Paul, Minnesota 55102-1396, Attention: Professional E&O Claim Unit.   All other notices to the Insurer under this Policy shall be given to the same addressee but to the attention of the Financial and Professional Services Unit. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one (1) day following the date such notice is sent, whichever is earlier.

### Defense and Settlement

The Insureds agree not to settle or offer to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation, admit any liability, voluntarily make any payment or confess or otherwise agree to any Damages or judgments with respect to any Claim covered by this Policy without the Insurer's written consent, which shall not be unreasonably withheld.   The Insurer shall not be liable for any settlement, Defense Costs, assumed obligation, admitted liability, voluntary payment, or confessed or agreed Damages or judgment to which it has not consented.

The Insurer shall be entitled to full cooperation and all information and particulars it may reasonably request from the Insureds in order to conduct its investigation or to reach a settlement of the Claim. The Insureds agree that in the event of a Claim, the Insureds will do nothing that may prejudice the Insurer's position or its potential or actual rights of recovery.

The Insurer may, with the consent of the Company, settle any Claim for any monetary amount that the Insurer deems reasonable. If the Company withholds consent to such settlement, the Insurer's liability for all Loss arising from such Claim shall not exceed:

(a) the amount for which the Insurer could have settled such Claim; plus

(b) Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer to the Company; plus

(c) 50% of the covered Loss, including Defense Costs incurred after the date such settlement was proposed in writing by the Insurer to the Company, in excess of the amount for which the Insurer could have settled such Claim.

Notwithstanding the foregoing, if the proposed settlement amount does not

exceed the applicable Retention set forth in the Declarations, subpart (c) above shall not apply and the Insurer's liability for all Loss arising from such Claim shall not exceed the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer to the Company.

Any amounts paid by the Insurer under subparts (a), (b) or (c) above shall be part of and not in addition to the applicable Limits of Liability set forth in the Declarations.

The Insurer and the Insureds shall not unreasonably withhold any consent referenced in this Defense and Settlement section.

The Insurer shall have the right to appeal any judgment with respect to any Claim covered, in whole or in part, by this Policy and the expense of appealing such judgment shall be part of Defense Costs as defined herein.

### Duty of the Insureds to Defend

If Duty of the Insureds to Defend is selected as set forth in the Declarations under an Insuring Agreement made part of this Policy, it shall be the duty of the Insureds and not the duty of the Insurer to select defense counsel and defend any Claim covered by such Insuring Agreement under this Policy.

With respect to any Claim submitted for coverage under such Insuring Agreement, the Insurer shall have the right and shall be given the opportunity to effectively associate with, and shall be consulted in advance by, the Insureds regarding: (a) the selection of appropriate defense counsel; (b) substantive defense strategies, including decisions regarding the filing and content of substantive motions; and (c) settlement negotiations.

Subject to the Allocation section, the Insurer shall advance, on behalf of the Insureds, Defense Costs which the Insureds have incurred in connection with Claims made against them, before disposition of such Claims, provided that to the extent that it is finally established that any such Defense Costs are not covered under this Policy, the Insureds, severally according to their respective interests, agree to repay the Insurer such Defense Costs.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

Exhibit A, Page 000046
© 2005 The Travelers Companies, Inc.

## Duty of the Insurer to Defend

If Duty of the Insurer to Defend is selected as set forth in the Declarations under an Insuring Agreement made part of this Policy, the Insurer shall have the right and duty to select defense counsel and defend any Claim covered by such Insuring Agreement under this Policy.

If a Claim is covered under more than one Insuring Agreement, and the Duty of the Insurer to Defend is selected as set forth in the Declarations under any such Insuring Agreement, the Insurer shall have the right and duty to select defense counsel and defend such Claim under all Insuring Agreements under which such Claim is covered.

The Insurer's duty to defend Claims shall apply even if any of the allegations are groundless, false or fraudulent and shall only obligate the Insurer to pay Defense Costs.

Except as otherwise provided in this Defense and Settlement section, the Insurer's duty to defend any Claim ceases upon exhaustion of the applicable Each Insuring Agreement Limit of Liability or the Policy Year Total Limit of Liability, as set forth in of the Declarations, by the payment of Loss.

If the Insurer's duty to defend ceases with respect to any Claim, the Insurer shall notify the Company of such Claim so that the Company can arrange to take control of the defense. The Insurer agrees to take whatever steps are necessary to avoid a default judgment during a transfer of control of the defense of any outstanding Claim. The Insureds agree to repay the reasonable expenses incurred by the Insurer in taking any such steps during the transfer and further agree that, in undertaking any such steps, the Insurer has not waived or otherwise given up any rights under this Policy.

## Allocation

If on account of any Claim the Insureds who are covered for such Claim under this Policy incur Loss jointly with others, including any Insureds who are not covered for such Claim under this Policy, or the Insureds incur an amount consisting of both Loss covered by this Policy and loss not covered by this Policy because the Claim includes both covered and uncovered matters, such amount shall be allocated between covered Loss and uncovered loss based upon the relative legal exposures of the parties to covered and uncovered matters.

If Duty of the Insureds to Defend is selected as set forth in the Declarations under an Insuring Agreement made part of this Policy, with respect to any Claim submitted for coverage under such Insuring Agreement, if there can be an agreement on an allocation of Defense Costs, the Insurer shall advance, on behalf of the Insureds, Defense Costs which the Insureds have incurred in connection with such Claim and that are allocated to covered Loss. If there can be no agreement on an allocation of such Defense Costs, the Insurer shall so advance Defense Costs that the Insurer believes to be covered under this Policy, until a different allocation is negotiated, arbitrated or judicially determined. Any advancement of Defense Costs shall be subject to, and conditioned upon receipt by the Insurer of, a written undertaking by the Insureds that such advanced amounts shall be repaid to the Insurer by the Insureds, severally according to their respective interests, if and to the extent that such Defense Costs are not covered under this Policy.

Any negotiated, arbitrated or judicially determined allocation of Defense Costs incurred in connection with a Claim shall be applied retroactively to all Defense Costs incurred in connection with such Claim, notwithstanding any prior advancement to the contrary. Any allocation or advancement of Defense Costs incurred in connection with a Claim shall not apply to or create any presumption with respect to the allocation of other Loss on account of such Claim or any other Claim.

If Defense Costs arising from a single Claim are incurred and covered under more than one Insuring Agreement made part of this Policy, such Defense Costs shall be allocated to each applicable Insuring Agreement. To the extent such an allocation can not reasonably be made, such Defense Costs shall be covered, subject to all of the General Terms, Conditions and Limitations and the limitations, conditions, provisions and other terms of this Policy, under the applicable Insuring Agreements in the following order, until such time as such an allocation can reasonably be made:

1. Employment Practices Liability Insuring Agreement.

2. Bankers Professional Liability Insuring Agreement.

3. Trust Liability Insuring Agreement.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

---

4. Fiduciary Liability Insuring Agreement.

5. Management Liability Insuring Agreement.

## Other Insurance

Except as may be provided in any Outside Position Liability subsection of this Policy, if any Loss arising from any Claim made against any Insured is insured under any other valid and collectible insurance, prior or current, then this Policy shall cover such Loss, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such Loss is in excess of the amount of such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this Policy.

## Changes In Exposure

### Acquisition or Creation of Another Entity or Plan

If during the Policy Period the Company:

    (a) acquires securities in another entity or creates another entity, which as a result of such acquisition or creation becomes a Subsidiary;

    (b) acquires any entity by merger into or consolidation with the Company;

    (c) creates a Plan; or

    (d) acquires a Plan through merger into or consolidation with the Company,

such entity, or Plan, and its Insured Persons shall be covered under this Policy as follows:

If the fair value of all cash, securities, assumed indebtedness and other consideration paid by the Company for any such creation or acquisition is less than 25% of the total assets of all the Companies, or, with respect to a newly created or acquired Plan, less than 25% of the total assets of all of the Plans, as reflected in the Parent Company's or Plans' most recent financial statements as of the inception of the Policy Period, such entity, or Plan, and its Insured Persons shall automatically be covered under this Policy, but only with respect to Wrongful Acts taking place after such creation or acquisition, unless the Insurer agrees, after presentation of a complete application and all appropriate information, to provide coverage by endorsement for Wrongful Acts taking place before such creation or acquisition.

With respect to all other creations or acquisitions described in subparts (a), (b), (c) or (d) above, such entity, or Plan, and its Insured Persons shall automatically be covered under this Policy, but only for ninety (90) days or the remainder of the Policy Period, whichever is less, following the effective date of such creation or acquisition, ("Automatic Coverage Period") and only with respect to Wrongful Acts taking place after such creation or acquisition. As a condition precedent to further coverage with respect to such entity, or Plan, and its Insured Persons after the Automatic Coverage Period, the Parent Company shall give written notice of such creation or acquisition to the Insurer as soon as practicable, but in no event later than forty-five (45) days following the effective date of such creation or acquisition, and shall thereafter promptly provide to the Insurer such information as the Insurer may request. Upon receipt of such notice and other information, the Insurer shall promptly provide to the Parent Company a quotation for coverage under this Policy for such entity, or Plan, and its Insured Persons for the remainder of the Policy Period. If the Parent Company fails to comply with such condition precedent, or if within thirty (30) days following receipt of such quotation the Parent Company fails to pay any additional premium or fails to agree to any additional coverage terms and conditions as set forth in such quotation, coverage otherwise afforded by this subsection for such entity, or Plan, and its Insured Persons shall terminate upon expiration of the Automatic Coverage Period.

Notwithstanding the foregoing, no coverage shall be afforded by this subsection with respect to any multi-employer plan or employee stock ownership plan (as defined in ERISA) unless such coverage is specifically granted by endorsement to this Policy.

### Addition of a New Professional Service

If during the Policy Period the Insureds begin to offer a new type of Professional Service ("new Professional Service"), such new Professional Service shall be covered under this Policy as follows:

If the projected annual fee income or gross revenue to the Company for any such new Professional Service is less than 10% of the annual fee income or gross revenue to the Company for all Professional Services, as reflected in the Company's most recent financial statements as of the inception of the Policy Period, such new Professional Service shall automatically be covered under this Policy.

*This is not a certified copy of any policy form. *Actual policy provisions may differ. *

All other new Professional Services shall automatically be covered under this Policy, but only for ninety (90) days or the remainder of the Policy Period, whichever is less, following the effective date the Insureds began to offer such new Professional Service ("Automatic Coverage Period").

As a condition precedent to further coverage with respect to any such new Professional Service after the Automatic Coverage Period, the Parent Company shall give written notice of any such new Professional Service to the Insurer as soon as practicable, but in no event later than forty-five (45) days following the effective date that the Insureds began to offer such new Professional Service, and shall thereafter promptly provide to the Insurer such information as the Insurer may request. Upon receipt of such notice and other information, the Insurer shall promptly provide to the Parent Company a quotation for coverage for any such new Professional Service for the remainder of the Policy Period. If the Parent Company fails to comply with such condition precedent, or if within thirty (30) days following receipt of such quotation the Parent Company fails to pay any additional premium or fails to agree to any additional coverage terms and conditions as set forth in such quotation, coverage otherwise afforded by this subsection for any such new Professional Service shall terminate upon expiration of the Automatic Coverage Period.

Notwithstanding the foregoing, no coverage shall be afforded by this subsection with respect to any new Professional Service specifically excluded from the definition of Professional Services.

### Acquisition of Parent Company

If during the Policy Period:

  (a)  the Parent Company merges into or consolidates with another entity and the Parent Company is not the surviving entity; or

  (b)  another entity or person, or a group of entities or persons acting in concert, acquires the right to elect or otherwise appoint more than 50% of the directors, or members of the board of managers of the Parent Company,

coverage under this Policy shall continue until termination of this Policy, but only with respect to Wrongful Acts taking place before such merger, consolidation or acquisition. As of the effective date of such merger, consolidation or acquisition, all

premiums paid or due at any time under this Policy shall be deemed fully earned and non-refundable.

The Parent Company shall give written notice of such merger, consolidation or acquisition to the Insurer as soon as practicable together with such information as the Insurer may request. Upon receipt of such notice and information and at the request of the Parent Company, the Insurer shall promptly provide to the Parent Company a quotation for a three-year (or such lesser or greater period as may be negotiated with the Insurer) extension of coverage with respect to Wrongful Acts taking place before such merger, consolidation or acquisition. Any coverage extension pursuant to such quotation shall be conditioned upon the Insureds, within sixty (60) days after receipt of such quotation: (a) giving to the Insurer written notice of their desire to elect such extended coverage; (b) paying any additional premium required by the Insurer, which shall be deemed fully earned and non-refundable upon inception of such coverage extension; and (c) accepting any additional coverage terms and conditions required by the Insurer.

Such coverage extension shall not increase or reinstate the applicable Each Insuring Agreement Limit of Liability or the Policy Year Total Limit of Liability set forth in the Declarations and the Limit of Liability for such coverage extension shall be part of and not in addition to the applicable Each Insuring Agreement Limit of Liability and the Policy Year Total Limit of Liability for the Policy Year in which such merger, consolidation or acquisition is effective.

The Insureds shall not be entitled to elect an extension of coverage under this Acquisition of Parent Company subsection if an Additional Extended Discovery Period is elected pursuant to the Additional Extended Discovery Period subsection.

### Cessation of Subsidiaries or Plans

If before or during the Policy Period, an entity ceases to be a Subsidiary, coverage under an Insuring Agreement made part of this Policy with respect to such Subsidiary and its Insureds shall continue until termination of such Insuring Agreement or this Policy, whichever is earlier, but only with respect to Wrongful Acts taking place before the date such entity ceased to be a Subsidiary.

If before or during the Policy Period, a Plan ceases to be sponsored by a Company, coverage under an Insuring Agreement made part of this Policy with respect to such Plan

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

and its Insureds shall continue until termination of such Insuring Agreement or this Policy, whichever is earlier, but only with respect to Fiduciary Acts taking place before the date such Plan ceased to be sponsored by a Company.

## Termination of Plan

If before or during the Policy Period, a Plan is terminated, coverage under an Insuring Agreement made part of this Policy with respect to such Plan and its Insureds shall continue until termination of such Insuring Agreement or this Policy, whichever is earlier. Such coverage continuation shall apply with respect to Fiduciary Acts taking place before or after the date such Plan was terminated.

## Representations and Severability

In granting coverage under this Policy, the Insurer has relied upon the statements and representations in the Application.  The Insureds represent that all such statements and representations are true.  All such statements and representations shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth thereof.

The Insureds agree that in the event that any such statements and representations are untrue, this Policy shall not afford any coverage with respect to any of the following Insureds:

(a) any Insured Person who knew the facts that were not truthfully disclosed in the Application;

(b) the Company, under the **Company Indemnification Coverage**, to the extent that it indemnifies any Insured Person referenced in (a) above;

(c) the Company, if any Executive Officer knew the facts that were not truthfully disclosed in the Application; or

(d) the Plan, under the **Fiduciary Liability Coverage**, if any Executive Officer knew the facts that were not truthfully disclosed in the Application,

whether or not such Insured Person or Executive Officer knew of such untruthful disclosure in the Application.

## Territory and Valuation

All premiums, limits, retentions, Loss and other amounts under this Policy are expressed and payable in the currency of the United States of America.  If judgment is rendered, settlement is denominated or another element of Loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the payment of other element of Loss is due, respectively.

Coverage under this Policy shall extend to Wrongful Acts taking place or Claims made anywhere in the world.

## Termination of Coverage

This Policy or any Insuring Agreement made part of this Policy shall terminate at the earliest of the following times:

(a) the effective date of termination specified in a prior written notice by the Parent Company to the Insurer; provided that this Policy or any Insuring Agreement made part of this Policy may not be terminated by the Parent Company after the effective date of the Parent Company merger, consolidation or acquisition as described in the Changes in Exposure section;

(b) upon expiration of the Policy Period as set forth in the Declarations;

(c) ten (10) days after receipt by the Parent Company of a written notice of termination of this Policy from the Insurer for failure to pay a premium when due, unless the premium is paid within such ten (10) day period; or

(d) at such other time as may be agreed upon by the Insurer and the Parent Company.

The Insurer may not terminate this Policy or any Insuring Agreement made part of this Policy before expiration of the Policy Period, except as provided above for non-payment of a premium.  The Insurer shall refund the unearned premium computed at customary short rates if this Policy or an Insuring Agreement made part of this Policy is terminated by the Parent Company.  Under any other circumstances, the refund shall be computed pro rata.  Payment or tender of any unearned premium by the Insurer shall

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

## Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all the Insureds' rights of recovery, including the Insured Persons' rights to indemnification or advancement from the Company.  The Insureds shall execute all papers required and shall do everything necessary to secure and preserve all rights of recovery, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the Insureds.

## Recoveries

Recovery of any Loss paid under this Policy, whether such recovery is effected by the Insurer or the Insureds, less the costs of recovery, shall be distributed first to the Insureds for any amounts which are in excess of the Limits of Liability of this Policy and would have otherwise been covered by this Policy, next to the Insurer for the amount of such Loss paid hereunder, next to the Insureds for any Retention or Coinsurance Percentage applicable to such Loss, and lastly to the Insureds for the amount of such loss excluded, or otherwise not covered, under this Policy.  Recovery by the Insurer from reinsurance or indemnity shall not be a recovery hereunder.

## Action Against the Insurer

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy.  No person or entity shall have any right under this Policy to join the Insurer as a party to any action against Insureds to determine the Insureds' liability, nor shall the Insurer be impleaded or otherwise brought into any action against the Insureds by the Insureds or their legal representatives.  Bankruptcy or insolvency of

an Insured or of the estate of any Insured Person shall not relieve the Insurer of its obligations, nor deprive the Insurer of its rights or defenses, under this Policy.

## Authorization

By acceptance of this Policy, the Parent Company agrees to act on behalf of the Insureds with respect to the giving and receiving of notice of Claim or termination of this Policy, the payment of premiums and the receiving of any return premiums that may become due under this Policy, the agreement to and acceptance of endorsements, and the giving or receiving of any other notice provided for in this Policy (except the giving of notice to apply for the Additional Extended Discovery Period), and the Insureds agree that the Parent Company shall act on their behalf in such respects.

## Alteration and Assignment

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy that is signed by an authorized representative of the Insurer.

## Arbitration

Only if requested by the Insureds, the Insurer shall submit any dispute, controversy or claim arising out of or relating to this Policy or the breach, nonrenewal, termination or invalidity of this Policy to final and binding arbitration pursuant to such rules and procedures as the parties may agree.  If the parties cannot so agree, the arbitration shall be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration rules.  The arbitration panel shall consist of one arbitrator selected by the Insureds, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators.  In any such arbitration, each party will bear its own legal fees and expenses.

**SelectOne**SM
     **for Community Banks**

The**StPaul**

**MANAGEMENT LIABILITY INSURING AGREEMENT**
Publicly Traded Community Banks

**IMPORTANT NOTE: THIS IS CLAIMS MADE COVERAGE.  PLEASE READ THIS POLICY CAREFULLY.**

**This Policy is written on a claims made basis and covers only Claims first made during the Policy Period, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period. The Limit of Liability Available to pay judgments or settlements shall be reduced and may be exhausted by amounts incurred as Defense Costs.  Retentions shall apply to Defense Costs.**

*\* This is not a certified copy of any policy form. \* Actual policy provisions may differ. \**

In consideration of payment of the premium and in reliance upon the statements made in the Application, which are made a part hereof and deemed attached hereto, and subject to the Declarations, the General Terms, Conditions and Limitations, and the limitations, conditions, provisions and other terms of this Policy, the Insurer, the Company and the Insured Persons agree as follows:

**Directors and Officers Individual Coverage**

The Insurer shall pay on behalf of the Insured Persons Loss for which the Insured Persons are not indemnified by the Company and which the Insured Persons become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for a Management Practices Act taking place before or during the Policy Period.

**Company Indemnification Coverage**

If **Company Indemnification Coverage** is granted as set forth in the Declarations, the Insurer shall pay on behalf of the Company Loss for which the Company grants indemnification to the Insured Persons, as permitted or required by law, and which the Insured Persons have become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for a Management Practices Act taking place before or during the Policy Period.

**Company Liability Coverage**

If **Company Liability Coverage** is granted as set forth in the Declarations, the Insurer shall pay on behalf of the Company Loss for which the Company becomes legally obligated to pay on account of any Securities Claim first made against the Company during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for a Management Practices Act taking place before or during the Policy Period.

**Duty To Defend Provision**

If the Duty of the Insurer to Defend is selected as set forth in the Declarations, then subject to the provisions of the Defense and Settlement section of the General Terms, Conditions and Limitations, the Insurer shall have the right and duty to select counsel and defend any Claim covered by this Insuring Agreement.  If the Duty of the Insureds to Defend is selected as set forth in the Declarations, then subject to the provisions of the Defense and Settlement section of the General Terms, Conditions and Limitations, it shall be the duty of the Insureds and not the duty of the Insurer to select counsel and defend any Claim covered by this Insuring Agreement.

**Extensions**

**Excess Directors and Officers Individual Coverage**

The Insurer shall pay up to $ 1,000,000 on behalf of the Directors or Officers for Loss for which the Directors or Officers are not indemnified by the Company and which the

**The St.Paul**

Directors or Officers become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for a Management Practices Act taking place before or during the Policy Period.

This extension of coverage shall be in addition to and excess of the Each Insuring Agreement Limit of Liability for the Management Liability Insuring Agreement set forth in the Declarations, and no Retention shall apply to this extension of coverage.

The Each Insuring Agreement Limit of Liability for the Management Liability Insuring Agreement must be completely exhausted by payment of Loss before the Insurer shall have any obligation to make any payment for Loss under this extension of coverage, unless the Each Insuring Agreement Limit of Liability for the Management Liability Insuring Agreement is subject to the Policy Year Total Limit of Liability and such Policy Year Total Limit of Liability is completely exhausted by payment of Loss before such Each Insuring Agreement Limit of Liability for the Management Liability Insuring Agreement is completely exhausted by payment of Loss.

This extension of coverage shall be specifically excess of any insurance available to the Directors or Officers that is specifically excess of this Policy or Insuring Agreement and such excess insurance must be completely exhausted by payment of loss, damages, defense costs, claim expenses or other sums covered thereunder before the Insurer shall have any obligation to make any payment for Loss under this extension of coverage.

**Outside Position Liability**

Subject to all of its limitations, conditions, provisions and other terms, this Insuring Agreement covers any Director or Officer serving in an Outside Position.  Any such coverage shall be specifically excess of any indemnity and insurance available from or provided by the entity in which the Director or Officer serves in the Outside Position. Payment by the Insurer, or any member company of The St. Paul Companies, Inc., under another policy as a result of a Claim against any Director or Officer in an Outside

Position shall reduce, by the amount of such payment, the Each Insuring Agreement Limit of Liability for this Insuring Agreement set forth in the Declarations with respect to such Claim.

**Investigative Costs Coverage**

If **Company Liability Coverage** and **Investigative Costs Coverage** is granted as set forth in the Declarations, the Insurer shall pay up to $100,000 on behalf of the Company for reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, trustees, members of the board of managers, management committee members, officers or employees of the Company) incurred by the Company, including it's board of directors, board of managers, or any committee thereof, in connection with the Company's investigation or evaluation of any written demand first made upon the board of directors or board of managers of such Company during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, by one or more security holders of the Company, without the solicitation, assistance or active participation of any Director or Officer, to bring a civil proceeding in a court of law on behalf of the Company against any Director or Officer for a covered Management Practices Act by a Director or Officer taking place before or during the Policy Period.  This extension of coverage shall be part of, and not in addition to, the Each Insuring Agreement Limit of Liability for this Insuring Agreement set forth in the Declarations, and no Retention shall apply to this extension of coverage.

**Exclusions**

**Exclusions Applicable to All Coverages of This Insuring Agreement**

The Insurer shall not be liable for Loss on account of any Claim made against any Insured:

1. based upon, arising out of, or attributable to any prior or pending written demand for monetary damages or non-monetary relief, administrative or regulatory

*  *This is not a certified copy of any policy form.  * Actual policy provisions may differ.  *

©St.Paul Fire and Marine Insurance Co. 2002 All Rights Reserved

Exhibit A Page 000053

The St Paul

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

proceeding or civil or criminal litigation against any Insured as of the applicable Prior Litigation Date set forth in the Declarations, or the same or substantially the same facts, circumstances or situations underlying or alleged therein;

2. for an actual or alleged violation of the responsibilities, obligations or duties imposed by ERISA, or similar provisions of any federal, state, provincial or local statutory law, common law or civil law anywhere in the world, upon fiduciaries of any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to Employees of the Company;

3. based upon, arising out of, or attributable to any actual or alleged infringement or violation of any intellectual property rights or laws, including copyright, title, slogan, patent, service mark, service name, trade dress, trade name, trade secret, or trademark; provided that this exclusion shall not apply to a Securities Claim;

4. based upon, arising out of, or attributable to bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property or any data including loss of use thereof, or false arrest, detention or imprisonment, malicious prosecution, wrongful entry, wrongful eviction, invasion of the right of private occupancy, discrimination, libel, slander, disparagement, or violation of a person or organization's right of privacy or publicity right;

provided this exclusion shall not apply to:

(a) a Securities Claim;

(b) a Claim for any actual or alleged mental anguish, emotional distress, discrimination, libel, slander, or invasion of privacy on account of an Employment Practices Act; or

(c) a Claim for any actual or alleged mental anguish or emotional distress on account of a Lending Act;

5. based upon, arising out of, or attributable to any actual or alleged loan, lease or extension of credit:

(a) to any Affiliated Person;

(b) to any other person or entity if loans, leases or extensions of credit to such person or entity would be aggregated with a loan, lease or extension of credit to any Affiliated Person for purposes of determining the Company's compliance with any applicable restriction on the concentration of the Company's loans; or

(c) that was, at the time of its making, in excess of the legal lending limit of the Company; or

6. for an accounting of profits in fact made from the purchase or sale by such Insured Person of securities of the Company within the meaning of Section 16 (b) of the Securities Exchange Act of 1934 or amendments thereto or similar provisions of any federal, state or local statutory law or common law.

**Exclusions Applicable to Company Liability Coverage**

The Insurer shall not be liable under the **Company Liability Coverage** for Loss on account of any Claim made against the Company based upon, arising out of, or attributable to the actual or proposed payment by the Company of allegedly inadequate consideration in connection with the Company's purchase of securities issued by any Company; provided that this exclusion shall not apply to Defense Costs.

**Severability of Exclusions**

No fact pertaining to or knowledge possessed by any Insured Person shall be imputed to any other Insured Person for purposes of applying exclusion six set forth in the Exclusions Applicable to All Coverages of This Insuring Agreement subsection.

Exhibit A, Page 000054
Endorsement

**SelectOne**<sup>SM</sup> **For Community Banks**

## EMPLOYMENT PRACTICES LIABILITY INSURING AGREEMENT

**IMPORTANT NOTE: THIS IS CLAIMS MADE COVERAGE.  PLEASE READ THIS POLICY CAREFULLY.**

**This Policy is written on a claims made basis and covers only Claims first made during the Policy Period, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period.  The Limit of Liability Available to pay judgments or settlements shall be reduced and may be exhausted by amounts incurred as Defense Costs.  Retentions shall apply to Defense Costs.**

In consideration of payment of the premium and in reliance upon the statements made in the Application, which is made a part hereof and deemed attached hereto, and subject to the Declarations, the General Terms, Conditions and Limitations, and the limitations, conditions, provisions and other terms of this Policy, the Insurer and the Insureds agree as follows:

### Employment Practices Liability Coverage

The Insurer shall pay on behalf of the Insureds Loss for which the Insureds become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for an Employment Practices Act taking place before or during the Policy Period, provided that such Claim is brought by or on behalf of any federal, state, provincial or local governmental body, or any past, present or prospective Employee, officer of the Company, Independent Contractor or Leased Employee.

### Duty To Defend Provision

If the Duty of the Insurer to Defend is selected as set forth in the Declarations, then subject to the provisions of the Defense and Settlement section of the General Terms, Conditions and Limitations, the Insurer shall have the right and duty to select counsel and defend any Claim covered by this Insuring Agreement.  If the Duty of the Insureds to Defend is selected as set forth in the Declarations, then subject

to the provisions of Defense and Settlement section of the General Terms, Conditions and Limitations, it shall be the duty of the Insureds and not the duty of the Insurer to select counsel and defend any Claim covered by this Insuring Agreement.

### Extensions

### Outside Position Liability

Subject to all of its limitations, conditions, provisions and other terms, this Insuring Agreement covers any Director or Officer serving in an Outside Position. Any such coverage shall be specifically excess of any indemnity and insurance available from or provided by the entity in which the Director or Officer serves in the Outside Position. Payment by the Insurer, or any member company of The St. Paul Companies, Inc., under another policy as a result of a Claim against a Director or Officer in an Outside Position shall reduce, by the amount of such payment, the Each Insuring Agreement Limit of Liability for this Insuring Agreement set forth in the Declarations with respect to such Claim.

### Exclusions

### Exclusions Applicable to All Loss

The Insurer shall not be liable for Loss on account of any Claim made against any Insured:

1. based upon, arising out of, or attributable to any prior or pending written demand

*This is not a certified copy of any policy form. * Actual policy provisions may differ. *

| Name of Insured | Policy Number EC06100102 | Effective Date 06/05/08 |
|---|---|---|
| PACIFIC COAST NATIONAL BANK | | Processing Date 07/11/08   13:03   001 |

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

for monetary damages or non-monetary relief, administrative, regulatory or arbitration proceeding or civil or criminal litigation against any Insured as of the applicable Prior Litigation Date set forth in the Declarations, or the same or substantially the same facts, circumstances or situations underlying or alleged therein; provided this exclusion shall not apply to any Claim based upon, arising out of, or attributable to any facts, circumstances or situations underlying or alleged in any such prior or pending administrative proceeding before the Equal Employment Opportunity Commission or any similar federal, state, provincial or local government body if such administrative proceeding was brought by and on behalf of Employees who did not bring the Claim;

2.  for an actual or alleged violation of, or any obligation of any Insured under, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, ERISA, any law governing workers' compensation, unemployment insurance, social security, or disability benefits, other similar provisions of any federal, state, provincial or local statutory law, common law or civil law anywhere in the world, or any amendments, rules or regulations promulgated under any of the foregoing; provided that this exclusion shall not apply to any Claim for any actual or alleged retaliation against a claimant on account of such claimant's exercise of rights pursuant to any such law, rule or regulation;

3.  based upon, arising out of, or attributable to bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property or any data including loss of use thereof, or false arrest, detention or imprisonment, malicious prosecution, wrongful entry, wrongful eviction, invasion of the right of private occupancy, discrimination, libel, slander, disparagement, or violation of a person or organization's right of privacy or publicity right; provided this exclusion shall not apply to a Claim for any actual or alleged mental anguish, emotional distress, discrimination, libel, slander, or invasion of privacy on account of an Employment Practices Act;

4.  based upon, arising out of, or attributable to: (a) any actual or alleged violation of any federal, state, provincial, statutory law, common law, or civil law anywhere in the world relating to securities; or (b) any actual or alleged purchase, sale or distribution of or offer, representation or agreement relating to securities; provided that this exclusion shall not apply to any Claim for any actual or alleged retaliation against a claimant on account of such claimant's actual, alleged or threatened: (a) refusal to violate any such securities laws; or (b) disclosure by such claimant of any actual or alleged violation of such securities laws;

5.  based upon, arising out of, or attributable to liability of others assumed by the Insured under any contract or agreement, either oral or written; provided that this exclusion shall not apply to the extent that:

    (a)  the Insured would have been liable for such Loss in the absence of the contract or agreement; or

    (b)  the Company has agreed pursuant to the contract or agreement to indemnify a Leased Employee or Independent Contractor for such Loss, if coverage is provided for such Leased Employee or Independent Contractor under this Insuring Agreement; or

6.  for any actual or alleged breach of any express contract or agreement between the Company and any Independent Contractor governing the nature of the engagement of such Independent Contractor.

**Exclusions Applicable to Loss Other than Defense Costs**

The Insurer shall not be liable for that part of Loss that constitutes:

1.  amounts owed under a written contract or agreement; provided that this exclusion shall not apply to:

    (a)  Defense Costs;

    (b)  to the extent that the Insured would have been liable for such Loss in the absence of the contract or agreement; or

    (c)  severance pay owed pursuant to a settlement agreement in a Claim for Loss otherwise covered hereunder if the Insurer consents to the inclusion of such severance pay in such settlement agreement;

© 2005 The Travelers Companies, Inc.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

2.  compensation earned by the claimant in the course of employment but not paid by the Company including any unpaid salary, wages, or bonuses; provided that this exclusion shall not apply to:

    (a) back pay or front pay; or

    (b) Defense Costs; or

3.  fringe benefits, deferred payments (including insurance premiums in connection with an employee benefit plan), stock, stock options or warrants, stock appreciation rights, or similar rights in securities or rights to purchase securities, or the value thereof, or other perquisites, or any amounts that constitute severance pay pursuant to an express written obligation as part of employment termination; provided that this exclusion shall not apply to:

    (a) medical, pension, disability, life insurance or other similar employee benefits or insurance premiums in connection with such employee benefit plans to the extent a judgment or settlement in a Claim for actual or constructive wrongful discharge or termination expressly includes a monetary amount for consequential damages representing such employee benefits or insurance premiums; or

    (b) Defense Costs.

**SelectOne**<sup>SM</sup>
**for Community Banks**

**FIDUCIARY LIABILITY INSURING AGREEMENT**

**IMPORTANT NOTE: THIS IS CLAIMS MADE COVERAGE. PLEASE READ THIS POLICY CAREFULLY.**

**This Policy is written on a claims made basis and covers only Claims first made during the Policy Period, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period. The Limit of Liability available to pay judgments or settlements shall be reduced and may be exhausted by amounts incurred as Defense Costs. The Retention shall apply to Defense Costs.**

In consideration of payment of the premium and in reliance upon the statements made in the Application, which are made a part hereof and deemed attached hereto, and subject to the Declarations, the General Terms, Conditions and Limitations, and the limitations, conditions, provisions and other terms of this Policy, the Insurer and the Insureds agree as follows:

### Fiduciary Liability Coverage

The Insurer shall pay on behalf of the Insureds Loss for which the Insureds become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, during the Additional Extended Discovery Period, for a Fiduciary Act by an Insured or by any person for whose Fiduciary Acts the Insured is legally responsible, taking place before or during the Policy Period.

### Duty To Defend Provision

If the Duty of the Insurer to Defend option is selected as set forth in the Declarations, then subject to the provisions of the Defense and Settlement section of the General Terms, Conditions and Limitations, the Insurer shall have the right and duty to select counsel and defend any Claim covered by this Insuring Agreement. If the Duty of the Insureds to Defend is selected as set forth in the Declarations, then subject to the provisions of the Defense and Settlement section of the General Terms, Conditions and Limitations, it shall be the duty of the Insureds and not the duty of the Insurer to select counsel and defend any Claim covered by this Insuring Agreement.

### Extensions

#### Voluntary Compliance Program Coverage

If **Voluntary Compliance Program Coverage** is granted as set forth in the Declarations, and if the Insurer receives during the Policy Period, Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, prior written notice from the Insureds, of the Insureds intent to enter into a Voluntary Compliance Program or similar voluntary settlement program administered by the Internal Revenue Service of the United States of America or any other governmental body, the Insurer shall pay up to $100,000 on behalf of the Insureds for any fees, penalties or sanctions, other than the cost of corrections, imposed by law under any such Voluntary Compliance Program or similar voluntary settlement program entered into by the Insureds that any Insured becomes legally obligated to pay as a result of a covered Fiduciary Act taking place before or during the Policy Period. This extension of coverage shall be part of, and not in addition to, the Each Insuring Agreement Limit of Liability for this Insuring Agreement set forth in the Declarations, and no Retention shall apply to this extension of coverage.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

| Name of Insured | Policy Number EC06100102 | Effective Date 06/05/08 |
|---|---|---|
| PACIFIC COAST NATIONAL BANK | | Processing Date 07/11/08   13:03   001 |

## Exclusions

### Exclusions Applicable to All Loss

The Insurer shall not be liable for Loss on account of any Claim made against any Insured:

1. based upon, arising out of, or attributable to any prior or pending written demand for monetary damages or non-monetary relief, administrative or arbitration proceeding, civil or criminal litigation, or any fact-finding investigation by the Department of Labor or the Pension Benefit Guaranty Corporation against any Insured as of the applicable Prior Litigation Date set forth in the Declarations, or the same or substantially the same facts, circumstances or situations underlying or alleged therein;

2. for discrimination in violation of any law other than ERISA;

3. for liability of the Insured under any contract or agreement; provided that this exclusion shall not apply to the extent:

   (a) the Insured would have been liable in the absence of such contract or agreement; or

   (b) the liability was assumed in accordance with or under the trust agreement or equivalent document pursuant to which the Plan was established;

4. based upon, arising out of, or attributable to any actual or alleged obligation of an Insured under any law governing workers compensation, unemployment, social security or disability benefits, except the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; or

5. based upon, arising out of, or attributable to bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property or any data including loss of use thereof, or false arrest, detention or imprisonment, malicious prosecution, wrongful entry, wrongful eviction, invasion of the right of private occupancy, libel, slander, disparagement, or violation of a person or organization's right of privacy or publicity right.

### Exclusions Applicable to Loss Other Than Defense Costs

The Insurer shall not be liable for that part of Loss that constitutes:

1. (a) benefits due or to become due under any Plan;

   (b) benefits which would be due under any Plan if such Plan complied with all applicable law; or

   (c) that portion of any settlement or judgment which constitutes benefits; provided this shall not apply to the extent that recovery for such benefits is based upon a covered Fiduciary Act by an Insured Person and such benefits are payable as a personal obligation of such Insured Person;

   provided that this exclusion shall not apply to Defense Costs; or

2. contributions owed by the Company to any Plan for which any of the Insureds failed to collect, unless such failure is because of the negligent act, error or omission of an Insured solely in the Administration of a Plan; provided that this exclusion shall not apply to Defense Costs.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

**SelectOne**SM
   **for Community Banks**

**BANKERS PROFESSIONAL LIABILITY INSURING AGREEMENT**

> **IMPORTANT NOTE: THIS IS CLAIMS MADE COVERAGE.  PLEASE READ THIS POLICY CAREFULLY.**
>
> **This Policy is written on a claims made basis and covers only Claims first made during the Policy Period, the Automatic Discovery Period or, if exercised, the Additional Extended Discovery Period.  The Limit of Liability Available to pay judgments or settlements shall be reduced and may be exhausted by amounts incurred as Defense Costs.  Retentions shall apply to Defense Costs.**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

In consideration of payment of the premium and in reliance upon the statements made in the Application, which are made a part hereof and deemed attached hereto, and subject to the Declarations, the General Terms, Conditions and Limitations, and the limitations, conditions, provisions and other terms of this Policy, the Insurer, the Company and the Insured Persons agree as follows:

### Lender Liability Coverage

If **Lender Liability Coverage** is granted as set forth in the Declarations, the Insurer shall pay on behalf of the Insureds Loss for which the Insureds become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for a Lending Act taking place before or during the Policy Period.

### Professional Services Liability Coverage

If **Professional Services Liability Coverage** is granted as set forth in the Declarations, the Insurer shall pay on behalf of the Insureds Loss for which the Insureds become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for a Professional Services Act taking place before or during the Policy Period.

### Duty To Defend Provision

If the Duty of the Insurer to Defend is selected as set forth in the Declarations, then subject to the provisions of the Defense and Settlement section of the General Terms, Conditions and Limitations, the Insurer shall have the right and duty to select counsel and defend any Claim covered by this Insuring Agreement.  If the Duty of the Insureds to Defend is selected as set forth in the Declarations, then subject to the provisions of Defense and Settlement section of the General Terms, Conditions and Limitations, it shall be the duty of the Insureds and not the duty of the Insurer to select counsel and defend any Claim covered by this Insuring Agreement.

### Exclusions

**Exclusions Applicable to All Coverages of This Insuring Agreement**

The Insurer shall not be liable for Loss on account of any Claim made against any Insured:

1. based upon, arising out of, or attributable to any prior or pending written demand for monetary damages or non-monetary relief, administrative or regulatory proceeding or civil or criminal litigation against any Insured as of the applicable Prior Litigation Date set forth in the Declarations, or the same or substantially the same facts, circumstances or situations underlying or alleged therein;

---

| | | |
|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 |

CB006 Rev. 10-05
© 2005 The Travelers Companies, Inc.

2. based upon, arising out of, or attributable to any actual or alleged infringement or violation of any intellectual property rights or laws, including copyright, title, slogan, patent, service mark, service name, trade dress, trade name, trade secret, or trademark;

3. for bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or for damage to or destruction of any tangible property or any data including loss of use thereof, or for false arrest, detention or imprisonment, malicious prosecution, wrongful entry, wrongful eviction, invasion of the right of private occupancy, discrimination, libel, slander, disparagement, or violation of a person or organization's right of privacy or publicity right; provided this exclusion shall not apply to a Claim for any actual or alleged mental anguish or emotional distress on account of a Lending Act;

4. based upon, arising out of, or attributable to any violation of Federal or State laws or regulations relating to extensions or denials of credit, including the Truth-in-Lending Act, Equal Credit Opportunity Act, Fair Credit Reporting Act, Fair Debt Collection Practices Act, the Home Owners Equity Protection Act of 1996, or usury laws or regulations;

5. based upon, arising out of, or attributable to any actual or alleged loan, lease or extension of credit:

    (a) to any Affiliated Person;

    (b) to any other person or entity if loans, leases or extensions of credit to such person or entity would be aggregated with a loan, lease or extension of credit to any Affiliated Person for purposes of determining the Company's compliance with any applicable restriction on the concentration of the Company's loans; or

    (c) that was, at the time of its making, in excess of the legal lending limit of the Company; or

6. for a Lending Act or a Professional Services Act actually or allegedly committed or attempted by any Insured Person in their capacity as a director, officer, trustee, governor, member of the board of managers, or any equivalent position, or employee of any entity other than the Company, even if such service

is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Insured Person by, the Company.

## Exclusions Applicable to Lender Liability Coverage

The Insurer shall not be liable under the **Lender Liability Coverage** for Loss on account of any Claim made against the Insureds:

1. based upon, arising out of, or attributable to any lending or advisory service where such services are not part of the normal process of extending a loan, lease or extension of credit to a Borrower;

2. based upon, arising out of, or attributable to the rendering or failure to render appraisal services to a Borrower;

3. based upon, arising out of, or attributable to the Financial Impairment of the Company; or

4. based upon, arising out of, or attributable to any error, misstatement, misleading statement, act, omission, neglect or breach of duty arising out of the operation or control of any entity or property that the Insured acquired as security or collateral for any loan, lease or extension of credit.

## Exclusions Applicable to Professional Services Liability Coverage

The Insurer shall not be liable under the **Professional Services Liability Coverage** for Loss on account of any Claim made against the Insureds:

1. for the actual or alleged liability of any Insured under any oral, written or implied contract or agreement, regardless of whether such liability is direct or assumed; provided this exclusion shall not apply to:

    (a) the extent that the Company would have been liable in the absence of the contract or agreement;

    (b) Defense Costs to the extent that such Claim alleges a breach of contractual obligations because of a Professional Services Act; or

    (c) the extent that the Company has agreed to indemnify a Leased Employee, if coverage for such Leased Employee is provided under this Insuring Agreement;

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

2. based upon, arising out of, or attributable to the Company serving as a receiver, trustee in bankruptcy, conservator or assignee for the benefit of creditors;

3. based upon, arising out of or attributable to the insolvency, conservatorship, receivership, bankruptcy, or liquidation of, or financial inability to pay, or suspension of payment by, any bank or banking firm, investment company, investment bank, or any broker or dealer in securities or commodities, any insurance or reinsurance entity, or other organizations of a similar nature (other than the Company); provided, that this exclusion shall not apply to the extent such Claim alleges a covered Professional Services Act solely in connection with an Insured's investment on behalf of a customer in the stock of any of the foregoing entities;

4. based upon, arising out of or attributable to any dispute involving fees or charges for an Insured's services;

5. based upon, arising out of, or attributable to the mechanical or electronic failure, breakdown or malfunction of any machine or systems of machines;

6. based upon, arising out of, or attributable to any of the Insured's actual or written representations, promises or guarantees regarding the past performance or future value of any investment product;

7. for the depreciation (or failure to appreciate) in value of any investments, including securities, commodities, currencies, options or futures; provided this exclusion shall not apply to any such depreciation (or failure to appreciate) due solely to negligence on the part of an Insured in failing to effect a specific investment transaction in accordance with the specific prior instructions of a customer of the Company;

8. for the actual loss of money, securities, property or other items of value in the custody or control of the Company, its correspondent bank or other authorized representative, or in transit in the care, custody and control of an authorized representative of the Company;

9. based upon, arising out of, or attributable to:

   (a) accepting, paying or cashing any instrument which bears a forged,

altered or unauthorized signature or endorsement;

   (b) transferring, paying or delivering any funds or property or establishing any credit or giving any value on the faith of any instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or property, which such instructions or advices purport to have been signed or endorsed by a natural person or entity, but which such instructions or advices either bear a signature which is a forgery or have been altered without the knowledge and consent of such natural person or entity;

   (c) having guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, evidence of debt, endorsement or any other such items;

   (d) the notarization or certification of a signature of a person unless that person or someone claiming to be that person physically appeared before the Insured at the time of notarization or certification; or

   (e) the failure to comply with any notice of any customer of the Company or any authorized representative of such customer to stop payment on any check(s) or draft(s) made or drawn by such customer or the wrongful dishonor of any check(s) or draft(s) made or drawn by the customer of the Company or any authorized representative of such customer;

10. based upon, arising out of, or attributable to safe deposit box operations of the Company;

11. based upon, arising out of, or attributable to:

    (a) the Company's underwriting, syndication, or promotion of equity or debt securities;

    (b) the Company's investment banking activities, including the sale and distribution of a new offering of securities;

    (c) the Company's rendering advice, recommendations or services regarding any merger, tender offer, proxy contest, acquisition, restructuring, reorganization,

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

recapitalization, divestiture, or similar transaction;

(d) the Company's rendering of a "fairness opinion" regarding the valuation of any assets or business entity not held by an Insured as trustee; or

(e) any disclosure requirements in connection with subparts (a), (b), (c) and (d) above;

12. based upon, arising out of, or attributable to any actual conflict of interest by an Insured, provided such Insured in fact knew of the conflict of interest at the time the Professional Services Act was committed; or

13. for an actual or alleged violation of the responsibilities, obligations or duties imposed by ERISA, or similar provisions of any federal, state, provincial or local statutory law, common law or civil law anywhere in the world, upon fiduciaries of any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to Employees of the Company.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

Exhibit A, Page 000063

© 2005 The Travelers Companies, Inc.

**PRIOR ACTS EXCLUSION ENDORSEMENT – SPECIFIED DATE**

*\* This is not a certified copy of any policy form. \* Actual policy provisions may differ. \**

In consideration of the premium charged, it is understood and agreed that the following exclusion is added to the:

(Only items with an X in the box apply)

**Management Liability Insuring Agreement** in the

☒ Exclusions Applicable to All Coverages of This Insuring Agreement subsection of the Management Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Management Practices Act taking place prior to 11/04/2004

☒ Exclusions Applicable to Company Liability Coverage subsection of the Management Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable under the **Company Liability Coverage** for Loss on account of any Claim made against the Company based upon, arising out of, or attributable to any Management Practices Act taking place prior to 11/04/2004

☒ **Employment Practices Liability Insuring Agreement** in the Exclusions Applicable to All Loss subsection of the Employment Practices Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Employment Practices Act taking place prior to 11/04/2004

☒ **Fiduciary Liability Insuring Agreement** in the Exclusions Applicable to All Loss subsection of the Fiduciary Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Fiduciary Act taking place prior to 06/05/2008

☐ **Trust Liability Insuring Agreement** in the Exclusions section of the Trust Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Trust Act taking place prior to

**Bankers Professional Liability Insuring Agreement** in the

☐ Exclusions Applicable to All Coverages of This Insuring Agreement subsection of the Bankers Professional Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Lending Act or Professional Services Act taking place prior to

☒ Exclusions Applicable to the Lender Liability Coverage subsection of the Bankers Professional Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable under the **Lender Liability Coverage** for Loss on account of any Claim made against the

| | | |
|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 |

CB044 Ed. 10-02
© 2002 The St. Paul Travelers Companies, Inc. All Rights Reserved

Endorsement

EXHIBIT A, Page 000054
INSURED

Insureds based upon, arising out of, or attributable to any Lending Act taking place prior to 11/04/2004     .

☒ Exclusions Applicable to Professional Services Liability Coverage subsection of the Bankers Professional Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable under the **Professional Services Liability Coverage** for Loss on account of any Claim made against the Insureds based upon, arising out of, or attributable to any Professional Services Act taking place prior to 06/05/2008     .

All other terms of your policy remain the same.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

Exhibit A, Page 000065

© 2002 The St. Paul Travelers Companies, Inc.   All Rights Reserved

**COMPANY IRA/KEOGH ACT LIABILITY COVERAGE ENDORSEMENT –
MANAGEMENT LIABILITY INSURING AGREEMENT**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

In consideration of the premium charged, it is understood and agreed that:

1. The following coverage is added to the Management Liability Insuring Agreement:

### Company IRA/Keogh Act Liability Coverage

The Insurer shall pay on behalf of the Company Loss for which the Company becomes legally obligated to pay on account of any Claim first made against the Company during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for an IRA/Keogh Act taking place before or during the Policy Period.

2. The following is added to the Limits of Liability, Retentions, Coinsurance and Prior Litigation Date sections set forth in the Declarations, and amends such sections, notwithstanding anything to the contrary:

(Only items with an X in the box apply)

☒ **LIMITS OF LIABILITY**

**EACH INSURING AGREEMENT LIMIT OF LIABILITY**

Management Liability Insuring Agreement:

Company IRA/Keogh Act Liability Coverage

$5,000,000   Each Policy Year

**Note: The Limit of Liability for Company IRA/Keogh Act Liability Coverage is part of and not in addition to the Limit of Liability for the Management Liability Insuring Agreement.**

☒ **RETENTIONS**

Management Liability Insuring Agreement:

Company IRA/ Keogh Act Liability Coverage

$75,000   each Claim as respects any Loss on account of any Claim made against the Company based upon, arising out of, or attributable to an IRA/Keogh Act

☒ **COINSURANCE PERCENT APPLICABLE TO EACH INSURING AGREEMENT**

Management Liability Insuring Agreement:

Company IRA/Keogh Act Liability Coverage

0 % as respects any Loss on account of any Claim made against the Company based upon, arising out of, or attributable to an IRA/Keogh Act

☒ **PRIOR LITIGATION DATE**

Management Liability Insuring Agreement:

Company IRA/Keogh Act Liability Coverage Prior Litigation Date as respects any Claim based upon, arising out of, or attributable to an IRA/Keogh Act 06/05/2008

3. The following is added to the Each Insuring Agreement Limit of Liability and Policy Year Total Limit of Liability subsection of this Policy's General Terms, Conditions and Limitations:

The Limit of Liability for **Company IRA/Keogh Act Liability Coverage** shall be

| Name of Insured | Policy Number EC06100102 | Effective Date 06/05/08 |
|---|---|---|
| PACIFIC COAST NATIONAL BANK | | Processing Date 07/11/08   13:03   001 |

CB101 Ed. 10-02
© 2002 The St. Paul Travelers Companies, Inc. All Rights Reserved

Endorsement

Page 1 of 2

Exhibit A, Page 000066
INSURED

part of, and not in addition to, the Each Insuring Agreement Limit of Liability for the Management Liability Insuring Agreement. Payment of Loss under the **Company IRA/Keogh Act Liability Coverage** shall reduce and may exhaust the Each Insuring Agreement Limit of Liability for the Management Liability Insuring Agreement.

4. The following exclusions are added to the Exclusions section of the Management Liability Insuring Agreement:

**Exclusions Applicable to Company IRA/Keogh Act Liability Coverage:**

The Insurer shall not be liable under the **Company IRA/Keogh Act Liability Coverage** for Loss on account of any Claim made against the Company:

(Only items with an X in the box apply)

☒ based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given under any policy of which the **Company IRA/Keogh Act Liability Coverage** is a direct or indirect renewal or replacement.

☐ based upon, arising out of, or attributable to any IRA/Keogh Act taking place before the effective date of the **Company IRA/Keogh Act Liability Coverage.**

☐ based upon, arising out of, or attributable to

All other terms of your policy remain the same.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

Exhibit A, Page 000067

© 2002 The St. Paul Travelers Companies, Inc. All Rights Reserved

**EMPLOYMENT PRACTICES ACT, TRUST ACT, LENDING ACT OR PROFESSIONAL SERVICES ACT AMENDMENT TO DEFINITION OF MANAGEMENT PRACTICES ACT ENDORSEMENT – SERVICES EXCLUSION ADDED TO MANAGEMENT LIABILITY INSURING AGREEMENT – MANAGEMENT LIABILITY INSURING AGREEMENT**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

In consideration of the premium charged, it is understood and agreed that:

(Only items with an X in the box apply)

1.  The following is added to the definition of Management Practices Act in the Definitions of the General Terms, Conditions and Limitations:

    ☒ With respect to any **Directors and Officers Individual Coverage** and **Company Indemnification Coverage,** Management Practices Act also does not include an Employment Practices Act.

    ☐ With respect to any **Directors and Officers Individual Coverage** and **Company Indemnification Coverage,** Management Practices Act also does not include a Trust Act.

    ☒ With respect to any **Directors and Officers Individual Coverage** and **Company Indemnification Coverage,** Management Practices Act also does not include a Lending Act.

    ☒ With respect to any **Directors and Officers Individual Coverage** and        **Company**

**Indemnification Coverage,** Management Practices Act also does not include a Professional Services Act.

☐ 2.  Exclusion seven in the Exclusions Applicable to Company Liability Coverage subsection of the Management Liability Insuring Agreement is deleted.

☒ 3.  The following is added to the Exclusions Applicable to All Coverages of This Insuring Agreement subsection of the Management Liability Insuring Agreement:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to the rendering of, or failure to render, any service to a customer of the Company; provided this exclusion shall not apply to a Securities Claim.

All other terms of your policy remain the same.

| | | |
|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 |

CB108 Rev. 10-05
© 2005 The St. Paul Travelers Companies, Inc. All Rights Reserved

Exhibit A, Page 000068
Endorsement

Page 1 of 1

**ADDITION OF THIRD-PARTY SEXUAL HARASSMENT LIABILITY COVERAGE – EMPLOYMENT PRACTICES LIABILITY INSURING AGREEMENT**



In consideration of the premium charged and in reliance upon the statements made to the Insurer by letter or Application dated 05/30/2008     which is deemed attached to and incorporated into this Policy, it is understood and agreed that effective 06/05/2008    :

1. The following is added to the Declarations of this Policy:

   *Coverage is effective only for Insuring Agreements made part of this Policy and for which an Each Insuring Agreement Limit of Liability is set forth below. Insuring Agreements are subject to the Policy Year Total Limit of Liability only if the box is checked "Yes" next to such Insuring Agreement below. Additional Coverages and Additional Insureds under each such Insuring Agreement are effective only if the box is checked "Yes" next to such Coverage or Additional Insureds below. The selection of Duty of the Insureds to Defend or Duty of the Insurer to Defend under each such Insuring Agreement is set forth by the "X" in the box next to such Duty to Defend below.*

**LIMITS OF LIABILITY**

**EACH INSURING AGREEMENT LIMIT OF LIABILITY:**

  **Employment Practices Liability Insuring Agreement:**

    Third-Party Sexual Harassment Liability Coverage    Yes ☒ No ☐    $1,000,000     Each Policy Year

*Note: The Limit of Liability for Third-Party Sexual Harassment Liability Coverage is part of and not in addition to the Limit of Liability for Employment Practices Liability Coverage.*

**RETENTIONS**

  **Employment Practices Liability Insuring Agreement:**

    Third-Party Sexual Harassment Liability Coverage    $25,000     each Claim

**COINSURANCE PERCENT APPLICABLE TO EACH INSURING AGREEMENT**

  **Employment Practices Liability Insuring Agreement:**

    Third-Party Sexual Harassment Liability Coverage    0  %

**PRIOR LITIGATION DATE**

  **Employment Practices Liability Insuring Agreement:**

    Third-Party Sexual Harassment Liability Coverage
    Prior Litigation Date     11/04/2005

*This is not a certified copy of any policy form. * Actual policy provisions may differ. *

| | | |
|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 |

Exhibit A, Page 000069
INSURED

2. **Third–Party Sexual Harassment Liability Coverage** is added to the Employment Practices Liability Insuring Agreement made part of this Policy, as follows:

**Third–Party Sexual Harassment Liability Coverage**

If **Third–Party Sexual Harassment Liability Coverage** is granted as set forth in the Declarations, the Insurer shall pay on behalf of the Insureds Loss for which the Insureds become legally obligated to pay on account of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Discovery Period, or, if exercised, the Additional Extended Discovery Period, for a Third–Party Sexual Harassment Act taking place before or during the Policy Period, provided that such Claim is brought by or on behalf of any federal, state, provincial or local governmental body, or any natural person, other than a past, present or prospective Employee, Director or Officer, Independent Contractor or Leased Employee.

3. The following replaces exclusion three in the Exclusions Applicable to All Loss subsection of the Employment Practices Liability Insuring Agreement:

   3. based upon, arising out of, or attributable to bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property or any data including loss of use thereof, or false arrest, detention or imprisonment, malicious prosecution, wrongful entry, wrongful eviction, invasion of the right of private occupancy, discrimination, libel, slander, disparagement, or violation of a person or organization's right of privacy or publicity right; provided this exclusion shall not apply to a Claim for any actual or alleged mental anguish, emotional distress, discrimination, libel, slander, or invasion of privacy on account of an Employment Practices Act or a Third–Party Sexual Harassment Act;

4. It is further understood and agreed that the following exclusions are added to the Exclusions section of the Employment Practices Liability Insuring Agreement made part of this is Policy:

**Exclusions Applicable to Third–Party Sexual Harassment Liability Coverage**

The Insurer shall not be liable for Loss under the **Third–Party Sexual Harassment Liability Coverage** on account of any Claim made against any Insured:

(Only items with an X in the box apply)

☐ based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given under any policy of which the **Third–Party Sexual Harassment Liability Coverage** is a direct or indirect renewal or replacement.

☐ based upon, arising out of, or attributable to any Third-Party Sexual Harassment Act taking place before the effective date of the **Third–Party Sexual Harassment Liability Coverage.**

☐ based upon, arising out of, or attributable to

5. The following replaces the definition of Wrongful Act in the Definitions of the General Terms, Conditions and Limitations:

**Wrongful Act** means Employment Practices Act, IRA/Keogh Act, Fiduciary Act, Lending Act, Management Practices Act, Professional Services Act, Third-Party Sexual Harassment Act and Trust Act, but only to the extent that coverage is granted for such acts pursuant to an Insuring Agreement made part of this Policy

6. The following is added to the Definitions section of this Policy's General Terms, Conditions and Limitations:

**Third–Party Sexual Harassment Act** means violation of any federal, state, provincial or local statutory law, common law or civil law anywhere in the world,

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

prohibiting any kind of sexual harassment, such as unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature, committed or attempted by any of the Insureds in their capacity as such against a natural person who is not an Insured; provided that Third-Party Sexual Harassment Act shall not include any Employment Practices Act.

Third-Party Sexual Harassment Act does not include any conduct actually or allegedly committed or attempted by any Insured Person in their capacity as a director, officer, trustee, governor, member of the board of managers, or any equivalent position, or employee of any entity other than the Company, even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Insured Person by, the Company.

7.  The following is added to the definition of Management Practices Act in the Definitions of the General Terms, Conditions and Limitations:

Management Practices Act also does not include a Third-Party Sexual Harassment Act.

All other terms of your policy remain the same.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

**CONDITIONAL NON-RESCINDABLE ENDORSEMENT**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

In consideration of the premium charged, it is understood and agreed that:

1. The following replaces the first paragraph of the Representations and Severability subsection of the General Terms, Conditions and Limitations section of this Policy:

   In granting coverage under this Policy, the Insurer has relied upon the statements and representations in the Application. The Insureds represent that all such statements and representations are true. All such statements and representations shall be deemed material to the acceptance of the risk or hazard assumed by the Insurer under this Policy. No such statement or representation, or the knowledge thereof, shall be imputed from one Insured Person to another Insured Person. The Policy is issued in reliance upon the truth thereof.

2. The following is added to the Representations and Severability subsection of the General Terms, Conditions and Limitations section of this Policy:

   The coverage provided under the **Directors and Officers Individual Coverage** shall be non-rescindable by the Insurer with respect to any Insured Person who, as of the inception date of this Policy, did not know the facts that were not truthfully disclosed in the Application.

All other terms of your policy remain the same.

| | | |
|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 |

MEL2401 Ed. 4-05                                             Endorsement
© 2005 The Travelers Companies, Inc.                                                    Page 1 of 1

Exhibit A, Page 000072

**REPLACE SUBPART (a) OF THE INSURED V INSURED
EXCLUSION − WHISTLEBLOWER PROTECTION −
GENERAL TERMS, CONDITIONS AND LIMITATIONS**

In consideration of the premium charged, it is understood and agreed that the following replaces subpart (a) of the fourth exclusion of the Exclusions Applicable to All Insuring Agreements and to All Loss subsection of the General Terms, Conditions and Limitations of this Policy:

(a) a Claim that is a derivative action brought or maintained on behalf of the Company by one or more persons who are not Directors or Officers and who bring and maintain such Claim without the solicitation, assistance or active participation of any Director or Officer; provided, however, if any Director or Officer engages in any activity protected under:

   (1) 18 U.S.C. 1514A (a) (whistleblower protection pursuant to Section 806 of the Sarbanes-Oxley Act of 2002), other than the activity of "filing or the causing to be filed" any proceeding as specified under

1514A (a) (2) and any other activity specified in 1514 (a) (2) that is engaged in on a voluntary basis, or

   (2) any similar whistleblower protection provision of an applicable federal, state, local or foreign securities law that affords protection to such Director or Officer, other than the filing, causing to be filed or other activities similar to the type specified in 18 U.S.C. 1514A(a)(2) engaged in on a voluntary basis,

for the purposes of this exception, such activity shall not alone be considered to be with the solicitation, assistance or active participation of the Company or any such Director or Officer;

All other terms or your policy remain the same.

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

| Name of Insured | Policy Number EC06100102 | Effective Date 06/05/08 |
|---|---|---|
| PACIFIC COAST NATIONAL BANK | | Processing Date 07/11/08   13:03   001 |

MEL4178 Ed. 4-06
© 2006 The Travelers Companies, Inc.

Exhibit A, Page 000073          Endorsement

Page 1 of 1

**REPLACE EXCLUSION FIVE IN THE EXCLUSIONS APPLICABLE TO ALL COVERAGES OF THIS INSURING AGREEMENT SUBSECTION – LEGAL LENDING LIMIT VIOLATIONS – BANKERS PROFESSIONAL LIABILITY INSURING AGREEMENT**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

In consideration of the premium charged, it is understood and agreed that the following replaces exclusion five in the Exclusions Applicable to All Coverages of This Insuring Agreement subsection of the Bankers Professional Liability Insuring Agreement:

5.  based upon, arising out of, or attributable to any actual or alleged loan, lease or extension of credit that was, at the time of its making, in excess of the legal lending limit of the Company; or

All other terms of your policy remain the same.

| | | |
|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/08 |
| PACIFIC COAST NATIONAL BANK | | **Processing Date** 07/11/08   13:03   001 |

MEL4374 Ed. 4-06
©  2006 The Travelers Companies, Inc.

Exhibit A, Page 000074

Endorsement

Page 1 of 1


**TRAVELERS**

**PROPRIETARY CUSTOMER INFORMATION COVERAGE
ENDORSEMENT - BANKERS PROFESSIONAL LIABILITY
INSURING AGREEMENT**

In consideration of the premium charged, it is understood and agreed that:

1. The following is added to the Definitions of the General Terms, Conditions and Limitations:

   **Proprietary Customer Information** means any customer name, address, telephone number, social security number, driver's license number, account number, credit or debit card number, PIN, password, account history or any other private or personal customer information.

2. The following is added to the end of exclusion 3 in the Exclusions Applicable to All Coverages of This Insuring Agreement subsection of the Bankers Professional Liability Insuring Agreement made part of this Policy:

   and provided this exclusion shall not apply to a Claim for any actual or alleged violation of a person's right of privacy directly related to the failure to protect Proprietary Customer Information;

3. The following is added to the end of exclusion 8 in the Exclusions Applicable to Professional Services Liability Coverage subsection of the Bankers Professional Liability Insuring Agreement made part of this Policy:

   provided this exclusion shall not apply to a Claim for the failure to protect Proprietary Customer Information;

All other terms of your policy remain the same.

| | | |
|---|---|---|
| **Name of Insured** | **Policy Number** EC06100102 | **Effective Date** 06/05/2008 |
| **Pacific Coast National Bank** | **Processing Date** 07/11/2008 | |

MEL4747 Ed. 11-06 Printed in U.S.A.                    Endorsement
ᵃ St.Paul Fire and Marine Insurance Co. 2002 All Rights Reserved                    Page 1 of 1

Exhibit A, Page 000073

**RUN–OFF COVERAGE ONLY ENDORSEMENT – APPLICABLE TO ENTIRE POLICY OR SPECIFIED INSURING AGREEMENT OR COVERAGE**

* This is not a certified copy of any policy form. * Actual policy provisions may differ. *

In consideration of the premium charged, it is understood and agreed that the following is added to the:

(Only items with an X in the box apply)

☒ **General Terms, Conditions and Limitations of this Policy** in the Exclusions Applicable to All Insuring Agreements and to All Loss subsection of the General Terms, Conditions and Limitations of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Wrongful Act taking place after 05/05/2009         .

☒ **Management Liability Insuring Agreement** in the

☒ Exclusions Applicable to All Coverages of This Insuring Agreement subsection of the Management Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Management Practices Act taking place after 05/05/2009         .

☒ Exclusions Applicable to Company Liability Coverage subsection of the Management Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable under the **Company Liability Coverage** for Loss on account of any Claim made against the Company based upon, arising out of, or attributable to any Management Practices Act taking place after 05/05/2009         .

☐ **Employment Practices Liability Insuring Agreement** in the Exclusions Applicable to All Loss subsection of the Employment Practices Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Employment Practices Act taking place after

☒ **Fiduciary Liability Insuring Agreement** in the Exclusions Applicable to All Loss subsection of the Fiduciary Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Fiduciary Act taking place after 05/05/2009         .

☐ **Trust Liability Insuring Agreement** in the Exclusions section of the Trust Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Trust Act taking place after

☒ **Bankers Professional Liability Insuring Agreement** in the

☒ Exclusions Applicable to All Coverages of This Insuring Agreement subsection of the Bankers Professional Liability Insuring Agreement made part of this Policy:

| Name of Insured | Policy Number EC06100102 | Effective Date 05/05/09 |
|---|---|---|
| PACIFIC COAST NATIONAL BANK | | Processing Date 05/15/09   13:22   001 |

CB048 Ed. 10-02                                Endorsement                                Page 1 of 2
© 2002 The St. Paul Travelers Companies, Inc.  All Rights Reserved

Exhibit A, Page 000076
INSURED

The Insurer shall not be liable for Loss on account of any Claim made against any Insured based upon, arising out of, or attributable to any Lending Act or Professional Services Act taking place after 05/05/2009          .

☒ Exclusions Applicable to the Lender Liability Coverage subsection of the Bankers Professional Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable under the **Lender Liability Coverage** for Loss on account of any Claim made against the Insureds based upon, arising out of, or attributable to any Lending Act taking place after 05/05/2009          .

☒ Exclusions Applicable to Professional Services Liability Coverage subsection of the Bankers Professional Liability Insuring Agreement made part of this Policy:

The Insurer shall not be liable under the **Professional Services Liability Coverage** for Loss on account of any Claim made against the Insureds based upon, arising out of, or attributable to any Professional Services Act taking place after 05/05/2009          .

All other terms of your policy remain the same.

*This is not a certified copy of any policy form. * Actual policy provisions may differ. *

Exhibit A  Page 000077

© 2002 The St. Paul Travelers Companies, Inc.   All Rights Reserved

# EXHIBIT B

1   Allan B. Cooper (SBN 60862)
        acooper@ecjlaw.com
2   **ERVIN COHEN & JESSUP LLP**
    9401 Wilshire Boulevard, Ninth Floor
3   Beverly Hills, California 90212-2974
    Telephone  (310) 273-6333
4   Facsimile  (310) 859-2325

5   Of Counsel:
    Robert J. Burvant
6   **KING, KREBS & JURGENS, PLLC**
    201 St. Charles Avenue, Suite 4500
7   New Orleans, Louisiana  70170
    Telephone  (504) 582-3800
8   Facsimile  (504) 582-1233

9   Attorneys for Plaintiff FEDERAL DEPOSIT
        INSURANCE CORPORATION, as Receiver
10      for PACIFIC COAST NATIONAL BANK

11

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14

15   FEDERAL DEPOSIT INSURANCE          Case No. SACV12 1938 JVS (MLGx)
     CORPORATION, as Receiver for
16   PACIFIC COAST NATIONAL BANK,       **COMPLAINT**

17              Plaintiff,

18        v.

19   MICHAEL S. HAHN, COLIN M.
     FORKNER, MICHAEL V.
20   CUMMINGS, RICHARD S.
     GRINYER, STANLEY M. CRUSE and
21   DAVID L. ADAMS,

22              Defendants.

23

24        Plaintiff Federal Deposit Insurance Corporation ("FDIC"), as Receiver

25   ("FDIC-R") for Pacific Coast National Bank ("PCNB" or "Bank"), files this

26   Complaint against Defendants Michael S. Hahn ("Hahn"), Colin M. Forkner

27   ("Forkner"), Michael V. Cummings ("Cummings"), Richard S. Grinyer ("Grinyer"),

28   Stanley M. Cruse ("Cruse"), and David L. Adams ("Adams") (collectively the

14609.1:1710169.1

COMPLAINT

Exhibit B, Page 000078

1   "Defendants") for negligence, gross negligence, and breaches of fiduciary duty, and

2   states as follows:

3   **I.   INTRODUCTION**

4       1.      FDIC-R brings this lawsuit in its capacity as receiver for PCNB, a

5   failed financial institution, against six of PCNB's former officers and/or directors.

6   The FDIC-R seeks to recover damages resulting from Defendants' negligence, gross

7   negligence, and breaches of fiduciary duty in operating and managing the lending

8   function of the Bank and allowing loans to fund in violation of the Bank's policies

9   and safe and sound banking practices.

10      2.      Defendants regularly failed, neglected, or refused to fully and properly

11  discharge their duties and obligations in operating and managing the Bank's lending

12  function.  The actions and omissions that give rise to Defendants' liability include,

13  among other things, originating, recommending, and/or approving loans in violation

14  of the Bank's own written loan policies; extending credit to borrowers who were not

15  creditworthy or were known to be in financial difficulty; originating, recommending

16  and/or approving participation loans without conducting independent underwriting;

17  extending credit based on inadequate information about the financial condition of

18  prospective borrowers and guarantors and without adequately analyzing cash flow

19  and other critical financial information; approving and originating speculative

20  commercial real estate loans despite known adverse economic conditions in the

21  local real estate market; permitting unsafe and unsound concentrations of credit;

22  failing to properly manage and preserve the resources of the Bank; and failing to

23  supervise, manage, conduct, and direct the business and affairs of the Bank to ensure

24  compliance with prudent principles of banking.

25      3.      The Bank suffered significant damages as a result of Defendants'

26  failure to properly operate and manage the Bank's lending function and allowing

27  loans to fund in violation of the Bank's policies and safe and sound banking

28  practices.  Defendants are liable to the FDIC-R for compensatory and other damages

ERVIN COHEN & JESSUP LLP

Exhibit B, Page 000079

1   PCNB sustained as a result of the Bank funding loans without proper underwriting

2   or review.

3   **II.   THE PARTIES**

4       **A.   The Plaintiff**

5       4.    FDIC is an instrumentality of the United States of America, established

6   under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its

7   principal place of business in Washington, D.C.  12 U.S.C. § 1821(d).  Among other

8   duties, the FDIC-R is charged with the orderly liquidation of failed banks.  12

9   U.S.C. § 1821(d).

10      5.    On November 13, 2009, the Office of the Comptroller of the Currency

11  ("OCC") closed PCNB and appointed FDIC as Receiver.  Plaintiff, FDIC-R, is the

12  successor to, among other things, all rights, titles and privileges of PCNB and its

13  stockholders, account holders, and depositors.  12 U.S.C. § 1821(d)(2)(A)(1).

14      **B.   Defendants**

15      6.    Hahn was President and Chief Operating Officer ("COO") of PCNB

16  from the Bank's inception on May 16, 2005, to May 16, 2008, and was Chief

17  Executive Officer ("CEO") from May 16, 2008, until August 19, 2009, when he was

18  demoted to Vice President.  Hahn was also a director of PCNB from the Bank's

19  inception until its closure.  At all material times, Hahn oversaw the day-to-day

20  operations of the Bank.

21      7.    Forkner was the Bank's CEO from May 16, 2005, until May 16, 2008,

22  when he was replaced by Hahn, and was also a director of PCNB from May 16,

23  2005, until the Bank closed.  As CEO, Forkner was responsible for the execution of

24  the Bank's credit program.

25      8.    Cummings was Chairman of PCNB's Directors Credit Committee

26  ("DCC") and a director from the Bank's inception on May 16, 2005, until the Bank

27  closed.  In his role as DCC Chairman, Cummings functioned as a member of the

28  Bank's executive management team ("EMT") regarding its lending operations.  He

ERVIN COHEN & JESSUP LLP

14609.1:1710169.1

3

COMPLAINT

Exhibit B, Page 000080

1    reviewed and approved internal credit recommendation memoranda ("CRM") from

2    loan officers before large loans were submitted to the DCC or Board for approval

3    and assisted with the oversight of the Bank's Chief Credit Officers.  Cummings also

4    served as a paid lending consultant from time to time, assisting the Bank with credit

5    policies and procedures.

6         9.    Grinyer was Chief Credit Officer ("CCO") of the Bank and a director

7    from May 16, 2005, until April 16, 2007, when he was demoted to loan officer and

8    resigned from PCNB's Board.  As CCO, Grinyer was responsible for establishing

9    and maintaining the Bank's credit policy and was charged with initiating and

10    maintaining the quality, safety, and soundness of the Bank's credit portfolio.

11         10.   Cruse was the Bank's CCO from June 1, 2007, until his resignation on

12    November 17, 2008.  As CCO, Cruse was responsible for establishing and

13    maintaining the Bank's credit policy and was charged with initiating and

14    maintaining the quality, safety, and soundness of the Bank's credit portfolio.

15         11.   Adams was hired on April 30, 2007, as Executive Vice President

16    ("EVP") and Real Estate Industries Group Manager to lead the Bank's growing real

17    estate construction portfolio.  Adams received a brokerage commission on most of

18    the loans he originated at PCNB, thereby incentivizing him to make loans even as

19    the local and national economy crumbled.  He was also CCO from November 17,

20    2008, until he resigned on June 5, 2009.

21    **III.**    **JURISDICTION AND VENUE**

22         12.   This Court has subject matter jurisdiction over this case pursuant to 12

23    U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331

24    and 1345.

25         13.   This Court has personal jurisdiction over Defendants who at all

26    relevant times were residents of, and conducted the business of the Bank, in the

27    State of California.

28         14.   Venue is proper in this district under 28 U.S.C. § 1391(b) because a

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1  substantial portion of the events and/or omissions giving rise to the claims and

2  damages asserted herein occurred in this district.

3  **IV.     THE BANK'S LENDING FUNCTION AND LOAN PORTFOLIO**

4       15.    Loan underwriting practices are the primary determinant of bank credit

5  risk and bank credit availability and one of the most critical aspects of loan portfolio

6  management.  Loan underwriting standards define a bank's desired level of

7  creditworthiness for individual loans and provide uniform criteria for evaluating

8  loans with similar characteristics.  It is also important in protecting bank capital,

9  which can erode from unsafe and unsound lending practices.

10      16.    Underwriting practices (which are described in Part 364 and 365 of the

11 FDIC Rules and Regulations) can generally be characterized by the criteria used to

12 qualify borrowers, loan pricing, repayment terms, sources of repayment, and

13 collateral requirements.  Underwriting practices also encompass the management

14 and administration of the loan portfolio, including its growth, concentrations in

15 specific markets, out-of-area lending, written lending policies, and adherence to

16 written underwriting policies.

17      17.    Commercial real estate ("CRE") and acquisition, development and

18 construction ("ADC") loans are known to be more speculative than other types of

19 loans because of, among other reasons, the lack of present cash flow source,

20 uncertainties of development and sale, and the need for adequate secondary sources

21 of repayment.  Prudent lending in this segment of banking requires sound

22 underwriting, timely evaluation and response to economic trends impacting the

23 industry, and strict adherence to prudent lending policies and standards.  Moreover,

24 concentrating a loan portfolio in CRE/ADC loans increases a bank's risk for

25 numerous reasons, including:  (a) concentration in any sector of the economy

26 increases risk resulting from that sector's downturn; (b) the housing market, in

27 particular, is cyclical by nature; (c) the primary source of repayment is cash flow

28 from the sale of the real estate collateral; and (d) historically, bank failure rates

Exhibit B, Page 000082

1   closely correlate with high CRE/ADC concentrations.  In short, concentrations of

2   CRE/ADC loans in the volatile commercial real estate market render a bank

3   vulnerable to changes in market conditions and require vigilant adherence to sound

4   lending practices.  It is imperative that the known risks inherent in such high loan

5   concentrations be managed by, at a minimum, management oversight, strategic

6   planning, underwriting, risk assessment and monitoring of CRE/ADC loans,

7   portfolio risk management, management information systems, market analysis, and

8   stress testing.

9          18.    Regulatory agencies periodically reminded financial institutions of the

10   risks involved in ADC/CRE lending.  On October 8, 1998, the FDIC issued

11   Financial Institution Letter 110-98, which warned financial institutions of the risk

12   inherent in ADC lending in a favorable real estate market, including an oversupply

13   of developed property.  Among other things, FIL 110-98 stated that "ADC lending

14   is a highly specialized field with inherent risks that must be managed and controlled

15   to ensure that this activity remains profitable."

16          Similarly, on December 12, 2006, the OCC, FDIC, and Board of Governors

17   of the Federal Reserve System jointly issued "Concentrations in Commercial Real

18   Estate Lending, Sound Risk Management Practices," which specifically warned

19   banks that "[c]oncentrations of credit exposure add a dimension of risk that

20   compound the risk inherent in individual loans."

21   **V.     FACTS**

22          **A.     History of PCNB**

23          19.    PCNB opened for business on May 16, 2005, with a main office in San

24   Clemente, California, and a branch office in Encinitas, California.  PCNB

25   commenced operations with $19.5 million in capital but was unprofitable every year

26   of its brief existence.

27          20.    PCNB's original business plan emphasized community banking and

28   Small Business Administration ("SBA") Sections 7(a) and 504 loans.  Due to slow

14609.1:1710169.1                                6
                                          COMPLAINT

Exhibit B, Page 000083

1  growth in SBA lending and higher than anticipated operating losses, in 2007, under

2  Forkner and Hahn's leadership, the Bank implemented an aggressive growth

3  strategy to expand CRE and ADC lending to generate profits.

4      21.   Hahn, the COO during this time period, was in charge of the Bank's

5  day-to-day operations and spearheaded the push to grow the Bank's CRE and ADC

6  loan portfolio. Adams was hired to grow the loan portfolio and was rewarded with

7  commissions for loan originations.

8      22.   Pursuant to PCNB's loan policy, primary control of the Bank's lending

9  function was delegated to the Bank's Executive Management Team ("EMT") –

10  CEO (Forkner), COO (Hahn), and CCO (Grinyer or Cruse), with Cummings also

11  serving in that capacity as Chairman of the DCC and a part-time paid lending

12  consultant of the Bank. The EMT was responsible for assuring that the Bank's

13  credit policies were administered within regulatory and Bank guidelines and that

14  loans conformed to the Bank's loan policy and were approved within established

15  guidelines. The EMT, including Cummings, reviewed, signed, and approved the

16  Credit Recommendation Memoranda ("CRM"), prepared by the originating loan

17  officer, prior to presentation to the DCC or full Board. The originating loan officers

18  were responsible for documenting and preparing the CRM, ensuring that that the

19  loan files were complete and that the CRM included all relevant information and

20  accurately analyzed the strengths and weaknesses of the loan, repayment sources,

21  project feasibility, and borrower viability.

22      23.   As a result of management's push to grow the Bank's loan portfolio,

23  PCNB's assets increased by 100 percent in 2007, and another 27 percent in 2008.

24  By March 31, 2008, ADC and CRE loan portfolios represented 582 percent of

25  capital. By September 30, 2009, ADC and CRE loans were 2,082 percent and 866

26  percent of capital, respectively.

27      24.   Despite this aggressive growth, the EMT did not take precautions to

28  ensure that the Bank's credit policies and procedures were followed, and that loans

1 conformed to the Bank's loan policy. Instead the EMT allowed unbridled growth in

2 a declining market and routinely recommended and approved CRM that lacked

3 complete and accurate borrower financial information, failed to fully analyze

4 repayment sources and borrower viability, and in the case of participation loans,

5 lacked independent loan underwriting.

6      25.    Due to the deficient credit administration, loan underwriting, and risk

7 management allowed by Defendants in originating, recommending, and/or

8 approving high-risk ADC and CRE loans, many after the local real estate markets

9 began to decline, the Bank's financial condition deteriorated in 2008 and 2009. As

10 of March 31, 2008, the Bank's classified assets exceeded 46 percent of Tier 1 capital

11 plus the allowance for loan and lease losses ("ALLL"). By March 31, 2009, the

12 classified assets had grown to more than 163 percent of Tier 1 capital plus the

13 ALLL. PCNB failed on November 13, 2009.

14    **B.**   **Regulatory History**

15      26.    As a national bank, PCNB was subject to the supervision of the OCC,

16 which conducted regular examinations of the Bank and provided a Report of

17 Examination ("RoE") at the conclusion of each examination.

18      27.    As early as the March 31, 2006 RoE (delivered on August 3, 2006),

19 examiners cited instances of liberal underwriting and inadequate internal appraisal

20 reviews.

21      28.    Each RoE between 2006 and 2009 reported that the Bank's credit risk

22 was increasing. The December 31, 2006 RoE (delivered April 2, 2007) criticized

23 the Bank's 2007 budget, which called for loan growth of 200 percent, as "overly

24 aggressive." While slightly adjusting its 2007 budget, the Bank nevertheless

25 proceeded with extremely aggressive loan growth in 2007. That RoE also cited

26 additional examples of liberal underwriting, specifically citing commercial loans

27 secured by equipment and accounts receivable without a strong source of

28 repayment.

1    29.    The March 31, 2008 RoE (delivered April 14, 2008) identified a

2  number of weaknesses in the Bank's credit risk management.  That RoE cited the

3  Bank's overly aggressive strategic plan as resulting in extremely high levels of

4  construction and CRE loans, a failure to independently analyze participation loans

5  purchased from other banks, inadequate appraisal review, and reduced credit risk

6  oversight.

7    30.    The March 31, 2009 RoE (delivered April 6, 2009) reported that the

8  Bank's strategy to grow the loan portfolio despite indicators of an economic

9  downturn was contrary to safe or sound banking practices, specifically holding

10  Forkner and Hahn responsible.  This RoE also cited a lack of strong CCOs, stating

11  that none of them "appeared to be capable."  The March 31, 2009 RoE also

12  specifically cited the Bank's weak underwriting of SBA loans.  The Bank's

13  aggressive growth in high-risk loans resulted in critically deficient asset quality and

14  a sharp increase in credit losses.

15    31.    As a result of the March 31, 2009 RoE, the OCC and the Bank entered

16  into a Consent Order on August 16, 2009.  However, PCNB's capital continued to

17  deteriorate as more of its speculative loans experienced charge-offs, and the OCC

18  closed PCNB on November 13, 2009.

19    **C.    PCNB's Corporate Loan Policy**

20    32.    PCNB's directors established a comprehensive Corporate Loan Policy

21  dated February 22, 2006, and amended from time to time thereafter (hereafter the

22  "Loan Policy").  The PCNB Loan Policy set forth the specific responsibilities of the

23  Bank's loan originators, the CCO, and the EMT.

24    33.    In addition, the PCNB Loan Policy established the following loan

25  approval authorities, as amended, but not materially, from time to time:

26       a.    Hahn and Forkner each had independent authority of $500,000.

27       b.    the EMT, by unanimous vote, had authority of up to $1.2

28  million.

c.      the EMT, by unanimous vote and with the consent of Cummings as DCC Chairman, had authority of up to $1.4 million.

d.      All loans above $1.4 million required the recommendation of the EMT and Cummings via an approved CRM, with loans up to $1.8 million to be approved by the DCC, and loans in excess of $1.8 million requiring the approval of the full PCNB Board.

34.     The PCNB Loan Policy contained extensive provisions regarding the underwriting and administering of various types of commercial loans, including but not limited to real estate loans, construction loans, equipment financing loans, and SBA loans.  Defendants violated and/or ignored numerous provisions of the PCNB Loan Policy, including but not limited to the following:

a.      ADC and CRE loans were designated as speculative, required caution and were reserved for the Bank's strongest customers.

b.      The Bank's geographical lending area was designated as San Bernardino, Riverside, Orange, and San Diego Counties.

c.      Real estate loans in excess of $250,000 required a complete written appraisal of the underlying collateral, less than six months old, which conformed to applicable standards.  All appraisals were required to be reviewed and ruled satisfactory by the Bank prior to loan funding.

d.      Borrowers must be creditworthy, demonstrate the capacity to provide a secondary recovery source (as principal or by guaranty) and must be able to submit financial statements, tax returns and project information.

e.      Because raw land and land development loans do not generate cash flow sufficient to support repayment, there is a significant risk associated with these types of loans, and their success is largely dependent upon current market conditions.

f.      The Bank's policy was to maintain a diversified loan portfolio, "because concentrations can expose the Bank to undue risk in the event of economic

1    adversity." Loans in excess of 10 percent of the Bank's total, by industry, were

2    considered a concentration, and real estate loans specifically qualified as a

3    concentration.

4              g.    All approved CRM must be booked within 90 days from

5    approval.

6        **D.    Loan Underwriting Violations and Deficiencies**

7        35.    Between at least May 17, 2006, and March 28, 2008, each Defendant

8    repeatedly originated, recommended, and/or approved loans which violated the

9    PCNB Loan Policy and/or prudent underwriting standards by some or all of the

10   following acts or omissions, among others:

11             a.    Loans to Non-Creditworthy Borrowers — Causing or permitting

12   loans to be made to borrowers who were or should have been known to be

13   uncreditworthy and/or in financial difficulty;

14             b.    Inadequate Financial Information — Causing or permitting loans

15   to be made with inadequate or inaccurate financial information regarding the

16   creditworthiness of the borrower, the borrower's prospective source of repayment,

17   and the borrower's security, if any, and failing to make reasonable efforts to verify

18   the accuracy of such information;

19             c.    Speculative Lending — Causing or permitting speculative, high-

20   risk loans to be made, many after the economic decline of the real estate market was

21   well known;

22             d.    Failure to Perform Independent Underwriting — Causing or

23   permitting participation loans to be purchased without conducting appropriate

24   independent underwriting and credit analysis;

25             e.    Inadequate Appraisals — Causing or permitting loans to be made

26   on the basis of inadequate appraisals, or using appraisers with an inherent conflict of

27   interest with the prospective loan;

28             f.    Lending Outside Trade Area — Causing or permitting loans to

ERVIN COHEN & JESSUP LLP

1  be made outside the designated trade area of the Bank;

2          g.      Inadequate Wherewithal of Guarantors – Causing or permitting

3  loans to be made where the guarantors lacked the financial strength to support or

4  repay the loans.

5          h.      Inadequate Loan Documentation — Causing or permitting the

6  Bank to approve loans based on inadequate loan documentation and files; and/or

7          i.      Unsecured or Undersecured Loans — Causing or permitting

8  loans to be made on an unsecured or inadequately secured basis.

9  **VI.    Transactions Causing Damages**

10         36.    The loan transactions set forth below illustrate the very types of

11 failures, breaches, and violations of duty referenced above committed by each of the

12 Defendants, resulting in depletion of the Bank's capital.  The FDIC seeks

13 compensatory damages and other relief as a result of Defendants' conduct as

14 described below.

15     **A.    Borrower A[1]**

16         37.    On May 16, 2006, PCNB entered into a participation agreement with

17 BankFirst of South Dakota whereby PCNB purchased a $1 million interest in

18 BankFirst's $18.75 million loan to Borrower A.  The purpose of the loan was to

19 provide financing to fund the development of 362 acres of raw land in Banning,

20 California.

21         38.    In connection with this loan participation, Defendant Grinyer originated

22 the loan and prepared a CRM.  Defendants Hahn and Forkner (along with Grinyer)

23 evidenced their approvals of the loan by signing Grinyer's CRM on May 16, 2006.

24         39.    The Borrower A loan participation was unsafe and unsound, violated or

25

26 [1] In light of privacy considerations, the identity of specific borrowers in the transactions
   described herein is being withheld.  All pertinent information necessary for the Defendants to
27 identify the transactions, including the name of the borrower and loan number, has been provided
   to counsel for the Defendants.

28

_ERVIN COHEN & JESSUP LLP_

Exhibit B, Page 000089

1  ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross

2  negligence, and breaches of fiduciary duty of Defendants Grinyer, Hahn, and

3  Forkner in originating and/or approving this loan in the following non-exclusive

4  particulars:

5          a.      The loan was a speculative, high risk undertaking requiring sale

6  of the underlying collateral to repay the loan, notwithstanding the warning in

7  PCNB's Loan Policy and warnings of federal regulators concerning this type of

8  lending.  The loan further violated the Bank's Loan Policy in that such speculative

9  lending was to be reserved for the Bank's best customers.

10         b.      PCNB had no previous banking relationship with Borrower A,

11  which was located out of the Bank's lending area as established in PCNB's Loan

12  Policy.

13         c.      The loan participation was made notwithstanding the fact that the

14  lead lender was located outside of the state of California.

15         d.      The appraisal supporting the loan was flawed in several

16  particulars, including (a) it used a "retrospective" "as is" date of July 2005 for a loan

17  made in May 2006; (b) the "as is" value of $40 million contradicted the actual $21

18  million purchase price of the property in 2005; and (c) it failed to provide any

19  comparables and utilized only a cost approach for the "as completed" valuation.

20         e.      Borrower A was a stand-alone entity created to own the property

21  and therefore had no independent wherewithal to support the debt.

22         f.      The sole guarantor was heavily involved in the real estate

23  market, and his cash flow to support the debt was marginal.

24         g.      PCNB failed to conduct independent underwriting of this

25  participation in violation of prudent banking practices and federal regulations,

26  instead relying on the credit analysis performed by the lead lender.

27         h.      Notwithstanding the speculative nature of the loan, Defendants

28  Grinyer, Hahn, and Forkner failed to take into account the declining real estate

ERVIN COHEN & JESSUP LLP

1  market which was already in effect when the loan was approved. A December 2007

2  appraisal valued the property securing the loan at $14.5 million (less than half of the

3  previous appraiser's valuation), and noted that "market values have dropped

4  significantly during the last 18 months."

5            i.     Because the loan refinanced Borrower A's acquisition of the

6  property in 2005, the loan violated PCNB's Loan Policy which prohibited

7  refinancing acquisition loans made within the previous two years.

8       Based upon the above-listed deficiencies, Defendants identified above should

9  not have originated or approved this loan or allowed the Bank to fund the loan to

10  Borrower A, and their acts and omissions have caused damages.

11      40.    In the August 23, 2006 Board meeting, PCNB's directors criticized,

12  among other things, (a) the failure to independently underwrite the loan, (b) the

13  speculative nature of the loan to Borrower A, (c) the fact that Borrower A was not

14  one of the Bank's best customers, and (d) the risk inherent in allowing the lead

15  lender to control such a specialized credit. Notwithstanding these criticisms, a

16  number of subsequent ADC/CRE loans contained the same deficiencies.

17      41.    By letter to the lead lender dated February 7, 2007, Defendant Grinyer

18  acknowledged the Bank's imprudent reliance on the lead lender's underwriting and

19  PCNB's failure to conduct independent underwriting concerning the loan.

20      42.    On January 30, 2009, BankFirst notified Borrower A of its default of its

21  obligations under the loan. Prior to the anticipated foreclosure, BankFirst was

22  closed by the FDIC.

23      43.    On April 14, 2009, PCNB declared a $742,741 loss on the loan to

24  Borrower A.

25      **B.**    **Borrower B**

26      44.    On April 23, 2007, PCNB entered into a participation agreement with

27  Gilmore Bank whereby PCNB purchased a $1.9 million interest in Gilmore's $5.9

28  million loan to Borrower B. The purpose of the loan was to fund the construction of

ERVIN COHEN & JESSUP LLP

1    a 21-unit condominium development in Los Angeles County, California.

2        45.   In connection with this loan participation, Defendants Grinyer, Hahn,

3    Forkner, and Cummings signed the CRM on or about April 6, 2007, and Defendants

4    Hahn, Forkner, and Cummings voted to approve the loan as members of PCNB's

5    DCC on April 11, 2007.

6        46.   The Borrower B loan participation was unsafe and unsound, violated or

7    ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross

8    negligence, and breaches of fiduciary duty of Defendants Grinyer, Hahn, Forkner,

9    and Cummings in recommending and/or approving this loan in the following non-

10   exclusive particulars:

11           a.   The loan was a speculative, high risk undertaking requiring sale

12   of the underlying collateral to repay the loan, notwithstanding the warning in

13   PCNB's Loan Policy and warnings of federal regulators concerning this type of

14   lending.

15           b.   Contrary to the Bank's Loan Policy, Borrower B and the

16   collateral were located outside of the Bank's designated lending territory.

17           c.   PCNB had no previous banking relationship with Borrower B or

18   the loan's guarantors, again contrary to PCNB's Loan Policy, with regard to this

19   speculative loan.

20           d.   The loan to Borrower B was recommended and approved

21   notwithstanding the fact that the borrower and guarantors did not have the financial

22   capacity to repay the loan.

23           e.   Notwithstanding the Bank's complete reliance on the collateral

24   in making this loan, the appraisal supporting the loan was flawed, a fact which was

25   recognized by Defendant Grinyer who performed the Bank's appraisal review.

26           f.   PCNB failed to conduct independent underwriting of this

27   participation in violation of prudent banking practices and federal regulations,

28   instead relying on the credit analysis performed by the lead lender.

g.      Notwithstanding the speculative nature of the loan, Defendants Grinyer, Hahn, Forkner, and Cummings failed to take into account the declining real estate market which was already in effect when the loan was approved.

h.      The CRM which Defendants Grinyer, Hahn, Forkner, and Cummings signed improperly assigned a risk rating of "2" to this loan, notwithstanding the weaknesses and deficiencies cited above and the fact that the lead lender assigned a risk rating of "3" in the credit analysis it provided to PCNB. As a participating lender, PCNB's risk was even greater than the risk of the lead lender.

Based upon the above-listed deficiencies, Defendants identified above should not have originated, recommended, or approved this loan or allowed the Bank to fund the loan to Borrower B, and their acts and omissions have caused damages.

47.     An appraisal of the subject collateral in May 2008 reflected a bulk sale value of the property as being significantly less than the amount of the loan. Thereafter, PCNB declared a $434,875 loss on the loan to Borrower B on July 18, 2008.

**C.      Borrower C**

48.     On May 18, 2007, PCNB entered into a loan with Borrower C in the amount of $750,000. The purpose of the loan was to finance the acquisition of furniture, fixtures, and equipment for a new restaurant to be opened in Lake Forest, California. The loan to Borrower C was one of several similar loans to affiliated restaurant companies originated by PCNB through a brokering relationship with Vision Capital Corporation.

49.     In connection with the loan to Borrower C, Defendant Grinyer originated the loan and prepared a CRM dated May 10, 2007. Defendants Hahn, Forkner, and Cummings evidenced their recommendation that the loan be approved by signing the CRM on May 11, 2007, and they also voted to approve the loan as

ERVIN COHEN & JESSUP LLP

1 | members of PCNB's Board of Directors on May 14, 2007.

2 | 50. The loan to Borrower C was unsafe and unsound, violated or ignored

3 | PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence,

4 | and breaches of fiduciary duty of Defendants Grinyer, Hahn, Forkner, and

5 | Cummings in originating, recommending, and/or approving this loan in the

6 | following non-exclusive particulars:

7 | a. The loan was made for a restaurant startup, which was identified

8 | as a high risk undertaking in the Bank's Loan Policy.

9 | b. While the loan had several guarantors, all were affiliated with the

10 | borrower's principal, and all were in the restaurant business. Thus, all sources of

11 | repayment were connected and reliant upon the success of the principal's restaurant

12 | ventures.

13 | c. Notwithstanding the risks associated with restaurant lending, the

14 | Bank loaned 100% of the value of the collateral, a violation of the Bank's Loan

15 | Policy.

16 | d. Defendant Grinyer's CRM recognized that the projected

17 | repayment source was the restaurant's cash flow, but the cash flow information on

18 | Borrower C's operations through December 31, 2006, did not support the ability to

19 | carry the debt.

20 | e. The CRM failed to adequately analyze the global cash flow of

21 | various affiliated entities and individuals guarantying the loan.

22 | Based upon the above-listed deficiencies, Defendants identified above should

23 | not have originated, recommended, or approved this loan or allowed the Bank to

24 | fund the loan to Borrower C, and their acts and omissions have caused damages.

25 | 51. In late 2008, Borrower C and the loan's guarantors filed for bankruptcy

26 | relief and the restaurant was closed. Shortly thereafter, PCNB declared a loss on the

27 | loan to Borrower C in the amount of $670,247.

28 |

ERVIN COHEN & JESSUP LLP

**D.   Borrower D**

52.    On June 22, 2007, PCNB entered into a participation agreement with Vineyard Bank whereby PCNB purchased a $1.8 million interest in Vineyard Bank's $10.455 million loan to Borrower D.  The purpose of the loan was to provide financing for the borrower to undertake extensive renovations to a luxury home in Bel Air, California.

53.    In connection with this loan participation, Defendant Adams originated the loan and prepared a CRM dated June 8, 2007.  Defendants Hahn, Cruse, and Cummings evidenced their recommendations of the loan by signing Adams's CRM on June 11, 2007, and Defendants Hahn, Forkner, and Cummings voted to approve the loan as members of PCNB's Board of Directors on June 13, 2007.

54.    The Borrower D loan participation was unsafe and unsound, violated or ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence, and breaches of fiduciary duty of Defendants Adams, Hahn, Forkner, Cruse, and Cummings in originating, recommending, and/or approving this loan in the following non-exclusive particulars:

a.    The loan was a speculative, high risk undertaking requiring sale of the underlying collateral to repay the loan, notwithstanding the warning in PCNB's Loan Policy and warnings of federal regulators concerning this type of lending.

b.    The property serving as collateral for the loan was located outside of the lending area prescribed in PCNB's Loan Policy.

c.    PCNB had no previous banking relationship with Borrower D and the loan's guarantors, who were located out of the Bank's lending area as established in PCNB's Loan Policy.  The loan further violated the Bank's Loan Policy in that such speculative lending was to be reserved for the Bank's best customers.

d.    Borrower D was a stand-alone entity created to own the subject

18

COMPLAINT

1   property and therefore had no independent wherewithal to support the debt.  Both

2   guarantors were heavily invested in the local real estate market, and their cash flow

3   was limited.

4            e.      PCNB failed to conduct independent underwriting of this

5   participation in violation of prudent banking practices and federal regulations,

6   instead relying on the credit analysis performed by the lead lender.  Defendant

7   Adams' CRM indicated on numerous occasions that he was relying on the lead

8   bank's underwriting.

9            f.      While Defendant Adams in large measure copied the credit

10  analysis from Vineyard Bank in his CRM, he specifically omitted the marginal

11  credit score of one of the loan's guarantors.

12           g.      Notwithstanding the speculative nature of the loan, Defendants

13  Adams, Hahn, Forkner, Cruse, and Cummings failed to take into account the

14  declining real estate market which was already in effect when the loan was

15  approved.  In fact, the January 2007 appraisal of the property securing the loan

16  noted the slowdown in the Los Angeles market and potential oversupply of

17  properties.

18       Based upon the above-listed deficiencies, Defendants identified above should

19  not have originated, recommended, or approved this loan or allowed the Bank to

20  fund the loan to Borrower D, and their acts and omissions have caused damages.

21       55.    The renovation project incurred significant construction delays and

22  work was halted prior to completion.  Vineyard Bank notified Borrower D that it

23  was in default of its obligations under the loan in May 2009.  Prior to the anticipated

24  foreclosure, Vineyard Bank was closed by the FDIC on July 2009.

25       56.    On or about September 15, 2009, PCNB declared a $559,110 loss on

26  the loan to Borrower D.

27  **E.      Borrower E**

28       57.    On August 22, 2007, PCNB entered into a participation agreement with

ERVIN COHEN & JESSUP LLP

1 First Private Bank & Trust of Irvine, California, whereby PCNB purchased a $2

2 million interest (PCNB's legal lending limit) in First Private's $20 million loan to

3 Borrower E.  The purpose of the loan was to provide financing to the borrower for

4 the acquisition and rehabilitation of two apartment buildings located in Arizona.

5      58.   In connection with this loan participation, Defendant Adams originated

6 the loan and prepared the CRM dated August 1, 2007.  Defendants Forkner, Cruse,

7 and Cummings evidenced their recommendation of the loan by signing (or in the

8 case of Cummings, affirming by telephone) the CRM on August 2, 2007, and

9 Defendants Hahn, Forkner, and Cummings voted to approve the loan as members of

10 PCNB's Board of Directors on August 6, 2007.

11      59.   The Borrower E loan participation was unsafe and unsound, violated or

12 ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross

13 negligence, and breaches of fiduciary duty of Defendants Adams, Hahn, Forkner,

14 Cruse, and Cummings in originating, recommending and/or approving this loan in

15 the following non-exclusive particulars:

16      a.   The loan was a speculative, high risk undertaking requiring sale

17 of the underlying collateral or permanent financing to repay the loan,

18 notwithstanding the warning in PCNB's Loan Policy and warnings of federal

19 regulators concerning this type of lending.

20      b.   Contrary to the Bank's Loan Policy, Borrower E and the loan's

21 collateral were located outside of the Bank's designated lending territory.

22      c.   PCNB had no previous banking relationship with Borrower E or

23 the guarantors, again contrary to PCNB's Loan Policy, which stated that speculative

24 loans were to be reserved for the Bank's best customers.

25      d.   Borrower E and the loan's guarantors were heavily leveraged in

26 the real estate market and did not have the cash flow to support the debt.

27      e.   PCNB failed to conduct independent underwriting of this

28 participation in violation of prudent banking practices and federal regulations,

14609.1:1710169.1
20
COMPLAINT

Exhibit B, Page 000097

1   instead relying on the credit analysis performed by the lead lender.

2         f.     Even though Defendant Adams copied verbatim much of First
3   Private Bank's loan analysis for his CRM, he failed to include First Private Bank's
4   cited weakness that the borrower and guarantors' "[g]lobal cash flow did not support
5   the debt."

6         g.     Borrower E's U.S. tax returns for 2004 and 2005 (the last
7   available years) reflected an average net income of negative $4 million, and the
8   guarantors' 2004 and 2005 tax returns reflected an average adjusted gross income of
9   negative $5.6 million.

10         h.     Notwithstanding the Bank's reliance on the collateral in making
11   this loan, Adams' CRM contained no discussion of appraisals on the two properties,
12   and the loan was recommended, approved and closed before the appraisals were
13   reviewed on the underlying collateral, in violation of the Bank's Loan Policy.

14         i.     Notwithstanding the speculative nature of the loan, and the fact
15   that the loan was made at the Bank's legal lending limit, Defendants Adams, Hahn,
16   Forkner, Cruse, and Cummings failed to take into account the declining real estate
17   market which was already in effect when the loan was approved.

18         j.     Defendant Adams' CRM improperly assigned a risk rating of "2"
19   to this loan, notwithstanding the weaknesses and deficiencies cited above and the
20   fact that the lead lender assigned a risk rating of "3" in the credit analysis it provided
21   to PCNB.  As a participating lender, PCNB's risk was even greater than the risk of
22   the lead lender.

23         k.     The appraisers were not on the Bank's approved appraiser list,
24   and a Bank-approved appraiser was not retained to conduct an independent appraisal
25   review in violation of the Bank's Loan Policy.

26         l.     A July 26, 2009 Internal Memorandum written by Senior Vice
27   President Philip Johnson criticized Adams' CRM, specifically citing "inadequacies"
28   relating to the lack of a collateral analysis.

1    Based upon the above-listed deficiencies, Defendants identified above should

2   not have originated, recommended, or approved this loan or allowed the Bank to

3   fund the loan to Borrower E, and their acts and omissions have caused damages.

4       60.   PCNB initially funded $1,645,500 on August 27, 2007, in connection

5   with this loan.  On December 24, 2007, PCNB's funded an additional $308,750, and

6   a third apartment complex was added as collateral.  The PCNB loan file contains no

7   evidence that PCNB received (or reviewed) an appraisal on the additional property

8   prior to funding.

9       61.   Borrower E suspended interest payments in April 2009, and the lead

10   bank issued a notice of default on May 29, 2009.  On June 26, 2009, Borrower E

11   filed for Chapter 11 bankruptcy protection.

12       62.   In July 2009 PCNB declared a $1,203,000 loss on the loan to Borrower

13   E.

14       **F.   Borrower F**

15       63.   On September 24, 2007, PCNB entered into a loan to Borrower F in the

16   amount of $2 million (PCNB's legal lending limit).  The purpose of the loan was to

17   refinance the borrower's acquisition of a 20-lot residential subdivision in Escondido,

18   California.

19       64.   In connection with the loan to Borrower F, Defendant Adams

20   originated the loan and prepared the CRM dated August 16, 2007.  Defendants

21   Hahn, Forkner, and Cruse evidenced their recommendation of the loan by signing

22   the CRM on September 5, 2007, and Defendant Hahn voted to approve the loan as a

23   member of PCNB's Board of Directors on September 7, 2007.

24       65.   The loan to Borrower F was unsafe and unsound, violated or ignored

25   PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence,

26   and breaches of fiduciary duty of Defendants Adams, Hahn, Forkner, and Cruse in

27   originating, recommending, and/or approving this loan in the following non-

28   exclusive particulars:

ERVIN COHEN & JESSUP LLP

14609.1:1710169.1

22

COMPLAINT

Exhibit B, Page 000099

a.    The loan was a speculative, high risk undertaking, requiring sale of the underlying collateral or permanent construction financing to repay the loan, notwithstanding the warning in PCNB's Loan Policy and warnings of federal regulators concerning this type of lending.

b.    PCNB had no previous banking relationship with Borrower F, again contrary to PCNB's Loan Policy in that such speculative loans were to be reserved for the Bank's best customers.

c.    Borrower F's tax returns did not reflect an ability to provide cash flow to support the loan. Moreover, bank account statements the Bank received for Borrower F reflected less than the amount stated on his personal financial statement.

d.    The August 2007 appraisal obtained by Defendant Adams did not properly evaluate the property on an "as is" basis, used dated comparables, and failed to consider the recent purchase of the subject property, thereby arriving at an inflated value. Defendants Adams and Cruse reviewed and approved this appraisal.

e.    Defendant Adams' CRM revealed that the loan's broker was an affiliated entity of the appraiser utilized by Defendant Adams for the loan, thereby creating an impermissible conflict of interest which was or should have been known to Defendants who originated, recommended, and/or approved this loan.

f.    Defendant Adams' CRM failed to properly analyze Borrower F's financial condition and ability to repay the loan.

g.    Notwithstanding the speculative nature of the loan, and the fact that the loan was made at the Bank's legal lending limit, Defendants Adams, Hahn, Forkner, and Cruse failed to account for the declining real estate market which was already in effect when the loan was approved.

h.    The loan violated PCNB's Loan Policy by re-financing a real estate acquisition loan within two years of the making of the previous loan.

Based upon the above-listed deficiencies, Defendants identified above should not have originated or approved this loan or allowed the Bank to fund the loan to

ERVIN COHEN & JESSUP LLP

1   Borrower F, and their acts and omissions have caused damages.

2        66.    Borrower F filed for bankruptcy relief in December 2008.  In May

3   2009, PCNB instituted foreclosure proceedings.  An appraisal of the subject

4   collateral in May 2009 provided an "as is" value of $640,000.  As a result, PCNB

5   charged off $1,358,879 in July 2009.

6        67.    On October 8, 2009, PCNB became the owner of the property at

7   Trustee Sale.  Thereafter, the Bank charged off an additional $85,502, for a total loss

8   on the loan to Borrower F of $1,444,381.

9   **G.    Borrower G**

10        68.    On or about November 19, 2007, PCNB entered into a participation

11   agreement with 1st Centennial Bank whereby PCNB purchased a $2 million interest

12   (PCNB's legal lending limit) in 1st Centennial's $13.5 million loan to Borrower G.

13   The purpose of the loan was to fund the construction of 22 homes and 26 raw lots in

14   Riverside, California.

15        69.    In connection with this loan participation, Defendants Hahn, Forkner,

16   Cruse, and Cummings evidenced their recommendation of the loan by signing (or in

17   the case of Cummings, affirming by telephone) the Bank's July 9, 2007 CRM on

18   July 11, 2007, and Defendants Hahn, Forkner, and Cummings voted to approve the

19   loan as members of PCNB's Board of Directors on July 11, 2007.

20        70.    The Borrower G loan participation was unsafe and unsound, violated or

21   ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross

22   negligence, and breaches of fiduciary duty of Defendants Hahn, Forkner, Cruse, and

23   Cummings in recommending and/or approving this loan in the following non-

24   exclusive particulars:

25        a.    The loan was a speculative, high risk undertaking requiring sale

26   of the underlying collateral or permanent financing to repay the loan,

27   notwithstanding the warning in PCNB's Loan Policy and warnings of federal

28   regulators concerning this type of lending.

ERVIN COHEN & JESSUP LLP

b. PCNB had no previous banking relationship with Borrower G or the loan's guarantors, again contrary to PCNB's Loan Policy, which stated that speculative loans were to be reserved for the Bank's best customers.

c. Borrower G and the loan's guarantors were heavily leveraged in the real estate market and did not have the liquid assets or cash flow to support the debt.

d. PCNB failed to conduct independent underwriting of this participation in violation of prudent banking practices and federal regulations, instead relying on the credit analysis and information provided by the lead lender.

e. The loan to Borrower G further violated the Bank's Loan Policy in that it was not closed until over four months after loan approval.

f. The PCNB CRM referenced only a stale financial statement on the primary guarantor and no tax return information.

g. Notwithstanding the speculative nature of the loan, and the fact that the loan was made at the Bank's legal lending limit, Defendants Hahn, Forkner, Cruse, and Cummings failed to take into account the declining real estate market which was already in effect when the loan was approved and later funded.

h. The Bank's CRM improperly assigned a risk rating of "2" to this loan, notwithstanding the weaknesses and deficiencies cited above and the fact that 1st Centennial assigned a risk rating of "5" in the June 12, 2007 credit analysis it provided to PCNB. As a participating lender, PCNB's risk was even greater than the risk of the lead lender.

Based upon the above-listed deficiencies, Defendants identified above should not have originated, recommended, or approved this loan or allowed the Bank to fund the loan to Borrower G, and their acts and omissions have caused damages.

71. In April 2008, less than 5 months after PCNB's participation, the loan to Borrower G was downgraded to "substandard" by 1st Centennial. PCNB thereafter placed the loan on non-accrual status.

ERVIN COHEN & JESSUP LLP

72.   On January 23, 2009, 1st Centennial was closed by the FDIC, and the loan remained in default thereafter.

73.   In December 2008, PCNB declared a $458,251.92 loss on the loan to Borrower G.

**H.   Borrower H**

74.   On November 28, 2007, PCNB entered into a loan with Borrower H in the amount of $2,216,500, with $400,000 of the loan amount participated to another financial institution.  The purpose of the loan was to refinance the borrower's acquisition of the property and provide for the construction of four medical office condominiums in Escondido, California.

75.   In connection with the loan to Borrower H, Defendant Grinyer originated the loan and prepared a CRM dated July 16, 2007.  Defendants Forkner, Cruse, and Cummings evidenced their recommendations of the loan by signing (or in the case of Cummings, affirming by telephone) Grinyer's CRM on July 17-18, 2007, and Defendants Forkner and Cummings voted to approve the loan as members of PCNB's Board of Directors on July 25, 2007.

76.   The loan to Borrower H was unsafe and unsound, violated or ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence, and breaches of fiduciary duty of Defendants Grinyer, Forkner, Cruse, and Cummings in originating, recommending, and/or approving this loan in the following non-exclusive particulars:

a.   The loan was a speculative, high risk undertaking requiring sale of the underlying collateral to repay the loan, notwithstanding the warning in PCNB's Loan Policy and warnings of federal regulators concerning this type of lending.

b.   PCNB had no previous banking relationship with Borrower H or the loan's guarantors.  The loan further violated the Bank's Loan Policy in that such speculative lending was to be reserved for the Bank's best customers.

ERVIN COHEN & JESSUP LLP

14609.1:1710169.1

26

COMPLAINT

1          c.    The loan to Borrower H further violated the Bank's Loan Policy

2   in that it was not closed until over four months after loan approval.

3          d.    Borrower H was a stand-alone entity created to own the property

4   and therefore had no independent wherewithal to support the debt.

5          e.    The loan's guarantors were of marginal financial wherewithal.

6   Their liquid assets and cash flow were inadequate to support the debt.

7          f.    The loan to Borrower H refinanced a previous acquisition loan

8   for the property made less than two years prior, in violation of the Bank's Loan

9   Policy.

10         g.    The loan was made notwithstanding clear evidence in the loan

11  file that the construction of the buildings would cost more (between $164,000 and

12  $275,000) than projected by the borrower.  In fact, in November 2008 the

13  construction contractor advised that the project was initially underfunded.

14         h.    Notwithstanding the speculative nature of the loan, Defendants

15  Grinyer, Forkner, Cruse, and Cummings failed to take into account the declining

16  real estate market which was already in effect when the loan was approved.

17         i.    The Bank accepted inadequate financial statements from the

18  loan's guarantors, and Defendant Grinyer's CRM did not accurately portray the

19  guarantors' financial condition.

20         j.    The risk rating of "2" provided on Grinyer's CRM was not

21  justified in light of the deficiencies cited above.

22       Based upon the above-listed deficiencies, Defendants identified above should

23  not have originated, recommended, or approved this loan or allowed the Bank to

24  fund the loan to Borrower H, and their acts and omissions have caused damages.

25       77.    Based on the need for additional funds for the project's construction,

26  PCNB agreed to increase the total loan amount to $2,387,000, and its commitment

27  to $1,987,000, in April 2008.

28       78.    Because of disputes with the contractor in May 2009, the project stalled

ERVIN COHEN & JESSUP LLP

and was not completed.  PCNB estimated the project to be 80% complete and $285,000 underfunded.  PCNB filed a Notice of Default on June 3, 2009.

79.     On September 30, 2009 PCNB declared a $708,230 loss on the loan to Borrower H.

**I.     Borrower I**

80.     On December 28, 2007, PCNB entered into a loan to Borrower I in the amount of $1.6 million.  The purpose of the loan was to refinance the borrower's acquisition of the property and provide development costs for an 18-lot residential subdivision in Escondido, California.

81.     In connection with the loan to Borrower I, Defendant Adams originated the loan and prepared the CRM dated December 18, 2007.  Defendants Hahn, Forkner, and Cruse evidenced their recommendation of the loan by signing the CRM on December 18-20, 2007.

82.     The loan to Borrower I was unsafe and unsound, violated or ignored PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence, and breaches of fiduciary duty of Defendants Adams, Hahn, Forkner, and Cruse in originating, recommending, and/or approving this loan in the following non-exclusive particulars:

a.     The loan was a speculative, high risk undertaking, requiring sale of the underlying collateral or permanent construction financing to repay the loan, notwithstanding the warning in PCNB's Loan Policy and warnings of federal regulators concerning this type of lending.

b.     PCNB had no previous banking relationship with Borrower I, again contrary to PCNB's Loan Policy in that such speculative loans were to be reserved for the Bank's best customers.

c.     Contrary to the Bank's Loan Policy, Borrower I resided in Utah, well outside the Bank's geographic lending territory.

ERVIN COHEN & JESSUP LLP

d.   The November 2007 appraisal obtained by Defendant Adams did not properly evaluate the property on an "as is" basis, used dated comparables, and failed to consider the recent purchase of the subject property, thereby arriving at an inflated value.

e.   Defendant Adams' CRM revealed that the loan's broker was an affiliated entity of the appraiser utilized by Defendant Adams for the loan, thereby creating an impermissible conflict of interest, which was or should have been known to Defendants who originated, recommended, and/or approved this loan.

f.   Defendant Adams' CRM failed to adequately explain why over $700,000 of loan proceeds would be required for development.

g.   Notwithstanding the speculative nature of the loan, Defendants Adams, Hahn, Forkner, and Cruse failed to account for the declining real estate market which was already in effect when the loan was approved.

Based upon the above-listed deficiencies, Defendants identified above should not have originated, recommended, or approved this loan or allowed the Bank to fund the loan to Borrower I, and their acts and omissions have caused damages.

83.   As of the June 28, 2009 maturity date of the loan, PCNB had disbursed $1,021,419.  When Borrower I failed to repay the loan or provide a feasible plan for repayment, PCNB filed a Notice of Default.

84.   On September 30, 2009, PCNB declared a loss of $485,529 on the loan to Borrower I.

**J.   Borrower J**

85.   On March 28, 2008, PCNB entered into a loan with Borrower J in the amount of $2 million (PCNB's legal lending limit).  The purpose of the loan was to finance Borrower J's acquisition of a freight transporting and storage business in Pomona, California.  The loan to Borrower J was 75% guaranteed by the Small Business Association ("SBA").

86.   In connection with the loan to Borrower J, Defendants Hahn, Cruse,

ERVIN COHEN & JESSUP LLP

1 and Cummings evidenced their approval of the loan by signing (or in the case of

2 Cummings, affirming by telephone) the Bank's CRM on March 13, 2008, and

3 Defendants Hahn and Cummings also voted to approve the loan as members of

4 PCNB's Board of Directors on March 18, 2008.

5      87.    The loan to Borrower J was unsafe and unsound, violated or ignored

6 PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence,

7 and breaches of fiduciary duty of Defendants Hahn, Cruse, and Cummings in

8 recommending and/or approving this loan in the following non-exclusive

9 particulars:

10      a.    The loan was a high-risk undertaking made in a declining

11 economy. The fact that the loan was an SBA loan signifies that financing was not

12 available through customary sources.

13      b.    Borrower J and the business to be acquired were located outside

14 PCNB's lending area, contrary to the Bank's Loan Policy.

15      c.    The principals of Borrower J, who served as guarantors, did not

16 have the financial capacity to support the loan.

17      d.    The CRM approved by Defendants Hahn, Cruse, and Cummings

18 recognized that the collateral taken as security was insufficient to support the loan.

19      e.    Borrower J had limited experience in the freight transportation

20 and storage industry which increased the risk of the business going forward.

21      f.    In recommending and/or approving the loan to Borrower J,

22 Defendants Hahn, Cruse, and Cummings improvidently relied on a 75% SBA

23 guaranty as security for the loan, failing to recognize the Bank's exposure for

24 $500,000.

25      g.    Defendants Hahn, Cruse, and Cummings recommended and/or

26 approved the loan even though the company's net profits had decreased every year

27 from 2004 through 2007.

28      h.    An "Executive Summary" provided to the Bank by the

1   prospective seller and buyer, which the Bank's CRM copied extensively, included

2   numerous questionable assumptions.

3           i.     The Dunn & Bradstreet report obtained by PCNB on the business

4   to be acquired shortly before the loan was closed indicated a credit score of "4"

5   (moderate to high risk of severe payment delinquency over the next 12 months) and

6   a financial stress score of "5" (high risk of severe financial stress over the next 12

7   months).

8        Based upon the above-listed deficiencies, Defendants identified above should

9   not have originated, recommended, or approved this loan or allowed the Bank to

10   fund the loan to Borrower J, and their acts and omissions have caused damages.

11        88.    Within months of loan origination, Borrower J reported that sales were

12   substantially off track due to the declining economy.  Borrower J defaulted on the

13   loan on November 3, 2008.

14        89.    On April 29, 2009, the Bank declared a loss in the amount of $468,710

15   on the loan to Borrower J, virtually all of its 25% exposure on this loan.

16   **K.**    **Borrower K**

17        90.    On March 28, 2008, PCNB entered into a loan with Borrower K in the

18   amount of $350,000.  The purpose of the loan was to provide working capital to

19   alleviate the borrower's cash flow problems.

20        91.    In connection with the loan to Borrower K, Defendants Hahn and Cruse

21   evidenced their approval of the loan by signing the Bank's CRM on March 26,

22   2008.

23        92.    The loan to Borrower K was unsafe and unsound, violated or ignored

24   PCNB's Loan Policy, and/or otherwise exhibited the negligence, gross negligence,

25   and breaches of fiduciary duty of Defendants Hahn and Cruse in approving this loan

26   in the following non-exclusive particulars:

27           a.    The loan was a high-risk undertaking with minimal chance of

28   repayment.  In fact, the Bank's CRM provided a risk rating of "7."

ERVIN COHEN & JESSUP LLP

b.      At the time of loan approval, Borrower K's current operating expenses exceeded its revenues.

c.      At the time of loan approval, Borrower K had existing loans with PCNB which had experienced significant and prolonged cash flow difficulties, and the borrower's last annual Profit and Loss statement reflected net income of negative $450,000.

d.      At the time of loan approval, the loan's guarantors had credit scores of 536 and 500.

e.      In approving the loan to Borrower K, Defendants Hahn and Cruse improvidently relied on a 75% SBA guaranty as security for the loan.

Based upon the above-listed deficiencies, Defendants identified above should not have originated or approved this loan or allowed the Bank to fund the loan to Borrower K, and their acts and omissions have caused damages.

93.      Only months after the loan was made, Borrower K and the guarantors filed for bankruptcy relief.  As such, the borrower's early default negated the SBA guaranty.

94.      On September 18, 2008, the Bank declared a total loss of $350,000 on this loan.

## VII.   CAUSES OF ACTION

### COUNT I

### ORDINARY NEGLIGENCE UNDER CALIFORNIA LAW

95.      The FDIC re-alleges and incorporates by reference the allegations contained in paragraphs 1-94 above as if fully set out in this count.

96.      Each of the Defendants owed PCNB a duty of care under California common law to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in like position.  Also, each Defendant was further obligated to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws,

ERVIN COHEN & JESSUP LLP

32

COMPLAINT

1 rules, and regulations, as well as all applicable rules and policies of the Bank.

2      97.   Defendant Hahn, as COO and later CEO, a director, and a member of

3 the Bank's EMT, was responsible for the day-to-day management and operation of

4 the Bank and had the obligation to exercise the degree of diligence, care, and skill

5 that ordinarily prudent persons in like positions would exercise under similar

6 circumstances in management, oversight, and conduct of the Bank's business.

7 These duties included, but were not limited to, effectively managing and preserving

8 the Bank's resources; ensuring that the Bank had adequate policies, procedures, and

9 internal controls relating to, among other things, ADC/CRE and other high-risk

10 lending; that the Bank adhered to its lending and credit policies, loan approval

11 process, and loan and credit administration practices; that the Bank complied with

12 banking statutes and regulations; that the Bank did not make imprudent loans and

13 extensions of credit as part of a plan to unreasonably grow the Bank; and that loans

14 he recommended and/or approved complied with the Bank's Loan Policy and

15 prudent and sound lending practices.  As COO and a member of the Bank's EMT,

16 Hahn was responsible for reviewing CRM and recommending large loans to

17 PCNB's DCC and Board and was responsible for supervising various officers,

18 including, but not limited to, Defendants Grinyer, Cruse, and Adams.

19      98.   Defendant Forkner, as CEO, a director, and a member of the Bank's

20 EMT, was responsible for the overall management of the Bank including, but not

21 limited to, its lending function, and had the obligation to exercise the degree of

22 diligence, care, and skill that ordinarily prudent persons in like positions would

23 exercise under similar circumstances in management, oversight, and conduct of the

24 Bank's business.  These duties included, but were not limited to, effectively

25 managing and preserving the Bank's resources; ensuring that the Bank had adequate

26 policies, procedures, and internal controls relating to, among other things,

27 ADC/CRE and other high-risk lending; that the Bank adhered to its lending and

28 credit policies, loan approval process, and loan and credit administration practices;

ERVIN COHEN & JESSUP LLP

14609.1:1710169.1

33

COMPLAINT

1   that the Bank complied with banking statutes and regulations; that the Bank did not

2   make imprudent loans and extensions of credit as part of a plan to unreasonably

3   grow the Bank; and that loans he recommended and/or approved complied with the

4   Bank's Loan Policy and prudent and sound lending practices.  As CEO and a

5   member of the Bank's EMT, Forkner was also responsible for reviewing CRM and

6   recommending large loans to PCNB's DCC and Board and supervising various

7   officers, including, but not limited to, Defendants Hahn, Grinyer, Cruse, and Adams.

8          99.    Defendant Cummings, as a director and DCC Chairman, as well as a *de*

9   *facto* member of the Bank's EMT and a paid lending consultant, was also

10  responsible for the Bank's lending function and had the obligation to exercise the

11  degree of diligence, care, and skill that ordinarily prudent persons in like positions

12  would exercise under similar circumstances in management, oversight, and conduct

13  of the Bank's business.  These duties included, but were not limited to, ensuring that

14  the Bank had adequate policies, procedures, and internal controls relating to, among

15  other things, ADC/CRE and other high-risk lending; that the Bank adhered to its

16  lending and credit policies, loan approval process, and loan and credit

17  administration practices; that the Bank complied with banking statutes and

18  regulations; that the Bank did not make imprudent loans and extensions of credit as

19  part of a plan to unreasonably grow the Bank; and that the loans he recommended

20  and/or approved complied with the Bank's Loan Policy and prudent and sound

21  lending practices.  As DCC Chairman and a *de facto* member of the EMT,

22  Cummings was responsible for reviewing CRM and recommending large loans to

23  PCNB's DCC and Board, and also was responsible for supervising the Bank's

24  CCOs, namely Grinyer, Cruse, and Adams.

25         100.   Defendant Grinyer, as CCO, a director and a member of the Bank's

26  EMT, reported to Defendants Hahn, Forkner, and Cummings and was responsible

27  for establishing and maintaining the Bank's credit policy.  Grinyer had the

28  obligation to exercise the degree of diligence, care, and skill that ordinarily prudent

ERVIN COHEN & JESSUP LLP

1  persons in like positions would exercise under similar circumstances in
2  management, oversight, and conduct of the Bank's business.  These duties included,
3  but were not limited to, ensuring that the Bank had adequate loan policies,
4  procedures, and internal controls relating to, among other things, ADC/CRE and
5  other high-risk lending; that the Bank adhered to its policies, procedures, and
6  controls; and that the Bank complied with banking statutes/regulations and prudent
7  and sound lending practices.  As CCO and a member of the EMT, Grinyer was
8  responsible for reviewing CRM and recommending large loans to PCNB's DCC and
9  Board, and also responsible for supervising the Bank's lending personnel.  As a loan
10  originator, he was responsible for underwriting loans in accordance with the Bank's
11  Loan Policy and safe and sound practices and preparing CRM which were accurate
12  and complete and in accord with the Bank's Loan Policy.

13      101.  Defendant Cruse, as CCO and a member of the Bank's EMT, reported
14  to Defendants Hahn, Forkner, and Cummings and was responsible for establishing
15  and maintaining the Bank's credit policy.  Cruse had the obligation to exercise the
16  degree of diligence, care, and skill that ordinarily prudent persons in like positions
17  would exercise under similar circumstances in management, oversight, and conduct
18  of the Bank's business.  These duties included, but were not limited to, ensuring that
19  the Bank had adequate loan policies, procedures, and internal controls relating to,
20  among other things, ADC/CRE and other high-risk lending; that the Bank adhered
21  to its policies, procedures, and controls; and that the Bank complied with banking
22  statutes/regulations and prudent and sound lending practices.  As CCO and a
23  member of the EMT, Cruse was responsible for reviewing CRM and recommending
24  large loans to PCNB's DCC and Board, and also responsible for supervising the
25  Bank's lending personnel.

26      102.  Defendant Adams, as Executive Vice President and Real Estate
27  Industries Group Manager, among other duties, was charged with management
28  oversight of ADC/CRE loans as described below.  Adams had the obligation to

ERVIN COHEN & JESSUP LLP

1    exercise the degree of diligence, care, and skill that ordinarily prudent persons in

2    like positions would exercise under similar circumstances in management,

3    oversight, and conduct of the Bank's ADC/CRE lending.  These duties included, but

4    were not limited to, ensuring that the Bank adhered to its policies, procedures, and

5    controls, complied with banking statutes and regulations, and put the interests of the

6    Bank ahead of any personal interests he had to earn commission income from

7    originating loans.  Adams was responsible for ensuring that the ADC/CRE loans for

8    which he had responsibilities were made in a prudent and sound manner and in

9    accord with the Bank's Loan Policy, that loans which he originated and

10   recommended were properly underwritten, and that CRM were accurate and

11   complete, with all necessary information provided to his superiors.

12         103.   By their actions and inactions, as described specifically and generally

13   herein, Defendants Hahn, Forkner, Cummings, Grinyer, Cruse, and Adams

14   repeatedly failed and neglected to perform their respective duties with due care and

15   diligence and took actions and made decisions without regard to the significant risks

16   involved, constituting breaches of their duties of care, as follows:

17              a.   As to Defendant Hahn, his negligent (and grossly negligent) acts

18   included, without limitation:

19                   (i)   Pursuing an aggressive lending strategy that placed short-

20   term income and profits ahead of compliance with the Bank's policies, banking

21   statutes and regulations, and prudent and sound lending practices;

22                   (ii)   Failing to ensure that the Bank's lending complied with

23   the Bank's policies and procedures, banking statutes and regulations, and prudent

24   and sound lending practices;

25                   (iii)   Failing to monitor and supervise subordinate officers and

26   employees of the Bank with respect to ADC/CRE and other high-risk lending;

27                   (iv)   Recommending and/or approving ADC/CRE and other

28   high-risk loans, which violated the Bank's Loan Policy and were unsafe and

1    unsound;

2             (v)    Recommending and/or approving loans that had not been

3    properly underwritten prior to funding;

4             (vi)   Failing to ensure that ADC/CRE and other high-risk loans

5    made by the Bank were safe, sound, and reasonable, and that the Bank had a

6    reasonable prospect of being repaid by the debtors;

7             (vii)  Failing to implement and follow sound loan underwriting

8    and credit administration practices;

9             (viii) Failing to implement prudent risk management strategies

10   by, among other things, allowing dangerous concentrations in ADC/CRE loans;

11            (ix)   Failing to adhere to the Bank's Loan Policy and failing to

12   ensure that Bank management followed the Loan Policy;

13            (x)    Failing to properly supervise, manage, and oversee the

14   Bank's loan operations; and

15            (xi)   Failing to properly manage and preserve the Bank's

16   resources.

17        b.    As to Defendant Forkner, his negligent (and grossly negligent)

18   acts included, without limitation:

19            (i)    Pursuing an aggressive lending strategy that placed short-

20   term income and profits ahead of compliance with the Bank's policies, banking

21   statutes and regulations, and prudent and sound lending practices;

22            (ii)   Failing to ensure that the Bank's lending complied with

23   the Bank's policies and procedures, banking statutes and regulations, and prudent

24   and sound lending practices;

25            (iii)  Failing to monitor and supervise subordinate officers and

26   employees of the Bank with respect to ADC/CRE and other high-risk lending;

27            (iv)   Recommending and/or approving ADC/CRE and other

28   high-risk loans which violated the Bank's loan policy and were unsafe and unsound;

ERVIN COHEN & JESSUP LLP

14609.1:1710169.1

37

COMPLAINT

1              (v)     Recommending and/or approving loans that had not been

2  properly underwritten prior to funding;

3              (vi)   Failing to ensure that ADC/CRE and other high-risk loans

4  made by the Bank were safe, sound, and reasonable, and that the Bank had a

5  reasonable prospect of being repaid by the debtors;

6              (vii)  Failing to implement and follow sound loan underwriting

7  and credit administration practices;

8              (viii) Failing to implement prudent risk management strategies

9  by, among other things, allowing dangerous concentrations in ADC/CRE loans;

10             (ix)   Failing to adhere to the Bank's Loan Policy and failing to

11 ensure that Bank management followed the Loan Policy;

12             (x)     Failing to properly supervise, manage, and oversee the

13 Bank's loan operations; and

14             (xi)   Failing to properly manage and preserve the Bank's

15 resources.

16       c.     As to Defendant Cummings, his negligent (and grossly

17 negligent) acts included, without limitation:

18             (i)     Pursuing an aggressive lending strategy that placed short-

19 term income and profits ahead of compliance with the Bank's policies, banking

20 statutes and regulations, and prudent and sound lending practices;

21             (ii)   Failing to ensure that the Bank's lending complied with

22 the Bank's policies and procedures, banking statutes and regulations, and prudent

23 and sound lending practices;

24             (iii)  Failing to properly supervise the Bank's CCOs;

25             (iv)  Recommending and/or approving ADC/CRE and other

26 high-risk loans which violated the Bank's Loan Policy and were unsafe and

27 unsound;

28             (v)     Recommending and/or approving loans that had not been

ERVIN COHEN & JESSUP LLP

1 | properly underwritten prior to funding;

2 | (vi)   Failing to ensure that ADC/CRE and other high-risk loans
3 | made by the Bank were safe, sound, and reasonable, and that the Bank had a
4 | reasonable prospect of being repaid by the debtors;

5 | (vii)   Failing to implement and follow sound loan underwriting
6 | and credit administration practices;

7 | (viii)  Failing to implement prudent risk management strategies,
8 | by, among other things, allowing dangerous concentrations in ADC/CRE loans;

9 | (ix)   Failing to adhere to the Bank's Loan Policy and failing to
10 | ensure that Bank management followed the Loan Policy; and

11 | (x)   Failing to properly supervise, manage, and oversee the
12 | Bank's loan operations.

13 | d.   As to Defendant Grinyer, his negligent (and grossly negligent)
14 | acts included, without limitation:

15 | (i)   Failing to comply with the Bank's Loan Policy and
16 | prudent and sound lending practices in originating, underwriting, recommending,
17 | and approving ADC/CRE and other high-risk loans;

18 | (ii)   Failing to ensure that the Bank's ADC/CRE and other
19 | high-risk lending complied with the Bank's policies and procedures, banking
20 | statutes and regulations, and prudent and sound lending practices;

21 | (iii)   Failing to monitor and supervise subordinate officers and
22 | employees of the Bank with respect to ADC/CRE and other high-risk lending;

23 | (iv)   Preparing and submitting CRM that were incomplete
24 | and/or otherwise deficient;

25 | (v)   Failing to ensure that ADC/CRE loans and other high-risk
26 | loans made by the Bank were safe, sound, and reasonable, and that the Bank had a
27 | reasonable prospect of being repaid by the debtors;

28 | (vi)   Failing to perform independent underwriting on

ERVIN COHEN & JESSUP LLP

1 participation loans he originated and recommended;

2     (vii)   (vii)  Failing to implement and follow sound loan

3 underwriting and credit administration policies;

4     (viii)  Failing to maintain the quality, safety and soundness of the

5 Bank's credit portfolio; and

6     (ix)  Originating, recommending, and/or approving loans that

7 had not been properly underwritten prior to funding.

8     e.  As to Defendant Cruse, his negligent (and grossly negligent) acts

9 included, without limitation:

10     (i)  Failing to comply with the Bank's Loan Policy and

11 prudent and sound lending practices in recommending and approving ADC/CRE

12 and other high-risk loans;

13     (ii)  Failing to ensure that the Bank's ADC/CRE and other

14 high-risk lending complied with the Bank's policies and procedures, banking

15 statutes and regulations, and prudent and sound lending practices;

16     (iii)  Failing to monitor and supervise subordinate officers and

17 employees of the Bank with respect to ADC/CRE and other high-risk lending;

18     (iv)  Failing to ensure that ADC/CRE loans made by the Bank

19 were safe, sound, and reasonable, and that the Bank had a reasonable prospect of

20 being repaid by the debtors;

21     (v)  Failing to implement and follow sound loan underwriting

22 and credit administration policies;

23     (vi)  Failing to maintain the quality, safety, and soundness of

24 the Bank's credit portfolio;

25     (vii)  Recommending and/or approving loans that had not been

26 properly underwritten prior to funding.

27     f.  As to Defendant Adams, his negligent (and grossly negligent)

28 acts included, without limitation:

ERVIN COHEN & JESSUP LLP

(i)    Originating and recommending ADC/CRE and other high-risk loans which were not properly underwritten and which violated the Bank's Loan Policy;

(ii)    Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(iii)    Failing to independently underwrite participation loans that he originated and recommended;

(iv)    Failing to ensure that ADC/CRE loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(v)    Failing to provide accurate and complete CRM on the loans he originated and recommended; and

(vi)    Allowing impermissible conflicts of interest with regard to the brokering of loans.

104.    As a direct and proximate result of Defendants' negligence, the Bank suffered millions of dollars in damages, in an amount to be proved at trial.

105.    With respect to their negligent actions and inactions, each Defendant is jointly and severally liable for all damages for each loan he was negligent in originating, recommending, and/or approving.

106.    All Defendants, with the exception of Cummings, served as titled executive officers of the Bank. Cummings, as DCC Chairman, *de facto* member of the Bank's EMT, supervisor of the Bank's CCOs, and a paid lending consultant for the Bank, acted as an executive officer of the Bank at all material times.

107.    Accordingly, Defendants are not protected by California's Business Judgment Rule, which does not apply to officers or to directors who also served as officers. See FDIC v. Hawker, C.A. No. 1:12-CV-00127 (E.D. Cal. 6/7/12); FDIC v. Perry, 2011 WL-7178544 (C.D. Cal. 12/13/11). Moreover, even if the business

41
COMPLAINT

Exhibit B, Page 000118

1    judgment rule were applicable, which is denied, a fundamental requirement of that

2    rule is the obligation to exercise reasonable diligence, which obligation was not met

3    by Defendants.

4                                      **COUNT II**

5    **GROSS NEGLIGENCE CLAIMS UNDER 12 U.S.C. § 1821(K)**

6         108.   Plaintiff re-alleges and incorporates by reference the allegations

7    contained in paragraphs 1-107 above as if fully set out in this count.

8         109.   Section 1821(k) of the Financial Institutions Reform, Recovery and

9    Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and

10   officers of failed financial institutions may be held liable to FDIC receiverships for

11   loss or damage caused by their "gross negligence," as defined by applicable state

12   law.  California law defines "gross negligence" as the extreme departure from the

13   ordinary standard of conduct.

14        110.   In the alternative, the cumulative nature of the repeated acts and

15   omissions of each of the Defendants, described particularly in paragraphs 35-94 and

16   97-103 of this Complaint, and especially in light of the Bank's significant over-

17   concentration in speculative ADC and CRE loans notwithstanding the cratering of

18   the local and national real estate market, constitute gross negligence under

19   California law.

20        111.   As a direct and proximate result of Defendants' gross negligence, the

21   Bank suffered millions of dollars in damages, in an amount to be proved at trial.

22        112.   With respect to their grossly negligent actions and inactions, each

23   Defendant is jointly and severally liable for all damages for each loan he was

24   grossly negligent in originating, recommending, and/or approving.

25                                     **COUNT III**

26                           **BREACH OF FIDUCIARY DUTY**

27        113.   Plaintiff re-alleges and incorporates by reference the allegations

28   contained in paragraphs 1-112 above as if fully set out in this count.

114.   Under California law, as officers and/or directors of the Bank, Defendants owed PCNB fiduciary duties of loyalty, obedience, due care, and diligence, as well as the duty to act in good faith and in the best interests of the Bank.  Thus, Defendants owed a duty to the Bank to adhere diligently and in good faith to the Bank's Loan Policy as well as laws, regulations, and guidelines established to ensure that PCNB operated in a safe and sound matter.

115.   In the alternative, the acts and omissions of each of the Defendants, described generally herein and particularly in paragraphs 35-94 and 97-103 of this Complaint, constitute breaches of their fiduciary duties to the Bank.

116.   As a direct and proximate result of Defendants' breach of fiduciary duty, the Bank suffered millions of dollars in damages, in an amount to be proved at trial.

117.   With respect to their breaches of fiduciary duties, each Defendant is jointly and severally liable for all damages for each loan he originated, recommended, and/or approved.

## VIII.  **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Federal Deposit Insurance Corporation, as Receiver for Pacific Coast National Bank, demands a trial by jury and judgment in its favor against Defendants as follows:

1.      For compensatory damages and other damages, jointly and severally, against Defendants for their negligence, gross negligence, and/or breaches of fiduciary duty that resulted in damages;

2.      For prejudgment and other appropriate interest pursuant to 12 U.S.C. Sec. 1821(l) and California law;

3.      Such other and further relief as the Court deems just and proper; and

4.      Plaintiff demands a trial by jury on all issues.

1   DATED: November 6, 2012      ERVIN COHEN & JESSUP LLP
2                                     Allan B. Cooper
3
4                                 By: _____
5                                     Allan B. Cooper
6                                     Attorneys for FEDERAL DEPOSIT
                                      INSURANCE CORPORATION, as
7                                     Receiver for PACIFIC COAST
                                      NATIONAL BANK, Plaintiff
8
9   Of Counsel:                   KING, KREBS & JURGENS, P.L.L.C.
                                      Robert J. Burvant
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

14609.1:1710169.1                          44
                                        COMPLAINT

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for PACIFIC COAST NATIONAL BANK

**DEFENDANTS**

MICHAEL S. HAHN, COLIN M. FORKNER, MICHAEL V. CUMMINGS, RICHARD S. GRINYER, STANLEY M. CRUSE and DAVID L. ADAMS

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Allan B. Cooper, Esq.  (SBN 60862)
Ervin Cohen & Jessup LLP
9401 Wilshire Boulevard, Ninth Fl.
Beverly Hills, CA 90212-2974

Ph. 310-273-6333  Fax 310-859-2325

Attorneys (If Known)

Peter Rosen, Esq.
S. Drew Levin, Esq.
Latham & Watkins LLP
355 S. Grand Avenue
Los Angeles, CA 90071

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

[X] 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

[X] 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** [X] Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes [X] No   [X] MONEY DEMANDED IN COMPLAINT: $ According to proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity)

12 U.S.C. Sec. 1821(d). Claims for negligence, gross negligence and breach of fiduciary duty by bank officers causing bank to make imprudent loans.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/ PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | [X] 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 190 Other Contract | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 195 Contract Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | **REAL PROPERTY** | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 210 Land Condemnation | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS - Third Party 26 USC 7609 |

SACV12 1938

**FOR OFFICE USE ONLY:**  Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                CIVIL COVER SHEET                Page 1 of 2
                                                              CCD-JS44

Exhibit B, Page 000122

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No    [ ] Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] No    [ ] Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)    [ ] A. Arise from the same or closely related transactions, happenings, or events; or

[ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ] D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

[X] Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

[ ] Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, Orange | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Allan B. Cooper_      Date 11/6/12

Allan B. Cooper

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

Exhibit B, Page 000123